No. 19-70014

𝔍𝔫 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔉𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔣𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

## JAMES GARFIELD BROADNAX,
*Petitioner - Appellant*,

**v.**

## LORIE DAVIS, Director, Texas Department of Criminal Justice, Correctional Institutions Division,
*Respondent - Appellee.*

**On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
USDC No. 3:15-cv-01758-N**

MOTION FOR CERTIFICATE OF APPEALABILITY AND BRIEF IN
SUPPORT

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
STEVEN C. HERZOG
KIMBERLY A. FRANCIS
JORDANA L. HAVIV
AMEYA S. ANANTH
1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019
(212) 373-3000

**BURLESON, PATE & GIBSON, L.L.P**
Camille M. Knight
900 Jackson Street, Suite 330
Dallas, TX 75202
(214) 871-4900

COUNSEL FOR PETITIONER JAMES GARFIELD BROADNAX

## **CAPITAL CASE**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

A.    Parties:

Petitioner-Appellant:       James Garfield Broadnax

Respondent-Appellee:       Lorie Davis, Director, Texas
                           Department of Criminal Justice,
                           Correctional Institutions Division

B.    Attorneys:

For Petitioner-Appellant:   Steven C. Herzog
                           Kimberly A. Francis
                           Jordana L. Haviv
                           Ameya S. Ananth
                           Paul, Weiss, Rifkind,
                           Wharton & Garrison LLP
                           1285 Avenue of the Americas
                           New York, NY 10019

                           Camille M. Knight
                           Burleson, Pate & Gibson, LLP
                           900 Jackson Street, Suite 330
                           Dallas, TX 75202

For Respondent-Appellees:    Garrett M. Green
Office of the Attorney General
For the State of Texas
300 W. 15th Street
William P. Clements Building
Austin, TX 78701

Stephen M. Hoffman
Assistant Attorney General
Office of the Attorney General
Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Capitol Station
Austin, TX 78711-2548

Edward Larry Marshall
Office of the Attorney General
Criminal Appeals Division
P.O. Box 12548
Austin, TX 78711-2548

s/ Steven C. Herzog
STEVEN C. HERZOG
ATTORNEY OF RECORD FOR JAMES BROADNAX

NOVEMBER 20, 2019

ii

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF AUTHORITIES ..........................................................................vi

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................2

STATEMENT OF THE CASE ........................................................................3

I.    FACTUAL BACKGROUND.................................................................3

    A.    Television Reporters Interview Broadnax Without Counsel While in State Custody ...................................................................3

    B.    Broadnax's Trial Was Marred by Constitutional Violations ................5

II.   PROCEDURAL HISTORY ..............................................................6

SUMMARY OF THE ARGUMENT .................................................................9

STANDARD FOR CERTIFYING APPEAL ......................................................10

ARGUMENT ..............................................................................................11

I.    The Court Should Certify an Appeal of the District Court's Denial of Broadnax's *Batson* Claim ...................................................................11

    A.    Reasonable Jurists Would Find The District Court's Decision Debatable or Incorrect ...........................................................................11

        1.    Applicable Law ................................................................................11

        2.    The District Court Erred in Denying a COA and Relief on the Claim That Broadnax's Constitutional Rights Were Violated During Jury Selection .......................................13

            (a)    Statistical Evidence Showed the State's Discriminatory Intent.........................................................................14

(b)    The District Court Failed to Properly Consider Significant Documentary Evidence of Discriminatory Intent........................................15

(c)    The State's Purportedly Race-Neutral Explanations for Strikes Were Contradicted by the Record and by Its Treatment of Similarly Situated White Veniremembers.............................................21

    (i)    Reasonable Jurists Could Debate Whether the State Had Discriminatory Intent in Striking Aqwana Long .........................................23

    (ii)    Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Shaven McCraney ..................................26

    (iii)    Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Curtis Riser.............................................29

    (iv)    Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Mattie Vation....................................31

    (v)    Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Angelita Rivera...................................32

    (vi)    Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Dedric Morrison ..................................34

    (vii)    Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Betty Jackson..........................................35

(d)    The District Court Erroneously Concluded that the Spreadsheet was Barred by *Pinholster* and 28 U.S.C. § 2254(d)(2) .......................................36

3.     Reasonable Jurists Could Conclude That The Trial Court's Remedy Of Reseating A Single African-American Juror Was Not Sufficient.........................39

II.    The Court Should Certify an Appeal of the District Court's Denial of Broadnax's "For Cause" Challenge.................................41

    A.     Reasonable Jurists Could Debate Whether The District Court, In Affirming The Trial Court's Refusal To Excuse Juror Vessels, Applied An Erroneous Legal Standard.................................42

    B.     Reasonable Jurists Could Debate Whether The District Court's Decision Was Based On An Unreasonable Determination Of The Facts .................................44

III.   Reasonable Jurors Could Debate Whether Broadnax Was Selectively Prosecuted on the Basis of Race.................................46

IV.   The Court Should Certify an Appeal of the District Court's Denial of Broadnax's Sixth Amendment Challenge to the Admission of Uncounseled Media Interviews .................................52

V.    The Court Should Certify an Appeal of the District Court's Denial of Broadnax's Claim that His Appellate Counsel Was Constitutionally Ineffective .................................54

VI.   The District Court's Denial of Broadnax's Claims Was Based on Misapplication of the Relevant Legal Standards and Erroneous Fact Determinations.................................57

CONCLUSION.................................61

CERTIFICATE OF SERVICE .................................62

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS.................................63

v

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*United States* v. *Armstrong*,
   517 U.S. 456 (1996)..................................................................................46

*United States* v. *Bass*,
   310 F.3d 321 (5th Cir. 2002) ...................................................................56

*United States* v. *Bass*,
   536 U.S. 862 (2002)..................................................................................46

*Batson* v. *Kentucky*,
   476 U.S. 79 (1986)..................................................................5, 11, 12, 13

*Brewer* v. *Williams*,
   430 U.S. 387 (1977)..................................................................................51

*Broadnax* v. *State*,
   No. AP-76207, 2011 WL 6225399 (N.D. Tex. Dec. 14, 2011) .................3, 7, 45

*Broadnax* v. *Texas*,
   133 S. Ct. 103 (2012)..................................................................................7

*Broadnax* v. *Texas*,
   136 S. Ct. 77 (2015)................................................................................7, 20

*Ex parte Broadnax*,
   No. WR-81573–01, 2015 WL 2452758 (Tex. Ct. Crim. App. May
   20, 2015) ...................................................................................................7

*Calderon* v. *Waco Lighthouse for the Blind*,
   630 F.2d 352 (5th Cir. 1980) .............................................................47, 57

*Chavez* v. *Illinois State Police*,
   251 F.3d 612 (7th Cir. 2001) ...................................................................50

*Clark* v. *Stephens*,
   627 F. App'x 305 (5th Cir. 2015) .............................................................36

*United States* v. *Conley*,
   349 F.3d 837 (5th Cir. 2003) ....................................................56

*Cullen* v. *Pinholster*,
   563 U.S. 170 (2011).............................................................35, 36

*Dickens* v. *Ryan*,
   740 F.3d 1302 (9th Cir. 2014) (*en banc*) ...........................37

*Drain* v. *Woods*,
   595 Fed. App'x 558 (6th Cir. 2011) .................................41

*Eddings* v. *Oklahoma*,
   455 U.S. 104 (1982)....................................................42, 43, 50

*Escamilla* v. *Stephens*,
   749 F.3d 380 (5th Cir. 2014) ......................................37, 38

*United States* v. *Falk*,
   479 F.2d 616 (7th Cir. 1973) ...........................................49

*Flowers* v. *Mississippi*,
   139 S. Ct. 2228 (2019)................................................passim

*Foster* v. *Chatman*,
   136 S. Ct. 1737 (2016)...................................................18, 21

*United States* v. *Gonzalez-Lopez*,
   548 U.S. 140 (2006).........................................................51

*Graves* v. *Cockrell*,
   351 F.3d 156 (5th Cir. 2003) .............................................38

*Hayes* v. *Thaler*,
   361 F. App'x 563 (5th Cir. 2010) .............................14, 15, 21, 22

*Haynes* v. *Quarterman*,
   526 F.3d 189 (5th Cir. 2008) ...........................................10

*United States* v. *Jones*,
   287 F.3d 325 (5th Cir. 2002) ......................................46, 47, 49

vii

*Lafler* v. *Cooper*,
  566 U.S. 218 (2012)..................................................................................52

*United States* v. *Lewis*,
  517 F.3d 20 (1st Cir. 2008)......................................................................51

*Lockett* v. *Ohio*,
  438 U.S. 586 (1978)..................................................................................50

*Madison Cty. Bd. of Educ.* v. *Illinois Cent. R. Co.*,
  939 F.2d 292 (5th Cir. 1991) ..............................................................47, 58

*McCleskey* v. *Kemp*,
  481 U.S. 279 (1987)..................................................................................46

*State* v. *McCollum*,
  433 S.E.2d 144 (N.C. 1993), *cert. denied*, *McCollum* v. *North
  Carolina*, 512 U.S. 1254 (1994) .............................................................40

*Miller-El* v. *Cockrell*,
  537 U.S. 322 (2003)...........................................................................passim

*Miller-El* v. *Dretke*,
  545 U.S. 231 (2005)...........................................................................passim

*Minniefield* v. *State*,
  539 N.E.2d 464 (Ind. 1989) .....................................................................40

*Morgan* v. *Illinois*,
  504 U.S. 719 (1992)..................................................................................42

*Murray* v. *Carrier*,
  477 U.S. 478 (1986)..................................................................................38

*Patterson* v. *Strippoli*,
  639 F. App'x 137 (3d Cir. 2016) ..............................................................51

*Reed* v. *Quarterman*,
  555 F.3d 364 (5th Cir. 2009) ..............................................................22, 23

*Reese* v. *State*,
  33 S.W.3d 238 (Tex. Crim. App. 2000) ...................................................55

*Rhoades* v. *Davis*,
852 F.3d 422 (5th Cir. 2017) ...............................................................21

*Rideau* v. *Louisiana*,
373 U.S. 723 (1963) ...............................................................................53

*Rothgery* v. *Gillespie Cnty.*,
554 U.S. 191 (2008) ...............................................................................52

*Sheppard* v. *Maxwell*,
384 U.S. 333 (1966) ...............................................................................53

*Shumway* v. *United Parcel Service, Inc.*,
118 F.3d 60 (2d Cir. 1997) ...................................................................51

*Slack* v. *McDaniel*,
529 U.S. 473 (2000) ...............................................................................10

*Snyder* v. *Louisiana*,
552 U.S. 472 (2008) .........................................................................28, 33

*Soria* v. *Johnson*,
207 F.3d 232 (5th Cir. 2000) ...........................................................42, 44

*Sorto* v. *Davis*,
859 F.3d 356 (5th Cir. 2017), *rev'd on other grounds*, 881 F.3d
933 (5th Cir. 2018) ...........................................................................38, 47

*United States* v. *Steele*,
461 F.2d 1148 (9th Cir. 1972) ...............................................................49

*Tennard* v. *Dretke*,
542 U.S. 274 (2004) .........................................................................42, 59

*United States* v. *Thorpe*,
471 F.3d 652 (6th Cir. 2006) .................................................................51

*United States* v. *Wade*,
388 U.S. 218 (1967) ...............................................................................52

*Wainwright* v. *Witt*,
469 U.S. 412 (1985) ...............................................................................42

*United States* v. *Walker*,
    490 F.3d 1282 (11th Cir. 2007) ...............................................................40

*Wayte* v. *United States*,
    470 U.S. 598 (1985)..................................................................................46

*United States* v. *Webster*,
    162 F.3d 308 (5th Cir. 1998) ...................................................................46

*Wessinger* v. *Cain*,
    No. 04-cv-637, 2015 WL 4527245 (M.D. La. July 23, 2015), *rev'd*
    *on other grounds sub. nom. Wessinger* v. *Vannoy*, 864 F.3d 387
    (5th Cir. 2017)................................................................................37, 38

*Williams* v. *Taylor*,
    529 U.S. 362 (2000)..................................................................................57

*Wilson* v. *Sellers*,
    138 S. Ct. 1188 (2018)........................................................................47, 57

*United States* v. *Wilson*,
    864 F.2d 1219 (5th Cir. 1989) .................................................................57

*Winston* v. *Pearson*,
    683 F.3d 489 (4th Cir. 2012), *cert. denied*, 568 U.S. 1205 (2013) ...................37

*Wolfe* v. *Clarke*,
    691 F.3d 410 (4th Cir. 2012) ...................................................................37

*Woodson* v. *North Carolina*,
    428 U.S. 280 (1976)..................................................................................50

**STATUTES**

28 U.S.C. § 2253(c)(2)......................................................................................10

28 U.S.C. § 2254(d) ........................................................................................37

28 U.S.C. § 2254(d)(2)..............................................................................35, 39

x

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 2254 because Broadnax alleged that he is a person in custody pursuant to the judgment of a Texas court in violation of the Constitution.  (*See* ROA.229.)  This Court has jurisdiction pursuant to 22 U.S.C. § 2253 because Broadnax filed a notice of appeal on August 21, 2019, and this Court granted his motion for an extension of time to comply with Certificate of Appealability ("COA") requirements, up to and including November 20, 2019.  (Fifth Circuit Dkt. No. 0051547071; *see* ROA.1261–1263.)

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Could reasonable jurists debate whether the District Court correctly denied Broadnax's *Batson* claim?

2.   Could reasonable jurists debate whether the District Court correctly denied Broadnax's claim that the seating of Juror Vessels violated due process?

3.   Could reasonable jurists debate whether the District Court correctly denied Broadnax's claim that he was selectively prosecuted on the basis of race?

4.   Could reasonable jurists debate whether the District Court correctly denied Broadnax's Sixth Amendment challenge to the trial court's admission of Broadnax's uncounseled media interviews?

5.   Could reasonable jurists debate whether Broadnax's appellate counsel was constitutionally ineffective for failing to assert that the trial court erred in admitting Dr. Price's testimony?

6.   Could reasonable jurists debate whether the District Court correctly applied the relevant legal standards to Broadnax's claims?

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

James Broadnax and his cousin, Demarius Cummings, were arrested on June 19, 2008 in connection with the murder of Stephen Swan and Matthew Butler, who died from gunshot wounds outside a music studio during an apparent robbery in Garland, Texas. *Broadnax* v. *State,* No. AP-76207, 2011 WL 6225399, *1 (N.D. Tex. Dec. 14, 2011). At the time, Broadnax was a 19-year-old with no history of violent crime. (ROA.7183–7184.)

#### A.    Television Reporters Interview Broadnax Without Counsel While in State Custody

After Broadnax's arrest on June 19, 2008, the Garland city police began to interrogate him, and he requested the assistance of a lawyer. (ROA.10533.) Broadnax was "book[ed]-in" at Dallas County Jail on June 21, 2008 at 2:51 AM and arraigned three hours later. (ROA.12936–12940, 126.) At the arraignment, Broadnax again requested counsel. (ROA.127.)

On June 23, 2008, Broadnax was examined by a physician and preliminarily diagnosed with polysubstance abuse; he was experiencing auditory hallucinations and paranoia. (ROA.10973, 10983–10984, 10986, 10990.) Broadnax had ingested PCP and formaldehyde in the period immediately before the alleged crime. (ROA.10974, 11348–11350.)

Around the same time, the Dallas County Sheriff's Department received requests from local television stations seeking to interview Broadnax. (ROA.116–120, 10525–10526.) Notwithstanding Broadnax's impaired mental state, and just a few hours after his diagnosis, an officer retrieved Broadnax from closed observation in the Mental Health Unit and escorted him to the visitation area. (ROA.11006–11007.) There, he was interviewed by four reporters, each affiliated with a different local television station. (ROA.11001, 11007.) Broadnax had not yet been appointed a lawyer, despite his two requests.[1]

Each of the reporters who questioned Broadnax sought to extract a confession from him. (*See, e.g.*, ROA.7057.)[2] Broadnax initially denied any involvement in the killings, and repeated his requests for counsel. When asked if he was remorseful, Broadnax initially answered, "I kind of regret what I did, but shit, you can't change it." (ROA.7057.) But under sustained, combative, and at times deceptive questioning—including a reporter's suggestion that "[i]f you tell me the truth, you may, your life may be spared"—Broadnax changed his answers. (ROA.10811.)

---

[1] Although Broadnax signed his name beside a handwritten "Yes" on two of the four stations' interview request forms, he did so while suffering from polysubstance abuse, which caused hallucinations and paranoia, and before he was provided counsel. (ROA.117–119, 10525–10529, 10984–10986.)

[2] Certain documents in the District Court record, such as the interview videos and sealed records, are not included in the Electronic Record on Appeal. The interview videos were filed in the District Court as State's Exhibit Nos. 403-07. The juror questionnaires were filed in the District Court under seal and are available in the Reporters Record ("RR") at volumes 55–57; Dkt. Nos. 40.4–40.6.

Prejudicial excerpts of the interviews aired on four Dallas-area television stations. Broadnax was not appointed counsel until the next day, June 24, 2008. (ROA.12233.)

**B.      Broadnax's Trial Was Marred by Constitutional Violations**

The State attempted to exclude every minority juror from Broadnax's jury. To facilitate this goal, the State created a spreadsheet during jury selection that identified the race of each qualified juror, indicating in bold only the names of black jurors. The State then used its peremptory challenges to strike every minority juror. (ROA.1044–1045.)

Notwithstanding objections pursuant to *Batson* v. *Kentucky*, 476 U.S. 79 (1986), the trial court accepted the State's pretextual reasons for the strikes as to seven of the nonwhite veniremembers. After the State used a peremptory challenge to strike Robert Patterson, the sole remaining black veniremember, the trial court expressed discomfort with the composition of the all-white jury. (ROA.2004.) The court sustained Broadnax's *Batson* challenge as to Patterson. (ROA.10574.) Ultimately, Broadnax faced a nearly all-white jury in a trial marked by unabashed appeals to racial prejudices, including opening statements from the State that Broadnax "went to Garland because that's where the rich white folks live," and cautioning the jury that it would "hear quite a bit of street talk in this case." (ROA.10788.)

The State played the videos of Broadnax's interviews repeatedly throughout the trial. They were characterized during the State's opening as "the most interesting thing that you will find in this case." (ROA.10790.)

After the jury returned a guilty verdict, the violations of Broadnax's rights continued throughout the penalty phase. Broadnax presented an extensive mitigation case, including: testimony that he suffered severe abuse as a child; evidence that he was suffering from substance-induced psychosis at the time of the alleged offenses; and neuropsychologist testimony that Broadnax's 19-year-old brain was not fully developed and thus should be considered less culpable and more capable of rehabilitation. (ROA.5624–5630, 5833, 11315–11316, 11325–1326, 11368–11369.)

In response, the State introduced the expert testimony of Dr. Jack Randall Price, a psychologist who never examined Broadnax, on the characteristics of a "psychopath." (ROA.5841–5855.) The State then argued at closing that Broadnax was an irredeemable "psychopath" deserving of the death penalty. (ROA.5838–5855.)

## II.   PROCEDURAL HISTORY

The jury found Broadnax guilty on August 12, 2009. (ROA.11016.) On August 20, 2009, the jury returned its verdict on punishment, and the trial court sentenced Broadnax to death. (ROA.5874–5875.)

Broadnax appealed to the Texas Court of Criminal Appeals, which affirmed his conviction and sentence on December 14, 2011. *Broadnax* v. *State*, No. AP-76207, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011). His petition for writ of certiorari to the U.S. Supreme Court was denied on October 1, 2012. *Broadnax* v. *Texas*, 133 S. Ct. 103 (2012) (mem.).

Broadnax filed a state application for post-conviction writ of habeas corpus on December 20, 2011. (ROA.11389–11502.) On December 7, 2012, an evidentiary hearing was held in connection with the post-conviction application. (ROA.12032.) The trial court entered findings of fact and conclusions of law recommending that relief be denied on September 17, 2014. (ROA.12354–12387.) The Court of Criminal Appeals adopted the trial court's findings and denied relief on May 20, 2015. *Ex parte Broadnax*, No. WR-81573–01, 2015 WL 2452758 (Tex. Ct. Crim. App. May 20, 2015). Broadnax again petitioned the U.S. Supreme Court for a writ of certiorari; his petition was denied on October 5, 2015. *Broadnax* v. *Texas*, 136 S. Ct. 77 (2015) (mem.).

On May 18, 2016, Broadnax filed a post-conviction petition for writ of habeas corpus in the U.S. District Court for the Northern District of Texas under 28 U.S.C. § 2254. (ROA.208–378.) On November 18, 2016, Broadnax filed an Amended Petition. (ROA.541–716.) He requested both discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and an evidentiary hearing.

(ROA.713–714.)  On July 23, 2019, the District Court denied habeas corpus relief, denied the request for discovery and an evidentiary hearing, and declined to issue a COA.  (ROA.1103–1249.)

## SUMMARY OF THE ARGUMENT

The District Court denied all of Broadnax's claims, disregarding the applicable law and standards of review, and making fact-findings that were unsupported by, and in some cases contrary to, the record evidence.

For the reasons explained in greater detail below, Broadnax submits that reasonable jurors could disagree about the District Court's resolution of five of his claims, including:

(1) The State exercised peremptory strikes against all eight nonwhite prospective jurors in violation of *Batson*;

(2) An unqualified juror, who was unwilling to consider mitigating evidence, sat on his jury;

(3) The District Attorney unconstitutionally charged him with the death penalty based on his race and the race of the victims;

(4) He was unconstitutionally denied counsel when interrogated by the media; and

(5) His appellate counsel was constitutionally ineffective for failing to raise, on appeal, the claim that Dr. Price's testimony should not have been admitted.

We respectfully request that this Court issue a COA for each of these claims so they can be fully considered on the merits.

**STANDARD FOR CERTIFYING APPEAL**

A COA should issue when the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court rejected claims on the merits, the standard is satisfied where "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack* v. *McDaniel*, 529 U.S. 473, 484 (2000). Where the district court denies a claim on procedural grounds, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

A COA does not require a "showing that the appeal will succeed." *Miller-El* v. *Cockrell*, 537 U.S. 322, 337 (2003) ("*Miller-El I*"). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. In a death penalty case, "any doubt regarding whether to grant a COA" must be "resolved in favor of the petitioner." *Haynes* v. *Quarterman*, 526 F.3d 189, 193 (5th Cir. 2008).

## ARGUMENT

### I.   The Court Should Certify an Appeal of the District Court's Denial of Broadnax's *Batson* Claim

The State violated Broadnax's rights to equal protection and due process during jury selection by using its peremptory challenges to strike every nonwhite veniremember.

The District Court credited the State's proffered explanations for the strikes despite the blatant statistical evidence, direct evidence of the State's race-consciousness in its assessment of jurors' fitness, and the fact that the State's explanations for its strikes were belied by the record. Because reasonable jurists could disagree with the District Court's conclusion, the Court should grant a COA.

### A.   Reasonable Jurists Would Find The District Court's Decision Debatable or Incorrect

#### 1.   Applicable Law

The Supreme Court has long recognized that striking jurors based on race violates a defendant's rights to due process and equal protection under the Fourteenth Amendment. *Batson*, 476 U.S. at 85–86.

While racial discrimination directly harms the accused and the excluded jurors, it also "touch[es] the entire community" by "undermin[ing] public confidence in the fairness of our system of justice." *Id.* This rationale has led the Court to repeatedly affirm that "[t]he Constitution forbids striking even a single

11

prospective juror for a discriminatory purpose." *Flowers* v. *Mississippi*, 139 S. Ct. 2228, 2244 (2019).

A *Batson* challenge involves three steps: (i) the opponent of a peremptory challenge must make a *prima facie* showing that the challenge was based on the juror's race, (ii) the proponent of the strike must then provide its reason for the strike; and if the reason is race-neutral and sufficiently specific, (iii) the court must decide whether that asserted basis is a pretext for racial discrimination, in which case the opponent of the strike will have proven the proponent's discriminatory intent. *Batson*, 476 U.S. at 96–98, 98 n.20.

The third step of the *Batson* analysis requires the trial court to evaluate whether the state's race-neutral explanation is credible. *Miller-El I*, 537 U.S. at 338–39. At this step, the court must examine the persuasiveness of the prosecutor's justification "in light of all evidence with a bearing on it," *Miller-El* v. *Dretke*, 545 U.S. 231, 251–52 (2005) ("*Miller-El II*"), including the strength of a prisoner's prima facie case. *Miller-El I*, 537 U.S. at 341. At the COA stage, the question is not whether the petitioner has "demonstrate[d] the prosecutors' rationales to have been pretexts" but instead whether "the evidence [] make[s] debatable the District Court's conclusion that no purposeful discrimination occurred." *Id.* at 343.

12

### 2.    The District Court Erred in Denying a COA and Relief on the Claim That Broadnax's Constitutional Rights Were Violated During Jury Selection

Broadnax indisputably made a *prima facie* showing of discrimination:  the prosecution used peremptory challenges to try to strike 100% of the nonwhite veniremembers.    That, plus the disparate treatment of white and nonwhite veniremembers, the fact that the trial court found a *Batson* violation as to one of the State's strikes and reseated the juror, the State's preparation and use of a spreadsheet on which only the names of black jurors were bolded, and the Dallas County D.A.'s Office's history of systematically excluding blacks from juries, raise an inference that the State struck the nonwhite jurors on account of their race. *See Batson*, 476 U.S. at 96–97.

In response, the State offered purportedly race-neutral explanations for its strikes.  The State claimed that all the nonwhite jurors struck were "not in favor of the death penalty," citing juror questionnaires and answers given during voir dire (some of which were also given by white jurors the State did not strike). (ROA.935.)  It also relied on supposed justifications like the juror's demeanor or their seeming desire to "sound intelligent."  (ROA.10364, 10366.)

The District Court accepted the State's reasons for the strikes, even though many of the explanations contradicted the record.  And with respect to Broadnax's argument that the State failed to exercise peremptory strikes against white

13

veniremembers who gave similar answers to stricken nonwhite veniremembers, the District Court, contrary to Supreme Court and Fifth Circuit precedent, dismissed the similarity in answers as "hardly surprising—or conclusive of anything." (ROA.1190–1191.) Reasonable jurists could debate whether the District Court's decision was wrong.

### (a) Statistical Evidence Showed the State's Discriminatory Intent

Courts consider statistical evidence "when considering whether the prosecution used its peremptory strikes in a discriminatory manner" in violation of *Batson*. *Hayes* v. *Thaler*, 361 F. App'x 563, 570 (5th Cir. 2010) (collecting cases); *see also Flowers*, 139 S. Ct. at 2243.[3] In the context of a request for a COA, statistical evidence can "alone raise[] some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors," such that a COA should be granted. *Miller-El I*, 537 U.S. at 341–42.

Thus, the Supreme Court in *Miller-El II* found it "remarkable" that the State had used ten strikes to exclude 91% of the eligible African-American veniremembers, resulting in a jury on which only one African-American member

---

[3] Shortly after the Supreme Court decided *Flowers*, Broadnax filed a letter to alert the District Court to the opinion. (ROA.1099.) The District Court included a footnote in its opinion stating that this letter described *Flowers* as controlling precedent and "misrepresent[ed]" the record. (ROA.1186.) That was not the case. Broadnax cited the *Flowers* decision to highlight the fact that the Supreme Court recently reaffirmed the importance of analyzing statistical evidence and comparing struck and empaneled jurors when reviewing *Batson* claims. Broadnax described the *Flowers* decision as "relevant to and provid[ing] additional support for" his *Batson* claim – not as controlling. (ROA.1099.) Broadnax also described the record accurately.

of the 108-person venire panel served.  545 U.S. at 240–41.  Similarly, in *Hayes*, the Fifth Circuit found that the prosecutor's use of eight out of eleven peremptory strikes to "exclud[e] 100% of the eligible African-American venire members" was "unlikely to be the product of happenstance" and was "indicative of discriminatory intent."  361 F. App'x at 570 (citing *Miller-El I*, 537 U.S. at 342); *see also Flowers*, 139 S. Ct. at 2245 (noting disproportionate use of strikes against black prospective jurors and stating that those numbers "speak loudly").

The statistical evidence in Broadnax's case is just as powerful.  At Broadnax's trial, the State used its peremptory challenges to strike *every* nonwhite qualified juror.  Out of the 47 veniremembers who were qualified to serve, black and Hispanic veniremembers constituted 17% of Broadnax's venire panel, but the state used 53% of its peremptory strikes to eliminate 100% of them.  (ROA.615.)  As in *Miller-El I*, Broadnax is entitled to a COA because such statistical evidence can "alone raise[] some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors."  537 U.S. at 342.

### (b)    The District Court Failed to Properly Consider Significant Documentary Evidence of Discriminatory Intent

Broadnax also uncovered shocking documentary evidence demonstrating that the State targeted black jurors:  the State prepared a spreadsheet which identified the race of each prospective juror, and on which the names of the black

jurors, and *only* the names of black jurors, were in bold, and it used that spreadsheet to select the jury:

16

**QUALIFIED JURORS**

| Qualified # | Juror # | Name | Race/Sex | *Death Penalty # | |
|---|---|---|---|---|---|
| 1 | 6 | Jerome Mitchell Williams | W/M | 2 | ● 1 |
| 2 | 58 | Jason Micah Ross | W/M | 2 | |
| 3 | 34 | John Edward Wherry | W/M | 2 | |
| 4 | 101 | Jon D. Desmond | W/M | 2 | |
| 5 | 123 | Sue McCormick | W/F | 3 | |
| **6** | **165** | **Sharron Denise McCraney** | **B/F** | **3** | |
| 7 | 134 | Edith Elaine Clements | W/F | 2 | ● 2 |
| 8 | 150 | Bradley A. Wiltshire | W/M | 2 | |
| **9** | **131** | **Mattie M. Vation** | **B/F** | **2** | |
| 10 | 227 | Alex James Folz | W/M | 2 | ● 3 |
| 11 | 208 | Angelita Marin Rivera | Hisp/F | 2 | |
| **12** | **222** | **Curtis Demetre Riser** | **B/M** | **3** | |
| 13 | 265 | Johnny William Sanford | W/M | 3 | |
| 14 | 277 | Vicki Sue Wood | W/F | 2 | ● 4 |
| 15 | 272 | Kelly Lynn McDonald | W/F | 2 | |
| 16 | 337 | Helen Ann Noble | W/F | 2 | |
| 17 | 301 | Billy Eugene Henry | W/M | 2 | |
| 18 | 284 | Heather Sylvia Eger | W/F | 2 | |
| 19 | 289 | John P. Maguire, Jr. | W/M | 2 | |
| 20 | 392 | Lisa Lanelle Davison | W/F | 2 | |
| 21 | 544 | Carl Whitt Jackson | W/M | 3 | |
| 22 | 401 | Leah Michelle Kunard | W/F | 2 | |
| 23 | 451 | Bruce Edward McDonald | W/M | 2 | |
| 24 | 601 | Teresa Elaine Randleas | W/F | 2 | |
| 25 | 626 | Kimberly Bronwyn Morris | W/F | 2 | ● 5 |
| 26 | 573 | Guy Gant Ferreira | W/M | 2 | ● 6 |
| 27 | 596 | Rindy Kay Woodward | W/F | 2 | |
| 28 | 474 | John Joseph Cantwell | W/M | 2 | |
| 29 | 660 | Alexander Wayne Konkle | W/M | 2 | |
| 30 | 551 | Wesley Brian Marshall | W/M | 2 | |
| 31 | 468 | Lance Russell Bedford | W/M | 2 | |
| 32 | 412 | Steven James Zaidel | W/M | 2 | ● 7 |
| 33 | 684 | William T. Stinson | W/M | 2 | ● 8 |
| 34 | 797 | Lyle Wynne Livingston | W/M | 2 | |
| 35 | 824 | Jennifer Robin Stockton | W/F | 2 | |
| **36** | **868** | **Aqwana Swheli Long** | **B/F** | **2** | |
| **37** | **930** | **Robert Lee patterson** | **B/M** | **2** | |
| 38 | 874 | William Bruce Kreighbaum | W/M | 2 | ● 9 |
| 39 | 977 | Patricia Diane Hodges | W/F | 2 | |
| **40** | **1397** | **Betty Rue Jackson** | **B/F** | **3** | |
| **41** | **1062** | **Dedric Olin Morrison** | **B/M** | **2** | |
| 42 | 1321 | Clarence Ray Winfield | W/M | 2 | ● 10 |
| 43 | 1345 | John Francis Vessels | W/M | 2 | ● 11 |
| 44 | 1313 | Emily Alane Blevins | W/F | 2 | ● 12 |
| 45 | 1094 | Barry Douglas Fiddick | W/M | 2 | Alternate (1) |
| 46 | 1178 | Elsa Yvonne Olvera | Hisp/F | 2 | |
| 47 | 1389 | George Rene Paradise | W/M | 2 | |
| 48 | 1335 | James McElroy | W/M | 2 | Alternate (2) |

\* With reference to the death penalty, which of the following statements best represents your feelings?
1. I believe that the death penalty is appropriate in all murder cases.
2. I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty.
3. Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances.
4. I believe that the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty.
5. I could never, under any circumstances, return a verdict which assessed the death penalty.

Calli:

I need you to type my notes on each of the Jurors I have numbered 1-12 and the 2 alternates. My notes are on the respective questionnaire and in the 2 legal Pads.

Also: Please make a copy of the Questionnaire for Juror #412.

Thanks.

(ROA.796.)

The Supreme Court has found similar documents to be compelling evidence of discriminatory intent. In *Miller-El I*, the Court granted a COA (and ultimately habeas relief) where prosecutors "marked the race of each prospective juror on their juror cards." 537 U.S. at 347. Similarly, in *Foster* v. *Chatman*, the Supreme Court granted relief where the prosecution's case file contained, among other things, copies of a jury venire list on which the names of each African-American veniremember—and only those veniremembers—were highlighted, with a legend noting that the highlighting "represents Blacks." 136 S. Ct. 1737, 1744 (2016). Here, the spreadsheet both identifies the race of each juror, like the cards in *Miller-El*, and bolds the black jurors, like the highlighting in *Foster*.

When confronted with this spreadsheet, the State offered a false defense, claiming in its Response to Broadnax's Petition that the spreadsheet was created after jury selection concluded on July 20, 2009. (*See* ROA.929 (stating that "this list appears to have been created to aid the State in its response to the *Batson* challenge" and suggesting that "it was created in preparation for a second *Batson* hearing held *after* the jury had been selected").) In his Reply, Broadnax pointed out that the spreadsheet could only have been prepared between July 9, 2009 and July 17, 2009—during jury selection—because the name of a 48th qualified juror, James McElroy, who was accepted to the qualified pool to replace Rindy

Woodward on July 17, was added in handwriting, obviously during jury selection. (*See* ROA.1065–1066 (citing 10331–10333).)  The State's argument is not credible for another reason:  During jury selection, Broadnax had raised a *Batson* challenge to the strike of Angelita Martin Rivera, a Hispanic veniremember, in addition to the strikes of the seven black veniremembers.  (ROA.10363.)  If the State had created this spreadsheet to assist it in responding to Broadnax's *Batson* challenges, Rivera's name would have been bolded too—but it wasn't.

The State's false explanation casts further doubt on the prosecutors' motives in exercising their strikes.  Instead of assessing whether the State's explanation was credible, the District Court posited an entirely different reason for the creation of the spreadsheet, one that was never offered by the State:  that it was prepared prior to the exercise of peremptory challenges in order to help the State ***comply*** with *Batson*:

> Having twice been criticized by the United States Supreme Court for its exercise of racially discriminatory peremptory strikes in [*Miller-El I* and *Miller-El II*], it would have been professionally irresponsible for the Dallas County District Attorney's Office (in 2009) to have failed to identify the members of the remaining jury venire who were members of a protected class and against whom it might have been preparing to exercise a peremptory challenge.

(ROA.1191.)  This analysis turns the caselaw on its head.  Instead of treating the Dallas County D.A.'s proven history of systematically excluding blacks from juries as raising an inference of purposeful discrimination, *see Miller-El I*, 537

19

U.S. at 346–47, the District Court treated it as warranting an inference *in the State's favor*.

The District Court then speculated that:

> [s]uch an endeavor would necessarily have first required the prosecution to identify all remaining members of the jury venire who were members of a protected class. No sinister motive can be inferred rationally simply because the prosecution noted the race and gender of every remaining member of the jury venire or highlighted those for whom that office would need to be prepared to offer sound, race-neutral, reasons in the event the prosecution chose to exercise a peremptory strike against such an individual and the defense raised a *Batson* objection.

(ROA.1191.) This explanation, which was never even argued by the State, finds no support in the record. *Cf. Miller-El II*, 545 U.S. at 252 ("If the [State's] stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.") The District Court's explanation also contradicts Supreme Court caselaw, including *Foster*, in which the Court rejected a nearly identical argument as "fall[ing] flat" and "reek[ing] of afterthought." 136 S. Ct. at 1755 (rejecting state's argument that references to race reflected an effort to ensure that the state was "thoughtful and non-discriminatory in [its] consideration of Black prospective jurors").

Finally, the District Court's explanation makes no sense. If the State's peremptory strikes were going to be made for race-neutral reasons, why would it need to "be prepared to offer sound, race-neutral, reasons" in advance of exercising

20

them?    And if the spreadsheet was prepared to help the State identify "all remaining members of the jury venire who were members of a protected class" so that it could comply with *Batson*, the names of the Hispanic jurors should have been bolded too.  *See Flowers*, 139 S. Ct. at 2243.  They were not.

Reasonable jurists could debate whether this sequence of events shows that the District Court did not correctly consider the evidence Broadnax presented in support of his *Batson* claim, such that he is entitled to a COA.

> **(c)    The State's Purportedly Race-Neutral Explanations for Strikes Were Contradicted by the Record and by Its Treatment of Similarly Situated White Veniremembers**

In addition to statistical and documentary evidence, Broadnax presented powerful evidence that the State treated white and nonwhite veniremembers differently.

"Side-by-side comparisons of some Black venire panelists who were struck and white panelists allowed to serve" can be powerful evidence of a *Batson* violation.  *Miller-El II*, 545 U.S. at 241.  Reasons that may seem race-neutral when "[v]iewed in isolation" may "falter[] upon closer examination."  *Hayes*, 361 F. App'x at 570 (quotations and citation omitted).  A *Batson* violation may be found where the State's purported justification is "explicitly contradicted by the record," or is "difficult to credit" because the State was willing to seat similarly-situated white jurors.  *Foster*, 136 S. Ct. at 1750–51; *see also Rhoades* v. *Davis*, 852 F.3d

422, 436 (5th Cir. 2017) (granting COA where some purportedly race-neutral reasons also applied to white jurors who went unchallenged).   Disparate questioning of black and nonblack panelists can also be probative of discriminatory intent because it undermines the credibility of race-neutral reasons for a strike.  *See Miller-El I*, 537 U.S. at 344.

Here,  the District Court failed to conduct the requisite comparative analysis.  Instead, the District Court concluded that none of the empaneled jurors was "similarly situated with the veniremembers against whom the prosecution exercised challenged strikes" and that any overlap between the character traits of the empaneled jurors and the reasons the State gave for striking black jurors was "hardly surprising—or conclusive of anything."  (ROA.1191–1192.)

Reasonable jurists could debate whether the District Court's dismissal of this evidence was erroneous.  This Court has recognized that *Miller-El II* "requires us to consider a 'comparative juror analysis' in a *Batson* claim."   *Reed* v. *Quarterman*, 555 F.3d 364, 373 (5th Cit. 2009).  And both the Supreme Court and this Court have made clear that, to demonstrate a *Batson* violation, a defendant need not demonstrate that white and nonwhite veniremembers were identical in all respects.  *See Miller-El II*, 545 U.S. at 247 n.6;  *Reed*, 555 F.3d at 375.  A rule that required jurors to be "identical in all respects" would "leave *Batson* inoperable." *Hayes*, 361 F. App'x at 567 (quoting *Miller-El II*, 545 U.S. at 247 n.6).

22

In light of these cases, the District Court was required to do more than simply conclude that there were no white veniremembers identical to the African-American and Hispanic jurors that the State struck. *See, e.g.*, *Reed*, 555 F.3d at 376–78 (considering, in turn, whether the state accepted nonblack jurors who had similar views on two different issues).

A proper comparative analysis demonstrates that several of the reasons the State advanced for striking the seven nonwhite veniremembers were deemed acceptable for white veniremembers not struck. Had the District Court conducted the requisite analysis, it would have been clear that the State's purportedly race-neutral explanations were pretextual.

### (i) Reasonable Jurists Could Debate Whether the State Had Discriminatory Intent in Striking Aqwana Long

The District Court accepted the prosecution's purportedly race-neutral explanation that it struck any veniremember whose questionnaire or voir dire testimony indicated that "they were not in favor of the death penalty." (ROA.1187.) The District Court cited two questions on the first page of the juror questionnaire that, in its view, established that each nonwhite juror was struck because none was sufficiently in favor of the death penalty: (i) a question asking whether the juror was in favor of the death penalty and (ii) a question asking which of "five pre-printed options" reflects "their "views of the death penalty."

23

(ROA.1187, 1189.)  The State claimed that it struck all jurors who either answered "no" to being in favor of the death penalty or picked answer choice "3" out of the five options.  (ROA.1176–1177 (Answer choice "3" states, "[a]lthough I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances").)

But neither prospective jurors Aqwana Long nor Patterson, both black veniremembers against whom the State exercised peremptory strikes, fit into either category.[4]  Long stated that she was in favor of the death penalty, and like the empaneled white veniremembers, chose option "2" out of the five options.  (*Id.* (answer choice "2" states "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty").)  The State argued that despite these answers, Long was, in fact, opposed to the death penalty.  But this argument was contradicted by the record: Long ranked herself a 7 out of 10 in favor of the death penalty, she wrote that she believed the death penalty is used too seldom, and in response to whether the death penalty is misused, she wrote, "not to my knowledge."  (RR57: 106 (Long Questionnaire at 4).)

The State also claimed that Long was opposed to the death penalty because she wrote on her juror questionnaire "I have mixed feelings about the death

---

[4] As discussed below, the trial court ultimately found a *Batson* violation with regard to Patterson and reinstated him as a juror.  (ROA.10574.)  But it failed to do the same with Long.

24

penalty, but I lean more towards yes." (ROA.1190.) Yet the State failed to mention that, during voir dire, Long clarified: "When I said I have mixed feelings about the death penalty, meaning I'm for it on some cases and I'm against it on some other cases . . . [d]epending on the situation." (ROA.9463.) The State at the time responded that this answer was "absolutely, you know, what the law contemplates." (*Id.*) The State did not challenge white veniremembers who gave similar answers. Prospective juror Elaine Clements, like Long, acknowledged that there "are circumstances that justify the death penalty," and Clements wrote "a human life is a precious thing to consider." (RR55: 121 (Clements Questionnaire at 1).) Prospective juror Clarence Kreighbaum gave an answer that indicates that he has mixed feelings on the death penalty, writing "'YES' in theory. It bothers me to read about all the death row inmates that have been there for years, and be very close to having their sentence carried out and thankfully exonerated before it could." (RR57: 140 (Kreighbaum Questionnaire at 1).) Prospective juror Williams stated during voir dire when asked if he thought "we need the death penalty in Texas": "I – I hedge, but probably yes." (ROA.3135.) Prospective juror Alex Folz stated: "Let's say that it was not in existence. I would not necessarily be one to push for it. . . . If it is the law, I would say I would support it, could support it in certain circumstances." (ROA.3913.)

25

The State's other stated reasons for striking Long also demonstrate pretext. The State claimed it struck Long because she received a "deferred adjudication in 1999 in a bad check case." (ROA.1190.) Yet it did not strike prospective juror Guy Ferreira, a white veniremember who acknowledged that he had pleaded guilty to a DWI charge. (RR56: 145–46 (Ferreira Questionnaire at 8–9).) The State also claimed that it struck Long because she believed intoxication was a mitigating circumstance—a reason that also applied to William Stinson, who was not struck. (ROA.9183, 9219; RR57: 51 (Stinson Questionnaire at 6).)

  **(ii)** **Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Shaven McCraney**

In response to trial counsel's *Batson* challenge to this strike, the State asserted that prospective juror Shaven McCraney was an "extremely nervous person." (ROA.10353.) In his petition, Broadnax pointed out that the trial court's acceptance of this demeanor-based explanation was error because the trial court failed to make a credibility determination. (ROA.613.) The District Court purported to render this issue "moot" by, "out of an abundance of caution . . . review[ing] the efficacy of the prosecution's proffered rationale for each of its peremptory strikes in question by focusing on only reasons given that can be objectively verified through review of the relevant juror questionnaires and voir dire examination." (ROA.1187.) But by removing this purported justification

26

from its analysis, the District Court failed to consider the fact that the State's pretextual "nervousness" rationale was itself evidence of the State's discriminatory intent.

For example, Clements, a white veniremember, also described herself as "nervous" about being on a jury "that is called upon to maybe sentence an individual to death." (ROA.3600.)  She explained:  "I've never wanted to be in a situation that I was—that I had to sit in judgment of another person." (*Id.*)  The State did not strike her.  (*Id.*)  Other white, empaneled veniremembers also described themselves as nervous in their questionnaires or during voir dire.  (*See* ROA.3893; RR56: 135 (Morris Questionnaire at 17).)

To the extent McCraney was more "nervous" than any of those white veniremembers—something that has not been established—that could have been the result of the State's disparate questioning.  The State told McCraney, as well as prospective jurors Vation, Long, and Jackson—all of whom are black—to look at Broadnax before the State asked whether they could give him the death penalty. (ROA.3581, 3761, 9469, 9929.)  In particular, after admitting that she was "[a] little nervous," McCraney was told:

> We're talking about you potentially being a part of taking another person's life. . . . [The judge] will have to go and sign a warrant for the death of the defendant and that's the defendant sitting down there.  I don't know if you got a good look at him.  Take a good look at him.  Are you okay with that?

(ROA.3581.)

27

This was followed by a graphic description of the death penalty:

> If you ultimately found yourself on a case where I had proved to you beyond a reasonable doubt the person was guilty of capital murder and I had provided to you [the special issues] *that means you're going to kill him* . . . that means he's going to go to Hunstville and *receive a lethal injection and he is going to die on a gurney*, how do you feel about that?

(ROA.3606 (emphasis added).)

Clements, Folz, and Kimberly Morris all expressed nervousness, but none was asked to look at Broadnax before being provided with graphic descriptions of the death penalty.  (ROA.3600, 3893; RR56: 135 (Morris Questionnaire at 17).)

Moreover, while the State described McCraney as nervous, this was disputed.  Broadnax's trial counsel stated at the time that "[McCraney] was no more nervous than anybody else put in a position of walking into the room and finding a good 12, 15 people looking at her[.]" (ROA.10354–10355.)  Yet the trial judge failed to make a factual finding on this issue.  When the State's peremptory challenge is based on demeanor, "the trial court's firsthand observations" are of "even greater importance."  *Snyder* v. *Louisiana*, 552 U.S. 472, 477 (2008) (refusing to credit a similar argument made by the State—that an African-American juror appeared "very nervous"—because the trial court failed to make a factual determination).

The State also claimed that it struck McCraney because she  was "very weak on the death penalty in her questionnaire and at voir dire." (ROA.943.)   The

28

District Court accepted this explanation despite the fact that McCraney consistently affirmed in both her voir dire and juror questionnaire that there were circumstances when she believed the death penalty was appropriate and that it was possible that a person convicted of capital murder would be a future danger. (ROA.3587–3588; RR55: 103, 105, 106 (McCraney Questionnaire at 2, 4–5).)  She also stated that she did not think that lacking a father was an excuse for murder. (ROA.3591.)  As even the State acknowledged in its own records, her answers to the juror questionnaire were "very good for [the State's] case."  (Dkt. No. 52-4 at 32 (handwritten prosecution notes).)

> **(iii)    Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Curtis Riser**

The State provided three reasons for striking Curtis Riser that were equally applicable to white veniremembers whom the State did not strike:  (i) his stated concerns about exonerations, (ii) his belief in rehabilitation, and (iii) the fact that he had relatives who were incarcerated.  (*See* ROA.1188.)  The District Court credited these explanations in a footnote without examining the responses of white veniremembers on these issues.  (*Id.*)  If the District Court had analyzed the record, it would have found that several white veniremembers—Folz, Clements, Kreighbaum, and Barry Fiddick—raised concerns about wrongful convictions yet were nonetheless accepted by the State.  (RR55: 181 (Folz Questionnaire at 4);

29

RR55: 124 (Clements Questionnaire at 4); RR57: 144 (Kreighbaum Questionnaire at 4); RR57: 277 (Fiddick Questionnaire at 4).)   One white veniremember—Morris—listed rehabilitation as the most important goal of the criminal justice system on her questionnaire.  (RR56: 126 (Morris Questionnaire at 8).)   And several empaneled jurors also had relatives who served time in prison.  (*See* RR55: 128–29 (Clements Questionnaire at 8–9); RR55: 280–81 (McDonald Questionnaire at 8–9); RR56: 126–27 (Morris Questionnaire at 8–9); RR57: 53–54 (Stinson Questionnaire at 8–9); RR57: 224–25 (Winfield Questionnaire at 8–9).)

The State also completely mischaracterized the record regarding one of Riser's statements.   Specifically, the District Court accepted the State's characterization of Riser's voir dire examination that "he had a son about the same age as the defendant and that he felt his son was in the courtroom."  (ROA.1188.) In reality, Riser explained that he was referring to the lawyer and the bailiff, stating:  "it's good because my son gets to see, besides seeing the black guys on TV all the time with the mugshots . . . he can see the lawyer, he can see the bailiff, he can see the District Attorney of Dallas."  (ROA.4072–4073.)

Finally, the District Court ignored Riser's answers that should have dispelled any concerns about his ability to vote for the death penalty.   He affirmatively responded to the question "if you found a person, a man guilty and answered the

30

questions so that he got the death sentence, you could reconcile that or be okay with your children with that?" (ROA.4071.)

### (iv) Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Mattie Vation

The State mischaracterized Mattie Vation's questionnaire and her feelings toward the death penalty. The State said that it struck every veniremember who was "classified as a 3 on the scale or who have stated that [they] are not in favor of the death penalty." (ROA.10356.) Vation classified herself as a "2" on her juror questionnaire, not a "3." (RR55: 159 (Vation Questionnaire at 1).) And while she did check on her questionnaire that she was not in favor of the death penalty, she later explained that her reservation stemmed solely from her concern with wrongful convictions (a concern echoed by white veniremembers who were not struck). (ROA.3758–3759.) She answered affirmatively that there are crimes for which the death penalty should be available and agreed with the Texas law allowing capital punishment for murder in the course of committing a robbery. (RR55: 162 (Vation Questionnaire at 4).)

And while the State claimed that it struck Vation because she had family members involved with or incarcerated for drug use, the State did not challenge several white veniremembers, including Kelly McDonald, Morris, Stinson, and Winfield, who indicated that they had family members involved with or

31

incarcerated for drug use.  (RR55: 281 (McDonald Questionnaire at 9); RR56: 126 (Morris Questionnaire at 8); RR57: 53–54 (Stinson Questionnaire at 8–9); RR57: 224–25 (Winfield Questionnaire at 8–9).)

Finally, the State's questioning of Vation provides further evidence that this strike was pretextual.  During voir dire, the prosecutor told Vation—a 70-year-old woman—that his own mother would find it "very difficult . . . when it was a young black man on trial to really put aside the injustices that were done in her day." (ROA.3761.)  He followed this by commanding Vation to look at Broadnax, describing the death penalty graphically, and asking her twice:  "Do you really think in your heart of hearts that you can take part in" this process?  Vation responded:  "Yes."  (ROA.3761.)

> **(v)     Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Angelita Rivera**

With respect to prospective juror Angelita Rivera, the State claimed that she was not in favor of the death penalty, reclassifying her as a "3" despite her having circled "2" on the form and providing many pro-prosecution answers in voir dire and on her juror questionnaire.  (ROA.10363; RR55: 197 (Rivera Questionnaire at 1).)  She indicated strong support for the death penalty in felony murder cases, such as a robbery.  (RR55: 200 (Rivera Questionnaire at 4).)  She stated that she could find a defendant to be a future danger even if he had never been convicted of

32

anything before and that it was possible to predict whether or not someone would continue to commit acts of violence.  (ROA.4016.)  She also rated herself an 8 out of 10 in support for the death penalty.  (RR55: 200 (Rivera Questionnaire at 4).) Seven white empaneled jurors rated themselves below an "8" and were not challenged, including McDonald, McElroy, Emily Blevins, and John Vessels who wrote "5" (or lower) on their questionnaires.  (RR55: 276 (McDonald Questionnaire at 4); RR57: 334 (McElroy Questionnaire at 4); RR57: 258 (Blevins Questionnaire at 4); RR57: 239 (Vessels Questionnaire at 4).)

Additionally, the District Court failed to consider several other reasons the State provided for striking Rivera, which also were pretextual.  The State made unverifiable comments regarding her demeanor.  (ROA.10364.)  The State criticized the fact that Rivera reported that she did not watch TV and noted that "it was [the prosecutor's] impression [Rivera] so desperately wanted to sound intelligent, but she absolutely could not give a straight answer."  (ROA.10364, 10366.)  If the District Court had reviewed these reasons, it would have found them not to be credible.  Rivera was not challenged until almost two months after she was questioned.  At that point, the trial court or the State "may not have recalled [Rivera's] demeanor." *See Snyder*, 522 U.S. at 479 (refusing to presume the trial court credited the prosecution's assertion that the challenged juror "was

33

nervous" where the juror "was not challenged until the day after he was questioned").

### (vi) Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Dedric Morrison

The State claimed it struck Dedric Morrison because, in part, he stated that he believed intoxication is mitigating in nature and that he thought that people can change. (ROA.955.) But nearly all empaneled jurors, including Stinson—a white veniremember—said that they would consider voluntary intoxication as a mitigating factor and they were not struck by the State. (RR57: 51 (Stinson Questionnaire at 6).)

The State also argued that it struck Morrison because he was not in favor of the death penalty. (ROA.956.) However, Morrison answered the jury questionnaire by checking "yes" or 2, when asked if he agreed with the Texas law saying that the death penalty may be imposed for murder committed in the course of a robbery, and also checked "yes" when asked if there are some crimes which call for the death penalty solely on their facts. (RR57: 201 (Morrison Questionnaire at 4).)

34

**(vii)  Reasonable Jurists Could Debate Whether The State Had Discriminatory Intent In Striking Betty Jackson**

The District Court accepted the State's statement that prospective juror Betty Jackson was struck because she stated that she would have only given the death penalty in cases of sexual assault and murder of a child.  (ROA.1189.)

But Jackson moved away from this position in her voir dire, ultimately stating she could follow the law and give the death penalty in other cases. (ROA.9977.)   The District Court dismissed the relevance of these statements, finding that she "seemed to change her mind only when questioned by the trial court directly."  (ROA.1189.)  Neither the State nor the District Court accepted her ultimate answers as truthful—although the trial court did when it denied the State's for cause challenge.  (ROA.9984.)  Rather, the State purported to base its strike on speculative assumptions as to Jackson's state of mind, saying that "if the Court had questioned her and had asked her specifically, 'will you only give the death penalty in a case of a child rapist or murderer,' she would have said 'yes,' instead of the way that [the trial court] posed it to her with 'yes' or 'no' answers."  (ROA.10412.) The District Court accepted this explanation without assessing whether it was credible.  (ROA.1188–1189.)

35

**(d)    The District Court Erroneously Concluded that the Spreadsheet was Barred by *Pinholster* and 28 U.S.C. § 2254(d)(2)**

The District Court incorrectly concluded that it could not consider the spreadsheet described above under *Cullen* v. *Pinholster,* 563 U.S. 170 (2011) and 28 U.S.C. § 2254(d)(2).  (*See* ROA.1189-90.).  The District Court simply ignored the arguments raised in Broadnax's reply brief on this issue.  Reasonable jurists could debate whether the District Court was wrong.

*First*, the District Attorney's office withheld the spreadsheet from Broadnax during his trial and state collateral proceeding, claiming that it was protected by the work product doctrine.  (ROA.1091).  It was only when Broadnax's federal habeas counsel sought access to the District Attorney's file that these materials were made available for Broadnax's counsels' review.  (*Id.*)  The files were only turned over in June 2016—nearly two years after the state habeas decision was issued.  (ROA.1040–1041.)  The spreadsheet was not available to Broadnax prior to the federal habeas proceedings.

*Second*, the Court in *Pinholster* acknowledged that in certain situations, new evidence is not barred because it may lead to a new claim.  Justice Sotomayor's dissenting opinion illustrated how a petitioner who learned of evidence later might be disadvantaged when compared to a petitioner who failed to present evidence that was available but was not presented due to the previous counsel's

36

ineffectiveness. (*Id.*) The majority responded that this was not so and that the dissent's "hypothetical petitioner may well have a new claim." *Pinholster*, 563 U.S. at 186 n.10.

Consistent with this statement, courts, including the Fifth Circuit, have concluded that *Pinholster* does not bar new evidence that "fundamentally alter[s]" the claim originally presented to the state court. *See, e.g.*, *Clark* v. *Stephens*, 627 F. App'x 305, 309 (5th Cir. 2015) (granting COA and noting that "*Pinholster* might not apply to prevent the admission of new evidence" on ineffective assistance of counsel claim because "this new claim was never adjudicated on the merits in state court, thus rendering § 2254(d) inapplicable"); *Dickens* v. *Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (*en banc*) ("*Pinholster* does not bar Dickens from presenting evidence of his 'new' IAC claim [because] the new allegations and evidence 'fundamentally altered' that claim."); *Wolfe* v. *Clarke*, 691 F.3d 410, 423 (4th Cir. 2012) ("Because we focus on an aspect of th[e] [*Brady* v. *Maryland*] claim—the long-concealed Newsome report—that was not adjudicated in the state court proceedings, we owe no 28 U.S.C. § 2254(d) deference to any state decision."); *Winston* v. *Pearson*, 683 F.3d 489, 501 (4th Cir. 2012), *cert. denied*, 568 U.S. 1205 (2013) (finding that § 2254(d) was no bar where petitioner was hindered from producing critical evidence through no fault of his own).

The district court's decision in *Wessinger* v. *Cain*, No. 04-cv-637, 2015 WL 4527245 (M.D. La. July 23, 2015), *rev'd on other grounds sub. nom. Wessinger* v. *Vannoy*, 864 F.3d 387 (5th Cir. 2017), illustrates this point. Applying the Fifth Circuit's ruling in *Escamilla* v. *Stephens*, 749 F.3d 380, 395 (5th Cir. 2014), the court noted that the materials before it went "way beyond what [p]etitioner presented to the state courts for consideration of this claim below," and concluded that the additional evidence "fundamentally alter[ed] the claim that was presented to the state court such that this Court considers the claim anew." 2015 WL 4527245, at *16 n.3.

Broadnax's claim here, to the extent it relies on the newly disclosed spreadsheet, falls squarely within these holdings. The spreadsheet offers a previously unavailable window into prosecutors' decision-making at the time of jury selection. It is "material and significantly different and stronger than what [Broadnax] presented to the state court," *Escamilla*, 749 F.3d at 395; *see Wessinger*, 2015 WL 4527245, at *16 n.3, and should be considered on federal habeas review in assessing Broadnax's *Batson* claims. This document "fundamentally alter[s]" Broadnax's *Batson* claims by undermining the race-

neutral pretextual explanations prosecutors provided for striking every minority veniremember from Broadnax's jury.[5]

The District Court's holding that consideration of the spreadsheet was barred under *Pinholster* and 28 U.S.C. § 2254(d)(2) was erroneous, and is at the very least debatable by reasonable jurists.[6]

### 3. Reasonable Jurists Could Conclude That The Trial Court's Remedy Of Reseating A Single African-American Juror Was Not Sufficient

Finally, the District Court erred in concluding that the trial court's remedy of reseating a single black juror was sufficient to cure the State's *Batson* violation with respect to Patterson.  (ROA.1191–1193.)

As Broadnax explained in his petition, the trial court found a *Batson* violation as to Patterson, and reseated him.  (ROA.2004.)  As an initial matter, the District Court dismissed the significance of this finding, stating that the trial court "could not conclude that the prosecution had subjectively presented pretextual

---

[5] To the extent that this renders Broadnax's new *Batson* claim procedurally defaulted or unexhausted, he has established cause and prejudice for the reasons discussed above.  *See Murray* v. *Carrier*, 477 U.S. 478, 488, 498 (1986) ("[S]howing that the factual or legal basis for a claim was not reasonably available to counsel" or that "some interference by officials . . . made compliance impracticable" constitutes cause).  Similarly, as in *Sorto* v. *Davis*, 859 F.3d 356, 359, 362 (5th Cir. 2017), *rev'd on other grounds*, 881 F.3d 933 (5th Cir. 2018), any exhaustion requirement here would be excused because the new evidence was unavailable to Broadnax during state court proceedings.  Lastly, since reasonable jurists could disagree about whether the spreadsheet is procedurally barred or exhausted, this Court should grant a COA on this issue. *Graves* v. *Cockrell*, 351 F.3d 156, 159 (5th Cir. 2003).

[6] To be clear, Broadnax submits that, even without this spreadsheet, the statistical and record evidence clearly demonstrates multiple *Batson* violations.

reasons" for its strike of that veniremember but decided to "restore the venire member to the jury nonetheless." (ROA.1184.)

The District Court failed to mention that, at that same hearing, the trial court plainly indicated that, notwithstanding the law, it was uncomfortable with *ever* finding pretext on the part of the prosecution. It stated:

> The problem with all of these cases, of course, is that if you grant a Batson challenge it implies some sort of nefarious intent on the part of the prosecutors. When you say it's a pretext, you're essentially saying that the prosecutors are lying. That's the problem with the whole line of the cases.

(ROA.10574.)

Nonetheless, it indisputably found a *Batson* violation as to Patterson: it found "that there was evidence of disparate treatment of the part of the State" and held that Broadnax "is entitled to relief." (ROA.2004.)[7]

Upon finding a *Batson* violation, the trial court should have struck the entire jury panel, and begun voir dire again. The trial court's remedy of reinstating a single African-American juror was insufficient to protect Broadnax's constitutional rights. *See United States* v. *Walker*, 490 F.3d 1282, 1295 (11th Cir. 2007) ("the better practice in certain circumstances is to begin afresh with a new venire.");

---

[7] The record with respect to Patterson provides additional evidence of the State's discriminatory intent. The State claimed that it struck him because, in part, "he was the foreman on two juries, one of which returned a not guilty verdict." (ROA.959.) Yet the State failed to ask **any** questions about the circumstances of that case during voir dire. "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Flowers*, 139 S. Ct. at 2249 (quoting *Miller-El II*, 545 U.S. at 246).

*State* v. *McCollum*, 433 S.E.2d 144, 159 (N.C. 1993), *cert. denied*, *McCollum* v. *North Carolina*, 512 U.S. 1254 (1994) ("the simpler, and . . . clearly fairer, approach is to begin the jury selection anew"); *Minniefield* v. *State*, 539 N.E.2d 464, 466 (Ind. 1989) (trial court erred by failing to grant mistrial to remedy prosecution's *Batson* violation). A reasonable jurist could conclude that, in these circumstances, the trial court's remedy was insufficient to cure the constitutional violation. *See Drain* v. *Woods*, 595 Fed. App'x 558, 580–81 (6th Cir. 2011) ("[o]nce a *Batson* violation has been found, it must be remedied" and that remedy must "adequately safeguard a defendant's right" and "must undo the effects of" the racial discrimination).

Even if the trial court's remedy were sufficient to cure the *Batson* violation as to Patterson—which it was not—Broadnax is entitled to a COA regarding the seven other *Batson* violations. *Eight* prospective jurors were struck for a discriminatory purpose, and only one was reinstated. Broadnax has demonstrated a "substantial showing of a violation of a constitutional right," *Miller-El I*, 537 U.S. at 336, and is entitled to a COA on his *Batson* claim.

II.  **The Court Should Certify an Appeal of the District Court's Denial of Broadnax's "For Cause" Challenge**

Broadnax is also entitled to a COA because reasonable jurists could debate whether he was sentenced to death by a jury that was not impartial, in violation of Due Process and the Eighth Amendment. Prospective juror Vessels indicated that

41

he was not willing to consider the mitigating evidence that Broadnax would present at the sentencing phase of his trial. The trial court denied both of Broadnax's requests that he be excused for cause.

### A.    Reasonable Jurists Could Debate Whether The District Court, In Affirming The Trial Court's Refusal To Excuse Juror Vessels, Applied An Erroneous Legal Standard

Due process requires that a jury judging a capital defendant at the sentencing phase "stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan* v. *Illinois*, 504 U.S. 719, 727 (1992). The Eighth Amendment "'requires that the jury be able to consider and give effect' to a capital defendant's mitigating evidence." *Tennard*, 542 U.S. at 285 (quoting *Boyde* v. *California*, 494 U.S. 370, 377–78 (1990)). Jurors in a capital case may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings* v. *Oklahoma*, 455 U.S. 104, 114 (1982) (emphasis added); *Soria* v. *Johnson*, 207 F.3d 232, 245 (5th Cir. 2000) (same).

While jurors may determine the weight to give relevant mitigating evidence, they "may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114–15. A prospective juror should be excluded for cause where "the juror's views on capital punishment would 'prevent or substantially impair the performance of his duties as a juror in accordance with

42

his instructions and his oath.'" *Wainwright* v. *Witt*, 469 U.S. 412, 424, 433 (1985) (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)).

Vessels' views on capital punishment met this standard. When Vessels was asked whether he could "think of some things that you might yourself consider to be sufficient mitigating circumstance to change a death sentence to a life sentence," he replied that he could not "think of anything . . . ." (ROA.10191.) In his questionnaire, he refused to consider intoxication as a relevant mitigating factor, stating that he disagreed with established Texas law that evidence of intoxication may be considered in mitigation of punishment. After checking "No"—that he did not agree with the Texas law—he also wrote that "most actions made under intoxication are just suppressed aspects of the personality hence could have been committed anyway." (RR57: 241 (Vessels Questionnaire at 6).)

Vessels also answered "No" when asked whether he thought "genetics, circumstances of birth, upbringing and environment" should be considered. He wrote that the only exception would be "in cases of actual organic brain disfunction [sic]." He was thus unable to consider exactly the type of mitigation evidence that Broadnax would present. (RR57: 243 (Vessels Questionnaire at 8).)

The district court mischaracterized Broadnax's argument by focusing on the "double-edged" nature of evidence that a juror might view as aggravating rather than mitigating. (ROA.1156–1157.) But Broadnax does not argue that the jurors

43

were required to accept his arguments that the evidence was sufficiently mitigating to result in a life sentence.  What he challenges is Vessels' refusal to even *consider* the mitigating evidence Broadnax offered.  *Eddings*, 455 U.S. at 116 ("[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing."); *Soria*, 207 F.3d at 245 ("[B]ecause [prospective juror's] voir dire examination . . . indicates that he could not consider a defendant's youth in mitigation of the death penalty, it appears that [his] views were such that he should have been excused for cause.").

**B.    Reasonable Jurists Could Debate Whether The District Court's Decision Was Based On An Unreasonable Determination Of The Facts**

Reasonable jurists could also debate whether the state court's decision concerning the for cause challenge of Vessels relied on an unreasonable determination of the facts.  The district court relied on two factual determinations: (1) that Vessels' questionnaire answers should not be construed as reflecting an unwillingness to consider all the evidence before the jury or to follow the law; and (2) that Vessels' voir dire examination revealed an individual who was not substantially impaired because he "gave no indication whatsoever during his voir dire examination that he was unable to put aside any personal views he might

44

possess and decide Broadnax's case ... based solely upon the law and the evidence presented at trial." (ROA.1157–1158.)

Reasonable jurists would debate whether these determinations were unreasonable. Vessels' juror questionnaire indicated an absolute unwillingness to consider genetics, circumstances of birth, upbringing, and environment in mitigation unless the defendant specifically suffered an organic brain injury. (RR57: 243 (Vessels Questionnaire at 8).) Vessels also clearly wrote that he did not believe intoxication could be a mitigating factor. (RR57:241 (Vessels Questionnaire at 6).)

Vessels reaffirmed these views at voir dire. When asked by defense counsel whether he could think of some things that he might consider to be sufficient mitigating circumstances to change a death sentence to a life sentence, he stated that he could not. (ROA.10191.)

The District Court ostensibly relied on a section of the voir dire where Vessels was asked whether he could put his personal views aside and consider the law with respect to a sentence of life without the possibility of parole. (ROA.10188.) Vessels indicated with respect to considering life without parole as a possible option, he could follow the law. (ROA.10189.) But the fact that Vessels was able to consider life without parole does not indicate that he was

45

willing to consider the mitigating evidence that he had specifically testified, and written, that he would not be able to consider.[8]

## III. Reasonable Jurors Could Debate Whether Broadnax Was Selectively Prosecuted on the Basis of Race

The government's "broad discretion" in deciding whom to prosecute is bounded by "constitutional constraints." *Wayte* v. *United States*, 470 U.S. 598, 607–08 (1985). Its decision "may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[.]'" *Id.* Reasonable jurists could debate whether the State sought to impose the death penalty on Broadnax on the basis of his race.

To make a *prima facie* case for selective prosecution, a claimant must show that the prosecutorial policy had a discriminatory effect and discriminatory purpose. *United States* v. *Armstrong*, 517 U.S. 456, 457 (1996). To establish discriminatory effect, "the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.*; *see also United States* v. *Jones*, 287 F.3d 325, 333–34 (5th Cir. 2002). An inference of discriminatory intent may be supported by statistical evidence of racial disparity. *See McCleskey* v. *Kemp*, 481 U.S. 279, 293 (1987); *see also United States* v. *Webster*, 162 F.3d 308, 334 (5th

---

[8] Although the District Court incorrectly intimated, in *dicta*, that Broadnax did not exhaust this claim, it was exhausted because the claim that Vessels was incapable of considering mitigating evidence was properly preserved at trial and presented on direct appeal. *State* v. *Broadnax*, No. AP–76207, 2011 WL 6225399, at *5–8 (Tex. Crim. App. Dec. 14, 2011).

Cir. 1998); *Jones*, 287 F.3d at 334.  Likewise, the showing that similarly situated individuals were not prosecuted may be satisfied by statistical evidence "regarding the record of the decisionmakers in [claimant's] case." *United States* v. *Bass*, 536 U.S. 862, 864 (2002).

The District Court reviewed Broadnax's selective prosecution claim de novo.  (ROA.1129.)[9]  The Fifth Circuit requires a de novo determination to be based on an independent review of the evidence in the record.  *See Calderon*, 630 F.2d at  355–56; *Madison*, 939 F.2d at 294; *Wilson*, 86 F.2d at 1222.

The District Court did not do such a review here.  To the contrary, the District Court ignored the substantial statistical evidence of racial disparity submitted in support of Broadnax's claim.  *See, e.g.*, *Calderon*, 630 F.2d at 355–56 (reversing where the district court inappropriately made a de novo determination without engaging with the record evidence); *Wilson*, 86 F.2d at 1222 (remanding where district judge did not "ma[k]e his own determination based upon the

---

[9] To the extent this Court considers whether Broadnax's selective prosecution claim is properly exhausted, reasonable jurists could debate whether the exhaustion requirement should be excused.  Under *Sorto* v. *Davis*, Section 2254(b)(1)'s exhaustion requirement is excused when the evidence at issue was unavailable during state court proceedings and "fundamentally alters, [rather than] merely supplements, the claim presented in state court."  859 F.3d at 362.  The evidence here was not available until the actions of the "single actor that was responsible" for the correlation between race and death penalty sentences could be statistically analyzed.  *See Jones*, 287 F.3d at 335.  That individual, Dallas County District Attorney Craig Watkins, was appointed in January 2007 and served through January 2015.  Broadnax was arrested in 2008 and sentenced to death in 2009, a mere two years into Watkins' tenure.  The evidence in support of Broadnax's selective prosecution claim was thus previously unavailable since there was not yet a statistically significant sample of defendants sentenced to death during Watkins' tenure.  (ROA.694); s*ee Jones*, 287 F.3d at 335.

record"). The District Court failed to engage at all with Professor Jonathan Sorensen's empirical analysis concerning the correlation between the races of homicide offenders and victims with death sentences in Dallas County from 2007 through 2014, corresponding to the tenure of District Attorney Craig Watkins. Professor Sorensen's empirical research demonstrates that there was "a clear pattern of racial disparity in death sentencing in Dallas County during 2007 through 2014," and that the racial discrepancy cannot be explained by the underlying crime rate or by the circumstances and seriousness of the crimes. (ROA.502, 689–693, 1088.) As shown in Table 1 below, the evidence demonstrates that, out of homicide arrests made during Mr. Watkins's tenure, black defendants—like Broadnax—were overrepresented by 26% among death sentence recipients. On the other hand, white defendants were underrepresented by 53% among death sentence recipients. And "[i]n combination, cases involving the killing of [w]hite victims by [m]inorities are over-represented among death sentences by 3.17 to 1." (ROA.499.)

48

Table 1. Racial Characteristics among Homicide Arrests and Death Sentences in Dallas County, 2007 – 2014

| Racial Characteristics | Homicide Arrests (n = 610) | Death Sentences (n = 12) | Ratio of Death Sentences to Arrests |
|---|---|---|---|
| Offender Race/Ethnicity | | | |
| White | 17.4% | 8.3% | 0.47 : 1 |
| Hispanic | 29.4% | 25.0% | 0.85 : 1 |
| Black | 53.0% | 66.7% | 1.26 : 1 |
| | | | |
| Victim Race/Ethnicity | | | |
| White | 23.2% | 41.7% | 1.80 : 1 |
| Hispanic | 31.4% | 16.7% | 0.53 : 1 |
| Black | 45.3% | 41.7% | 0.92 : 1 |
| | | | |
| Offender x Victim | | | |
| Minority kills White | 10.5% | 33.3% | 3.17 : 1 |
| All other Combinations | 89.5% | 66.7% | 0.75 : 1 |

(*Id.*)

Broadnax also demonstrated that just two years after Broadnax was sentenced to death, Watkins prosecuted a similar case quite differently. (ROA.692-693.) The defendant in that case murdered two men with a handgun during the course of a robbery. (*Id.*) Unlike in Broadnax's case, Watkins sought life in prison for that other defendant. (*Id.*) Unlike Broadnax, the other defendant was white.

Reasonable jurists could disagree as to whether the District Attorney's Office under Watkins was engaged in "racial discrimination in the administration of capital punishment." *Jones*, 287 F.3d 325, 334 (5th Cir. 2002) (quoting *Webster*, 162 F.3d at 334). Multiple circuit courts have granted relief upon similar

49

evidentiary showings. *See, e.g., United States* v. *Falk*, 479 F.2d 616 (7th Cir. 1973); *United States* v. *Steele*, 461 F.2d 1148 (9th Cir. 1972).

Notwithstanding this caselaw, there is not a single mention of the Sorensen Affidavit anywhere in the District Court's 157-page opinion.[10]  Instead, the District Court denied Broadnax relief on the basis that he "identified no other capital murderer who has ever given televised interviews in which he demanded to receive a death sentence." (ROA.1214.)  No evidence was presented to the District Court that these televised interviews were the basis for Watkins' decision to seek the death penalty.  Nor would they be a proper basis, if there were such evidence. *See Eddings*, 455 U.S. at 112 ("[C]apital punishment [must] be imposed fairly, and with reasonable consistency, or not at all."); *Lockett* v. *Ohio*, 438 U.S. 586, 604 (1978) ("[The] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); *Woodson* v. *North Carolina*, 428 U.S. 280, 304 (1976).

Nor does the fact that Broadnax gave interviews to media outlets that were later televised render his case "sui generis" for equal protection purposes, as the District Court stated.  The District Court identified no fewer than eight circumstances attendant to Broadnax's case that purportedly make him "sui generis." (ROA.1131.)  Distinguishing Broadnax's case at the level of granularity

---

[10] There is a single oblique reference in the Opinion to purportedly "new" evidence introduced by Broadnax in support of his selective prosecution claim.  (ROA.1130.)

employed by the District Court would render the standard meaningless because every case would be "sui generis."

While the Fifth Circuit has not addressed the issue directly, at least one Court of Appeals has explicitly cautioned against interpreting the "similarly situated" requirement too narrowly, and at least four additional circuits likewise advocate a broad application of the standard. *See Chavez* v. *Illinois State Police*, 251 F.3d 612, 636 (7th Cir. 2001) ("In determining who is similarly situated, we have [] been careful not to define the requirement too narrowly."); *United States* v. *Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed *roughly the same crime* under *roughly the same circumstances* but against whom the law has not been enforced." (emphasis added)); *Shumway* v. *UPS, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (two individuals must be similarly situated only in "material respects"); *Patterson* v. *Strippoli*, 639 F. App'x 137, 142 (3d Cir. 2016); *United States* v. *Thorpe*, 471 F.3d 652, 657 (6th Cir. 2006). Reasonable jurists therefore could, and in fact do, disagree with the District Court's application of the "similarly situated" standard to Broadnax's selective prosecution claim.

IV.   **The Court Should Certify an Appeal of the District Court's Denial of Broadnax's Sixth Amendment Challenge to the Admission of Uncounseled Media Interviews**

The Sixth Amendment guarantees criminal defendants the assistance of counsel, both at trial and at all "critical stage[s] of pretrial proceedings." *Brewer* v. *Williams*, 430 U.S. 387, 398–99, 404 (1977).   Any deprivation of the right to counsel "unquestionably qualifies as structural error," which is not subject to harmless-error analysis. *United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 148–50 (2006) (internal quotation marks and brackets omitted).

Broadnax was deprived of this right when he was denied counsel after his arraignment and subjected to highly prejudicial interviews—while in state custody—that later aired on four local television stations and formed the basis of the prosecution's case-in-chief at trial.  (ROA.566–569, ROA.598, ROA.605.)

In assessing whether the denial of counsel has resulted in a Sixth Amendment violation, the Supreme Court applies a two-prong inquiry.

*First*, the court must determine whether "adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"—have been initiated. *Rothgery* v. *Gillespie Cnty.*, 554 U.S. 191, 198 (2008).  Here, that prong was indisputably met, as Broadnax's right to counsel *attached* when he appeared before a magistrate pursuant to Texas

52

Code of Criminal Procedure article 15.17 on the morning of Saturday, June 21, 2008. *See id.* at 199.

*Second*, once attachment occurs, the court must decide if counsel was deprived for a critical stage of the proceedings. "[W]hat makes a stage critical is what shows the need for counsel's presence." *Id.* at 212. The right to counsel is not limited to the narrow confines of official courtroom activities. In *United States* v. *Wade*, 388 U.S. 218, 226 (1967), the Supreme Court held that counsel was required at an in-custody lineup. Similarly, in *Lafler* v. *Cooper*, 566 U.S. 218, 164–65 (2012), the Supreme Court held that counsel's deficient performance during plea bargaining negotiations occurred during a "critical stage."

The Supreme Court has also held that interactions between criminal defendants in state custody and the local media have the potential for the kind of prejudice that gives rise to the right to counsel. In *Rideau* v. *Louisiana*, 373 U.S. 723 (1963), the Court held that denial of the defendant's request to change venue denied him due process, where, as here, a local television station broadcast the defendant's pre-trial interview while in state custody without counsel present, because the Constitution "commands that no such practice as that disclosed by this record shall send any accused to his death." *Id.* at 727; *see also Sheppard* v. *Maxwell*, 384 U.S. 333, 354–58 (1966) (reversing a conviction where the defendant had been "examined for more than five hours without counsel during a

three-day inquest" that was "televised live from a high school gymnasium"). The Supreme Court's description of the proceedings in *Rideau* is particularly instructive:

> What the people [in the community from which the jury was drawn] saw on their television sets was [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the [crimes charged] . . . . **[T]his spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was [the defendant's] trial—at which he pleaded guilty to murder**. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Rideau*, 373 U.S. at 725–26 (emphasis added).

Broadnax argued that the interviews constituted a critical stage of the proceedings for which he had been denied his right to counsel, citing among other things the Supreme Court's decisions in *Powell*, *Wade*, *Rideau*, and *Sheppard* as support for his claim. (ROA.598–606.) The District Court, however, did not discuss this aspect of Broadnax's claim, reference any of the aforementioned cases, or grapple with the significant factual similarities between Broadnax's case and *Rideau*. (ROA.1172–1175.) Reasonable jurists could debate whether Broadnax is entitled to relief on this claim.

**V.     The Court Should Certify an Appeal of the District Court's Denial of Broadnax's Claim that His Appellate Counsel Was Constitutionally Ineffective**

At trial, Broadnax was labeled a "psychopath" by the State, based on the testimony of an expert, Dr. Price, who had never examined him or reviewed his

54

medical and social history. Dr. Price told the jury about a test, the PCL-R, which can be administered to an individual to identify whether he or she has the characteristics of a psychopath, and testified about those characteristics. Dr. Price never administered the PCL-R to Broadnax.[11]

Although Price did not himself opine that Broadnax was a psychopath, his testimony was used to that devastating effect by the State. It was the focus of the State's closing in the penalty phase, where the State argued that Broadnax was in fact an irredeemable "psychopath" who will "never change." (ROA.5850.) Trial counsel objected to the admission of this testimony under Texas Rules of Evidence 401, 403, and 702, but the trial court overruled those objections. (ROA.5756–5757.) Inexplicably, however, appellate counsel did not preserve this issue on appeal.

Broadnax submits that appellate counsel's failure to urge this claim was constitutionally ineffective, as this testimony should have been excluded under Texas law. *See Reese* v. *State*, 33 S.W.3d 238 (Tex. Crim. App. 2000) (vacating capital sentence where prejudicial photograph was introduced during punishment phase in violation of Rules 401 and 403). Reviewing this claim de novo, the District Court concluded that "even if erroneous under state law, the admission of

---

[11] Federal habeas counsel engaged an expert who did administer the PCL-R test to Broadnax. (ROA.387.) Broadnax did not meet the diagnostic criteria for a psychopath, or even come close. The testimony and argument presented by the State was not only unfounded, but false.

Dr. Price's rebuttal testimony at the punishment phase of trial did not, in all reasonable likelihood, constitute reversible error under state law or rise above the lever of harmless error under *Brecht*." (ROA.1207.) Reasonable jurists could debate whether Broadnax's appellate counsel was deficient for failing to raise this issue. Appellate counsel raised 56 other issues on appeal—but not this one. (*See* ROA.12497–12505.) There was no conceivable strategic reason not to raise this issue, particularly since this claim was clearly stronger than many others that were raised. At the very least, reasonable jurists could disagree about whether this failure was "harmless"; branding the defendant a "psychopath" incapable of change profoundly undercut Broadnax's strong mitigation case about his youth and abusive upbringing.

This Court has found ineffective assistance of appellate counsel in analogous circumstances. *See, e.g.*, *United States* v. *Bass*, 310 F.3d 321, 329–30 (5th Cir. 2002) (appellate counsel's failure to challenge an evidentiary issue was deficient and prejudiced the defense); *United States* v. *Conley*, 349 F.3d 837, 841–42 (5th Cir. 2003) (counsel on direct appeal were "constitutionally ineffective" for failure to object to trial court's sentencing error).

The Court should issue a COA to review this claim.

**VI.    The District Court's Denial of Broadnax's Claims Was Based on Misapplication of the Relevant Legal Standards and Erroneous Fact Determinations**

The District Court failed to apply the correct legal standards when considering Broadnax's claims, and in several instances, made unsupported factual determinations.

*First*, the District Court wrongly held that "a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision." (ROA.1114.)    That is simply not the law. Federal courts have an independent responsibility to interpret federal law.  *See Williams* v. *Taylor*, 529 U.S. 362, 378–79 (2000).  The Supreme Court requires the federal habeas court to inquire into the state court's reasoning as well as its conclusion before according the state court's decision deference.  *See Wilson* v. *Sellers*, 138 S. Ct. 1188, 1182 (2018) ("[The AEDPA standard] requires the federal habeas court to train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims . . . ." (internal citation omitted)).

*Second*, the District Court purported to undertake a de novo review of certain of Broadnax's arguments—including Broadnax's argument that he was

57

selectively prosecuted on the basis of his race—but failed to base its determination upon an independent review of the evidence in the record. Instead, the District Court ignored the evidence in the record, including the affidavit of an expert criminologist who conducted a statistical analysis of decisions by the Dallas County District Attorney to seek the death penalty. It substituted its own judgment as to whether Broadnax was worthy of the death penalty, based on the Court's reaction to a videotape. This was error. *See, e.g.*, *Calderon* v. *Waco Lighthouse for the Blind*, 630 F.2d 352, 355–56 (5th Cir. 1980) (reversing where the district court inappropriately made a de novo determination without engaging with record evidence); *United States* v. *Wilson*, 864 F.2d 1219, 1222 (5th Cir. 1989) (remanding where district judge did not "ma[k]e his own determination based upon the record"); *Madison Cty. Bd. of Educ.* v. *Illinois Cent. R. Co.*, 939 F.2d 292, 294 (5th Cir. 1991) ("[t]he exercise of *de novo* review requires [the court] to conduct an independent review of the record").

Finally, even where the District Court was not purporting to apply de novo review, it improperly resolved factual issues without considering the relevant evidence. For example, the District Court made findings of fact concerning the spreadsheet the State prepared for jury selection on which the names of black jurors, and *only* the names of black jurors, were bolded. (ROA.1044–1045.) After Broadnax showed that the State's argument—that the spreadsheet was prepared

58

*after* jury selection concluded—could not be true, the District Court concluded that the State must have created the spreadsheet *earlier*, in order to *comply* with its *Batson* obligations.  (ROA.1190–1192.)  No testimony, affidavit, or documentary support before the District Court could support such a conclusion, nor did the State advance such an argument.  The District Court should not have made such findings, particularly without weighing competing evidence or conducting an evidentiary hearing.

Similarly, the District Court purported to make a finding of fact that Broadnax was not under the influence of drugs at the time of his uncounseled media interviews.  The Court apparently reached this conclusion based on its own viewing of videotapes.  (ROA.1131.)  But the District Court failed to mention, let alone consider, the testimony of three mental health specialists who had examined Broadnax at the time and found him to be under the influence of drugs, as well as the testimony of a fourth expert in psychiatry and pharmacology who confirmed these conclusions. (*See* ROA.590, citing testimony of Drs. Lane (ROA.11326–11327, 11332), Varghese (ROA.10973-974), Mirmesdagh (ROA.10985, 10987), and Roache (ROA.11349).)

These errors—alone and together with the District Court's other errors—establish Broadnax's entitlement to a COA.  *Tennard* v. *Dretke*, 542 U.S. 274, 287 (2004) (granting COA and reversing the Fifth Circuit for assessing petitioner's

claims "under an improper legal standard"); *Miller-El I*, 537 U.S. at 341 (finding that petitioner's COA was improperly denied because the district court misapplied the relevant legal standards of review by conflating the requirements of two independent statutory sections).

## CONCLUSION

For the foregoing reasons, Mr. Broadnax respectfully requests that a COA be issued as to each of the above claims.

Respectfully submitted,

s/ Steven C. Herzog
Steven C. Herzog
Kimberly A. Francis
Jordana L. Haviv
Ameya S. Ananth
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
*(212) 373-3000*


Camille M. Knight
BURLESON, PATE & GIBSON, LLP
*900 Jackson Street, Suite 330*
*Dallas, TX 75202*
*(214) 871-4900*


*Attorneys for Petitioner-Appellant*
*James Broadnax*

61

## CERTIFICATE OF SERVICE

I, Camille M. Knight, a member of the Bar of this Court and counsel for petitioner James Broadnax, certify that, on November 20, 2019, a copy of the attached Brief in Support of Motion for Certificate of Appealability was filed with the Clerk through the Court's electronic filing system.  I further certify that all parties required to be served have been served.


s/ Camille M. Knight
CAMILLE M. KNIGHT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I, Camille M. Knight, a member of the Bar of this Court and counsel for petitioner James Broadnax, certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.3, that the attached Brief in Support of Motion for Certificate of Appealability is proportionately spaced, has a typeface of 14 points or more, and contains 12,739 words, not including those sections that are excluded under those rules.

s/ Camille M. Knight
CAMILLE M. KNIGHT

NOVEMBER 20, 2019

63