No. 19-70014

IN THE

# United States Court of Appeals for the Fifth Circuit

JAMES GARFIELD BROADNAX,

*Petitioner–Appellant,*

v.

LORIE DAVIS, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent–Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division

## RESPONSE IN OPPOSITION TO APPLICATION FOR CERTIFICATE OF APPEALABILITY

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GARRETT GREENE
Assistant Attorney General
*Counsel of Record*

P.O. Box 12548
Capitol Station
Austin, Texas 78711
512.936.1400
Garrett.greene@oag.texas.gov

*Counsel for Respondent–Appellee*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Respondent–Appellee*
Lorie Davis, Director, Correctional Institutions Division
TEXAS DEPARTMENT OF CRIMINAL JUSTICE

*Counsel for Respondent–Appellee*
Garrett M. Greene, Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Petitioner–Appellant*
James Garfield Broadnax

*Counsel for Petitioner–Appellant*
Steven C. Herzog
Kimberly A. Francis
Jordana L. Haviv
Ameya S. Ananth
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Camille M. Knight
BURLESON, PATE & GIBSON, LLP

s/ *Garrett Greene*
Garrett Greene
Assistant Attorney General

i

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2)(c), oral argument should be denied because the  facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................................. i

TABLE OF CONTENTS.................................Error! Bookmark not defined.

TABLE OF AUTHORITIES ...............................................................vi

INTRODUCTION..........................................................................1

STATEMENT OF JURISDICTION ..................................................1

STATEMENT OF THE ISSUES ......................................................1

STATEMENT OF THE CASE..........................................................2

I.      Facts Relating to Guilt/Innocence ....................................3

II.     Facts Relating to Punishment .........................................5

      A.      The State's future dangerousness evidence....................5

      B.      The defense's case in mitigation ...............................6

STANDARD OF REVIEW ...............................................................7

SUMMARY OF THE ARGUMENT..................................................10

ARGUMENT.................................................................................11

I.      Reasonable Jurists Would Not Debate the District Court's Denial of Broadnax's *Batson* Claim. ....................11

      A.      The State's race-neutral reasons for striking each juror are supported by the record. ........................14

      B.      Broadnax's statistical claim is not dispositive of discriminatory intent. ...........................................32

      C.      Reasonable jurists would not debate the district court's procedural ruling that Broadnax's spreadsheet is *Pinholster*-barred. ........................33

II.     Reasonable Jurists Would Not Debate the District Court's Decision that the Reseating of Juror Patterson was Sufficient to Remedy a *Batson* Violation.................................................37

III.    Reasonable Jurists Would Not Debate the Lower Court's Denial of Broadnax's Claim That the Seating of Juror Vessels Violated Due Process. ......................................................................39

    A.      Vessels's inability to give examples of mitigating circumstances did not render him unable to follow the law or consider mitigating evidence.........................................40

    B.      Vessels's answers on his juror questionnaire do not demonstrate an inability to consider mitigating evidence. .........41

IV.     Reasonable Jurists Would Not Debate the Lower Court's Denial of Broadnax's Selective Prosecution Claim. ...............................44

    A.      This claim is procedurally defaulted...............................44

    B.      This claim is meritless. ................................................45

V.      Reasonable Jurists Would Not Debate the District Court's Denial of Broadnax's Sixth Amendment Challenge to the Trial Court's Admission of his Uncounseled Media Interviews.................................48

    A.      Relevant facts..........................................................48

    B.      State court proceedings................................................49

    C.      The interviews did not constitute a "critical stage" of the proceedings............................................................50

VI.     Reasonable Jurists Would Not Debate the District Court's Denial of Broadnax's Ineffective Assistance of Appellate Counsel Claim. .......53

    A.      This claim is procedurally defaulted...............................54

    B.      Appellate counsel was not ineffective. ...........................54

VII.    Reasonable Jurists Would Not Debate Whether the District Court Correctly Applied the Relevant Legal Standards to Broadnax's Claims. .................................................................................58

CONCLUSION ..................................................................................61

CERTIFICATE OF COMPLIANCE ................................................63

ELECTRONIC CASE FILING CERTIFICATIONS .......................63

CERTIFICATE OF SERVICE ........................................................63

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) ..............................36

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ....................................................7

*Batson v. Kentucky*, 476 U.S. 79 (1986) ...............................Passim

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ...........................................58

*Broadnax v. State*, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011) .......................................................................................Passim

*Chamberlin v. Fisher*, 885 F.3d 832 (5th Cir. 2018)..............................32

*Chavez v. Cockrell*, 310 F.3d 805 (5th Cir. 2002) ..................................41

*Clark v. Thaler*, 673 F.3d 4107 (5th Cir. 2012) .....................................35

*Coleman v. Thompson*, 501 U.S. 722 (1991) ...................................42, 54

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ................................................8

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...................55

*Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007) ...........................43

*Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014)............................36

*Evans v. Davis*, 875 F.3d 210 (5th Cir. 2017) ........................................58

*Ex parte Broadnax*, 2015 WL 2452758 (Tex. Crim. App. May 20, 2015) .3

*Felkner v. Jackson*, 562 U.S. 594 (2011) ...............................................12

*Garcia v. Stephens*, 793 F.3d 513 (5th Cir. 2015) ..................................16

*Goss v. Johnson*, 199 F.3d 439 (5th Cir. 1999) ......................................46

*Gregg v. Georgia*, 428 U.S. 153 (1976) .................................................48

*Harrington v. Richter*, 562 U.S. 86 (2011) ..............................................8

*Hebert v. Rogers*, 890 F.3d 213 (5th Cir. 2018) ......................................20

*Hernandez v. New York*, 500 U.S. 352 (1991) ........................................12

*Hoffman v. Cain*, 752 F.3d 430 (5th Cir. 2014) ......................................13

*In re U.S.*, 397 F.3d 274 (5th Cir. 2005) ...............................................47

*Jones v. Butler*, 864 F.2d 348 (5th Cir. 1988) ........................................38

*Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992) ..........................55

*Laffler v. Cooper*, 132 S. Ct. 1376 (2012) ..............................................50

*Lewis v. Thaler*, 701 F.3d 783 (5th Cir. 2012) .......................................34

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ..............................................46

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ...............................................7

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ...............................................12

*Morgan v. Illinois*, 504 U.S. 719 (1992) ................................................40

*Murphy v. Dretke*, 416 F.3d 427 (5th Cir. 2005) ....................................13

*Pippin v. Dretke*, 434 F.3d 782 (5th Cir. 2005) ........................................8

*Powell v. Alabama*, 287 U.S. 45 (1932) .................................................50

*Purkett v. Elem*, 514 U.S. 765 (1995) ........................................................12

*Renico v. Lett*, 559 U.S. 766 (2010) .........................................................13

*Rice v. Collins*, 546 U.S. 333 (2006) .......................................................11

*Rice*, 546 U.S. at 974 ...............................................................................12

*Rideau* v. *Louisiana*, 373 U.S. 723 (1963) .............................................52

*Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191. (2008) .........................50

*Sheppard* v. *Maxwell*, 384 U.S. 333 (1966)............................................52

*Slack v. McDaniel*, 529 U.S. 473 (2000)....................................................8

*Smith v. Robbins*, 528 U.S. 259 (2000) ...................................................54

*Snyder v. Louisiana*, 552 U.S. 472 (2008)...............................................12

*Soria v. Johnson*, 207 F.3d 232 (5th Cir.2000).......................................40

*Sorto v. Davis*, 859 F.3d 356 (5th Cir. 2017)...........................................45

*Sorto v. Davis*, 881 F.3d 933 (5th Cir. 2018)...........................................45

*State ex rel. Curry v. Bowman*, 885 S.W.2d 421 (Tex. Crim. App. 1993)
    ............................................................................................................38

*Strickland v. Washington*, 466 U.S. 668 (1984)......................................54

*Teague v. Lane*, 489 U.S. 288 (1989).......................................................39

*Thaler v. Haynes*, 559 U.S. 43 (2010).....................................................22

*Thomas v. Vannoy*, 898 F.3d 561 (5th Cir. 2018) ...................................59

*U.S. v. Barnette*, 644 F.3d 192 (4th Cir. 2011) .......................................37

*United States v. Armstrong*, 517 U.S. 456, (1996) .................................45

*United States v. Sparks*, 2 F.3d 574 (5th Cir.1993)...............................45

*United States v. Thompson*, 735 F.3d 291 (5th Cir. 2013) .....................21

*United States v. Webster*, 162 F.3d 308 (1998) ......................................45

*Vasquez v. Hillery*, 474 U.S. 254 (1986)..................................................35

*Wayte v. United States*, 470 U.S. 598 (1985) ..........................................45

*Williams v. Davis*, 674 Fed. App'x. 359 (5th Cir. 2017).........................32

*Williams v. Stephens*, 761 F.3d 561 (5th Cir. 2014) ...............................55

*Wilson v. Sellers*, 138 S.Ct. 1188 (2018) .................................................59

*Woods v. Donald*, 575 U.S. 312 (2015) ....................................................53

Statutes

28 U.S.C. § 2253(c)(1)(A) ...........................................................................7

28 U.S.C. § 2253(c)(1)(A), (c)(2)................................................................1

28 U.S.C. § 2253(c)(2) .................................................................................7

28 U.S.C. § 2254(d)......................................................................................8

§ 2254(e)(1) ..................................................................................................9

Rules

Federal Rule of Appellate Procedure 34(a)(2)(c).......................................3

Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure ...............63

Rule 403.......................................................................................................56

x

Tex. R. App. P. 44.2(a)...........................................................57

x

## INTRODUCTION

Petitioner James Garfield Broadnax was convicted of and received the death penalty for the murder of Stephen Swan in the course of committing a robbery. He sought federal habeas relief, but the district court denied it. He now seeks a certificate of appealability (COA) on six issues. Because Broadnax has not made a substantial showing of the denial of a constitutional right as to any of his claims, this Court should deny a COA.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 2253(c)(1)(A), (c)(2).

## STATEMENT OF THE ISSUES

Petitioner's application (App.) presents six issues:

1.    Would reasonable jurists debate whether the district court correctly denied Broadnax's *Batson*[1] claim?

2.    Would reasonable jurists debate whether the district court correctly denied Broadnax's claim that the seating of Juror Vessels violated due process?

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

3.    Would reasonable jurists debate whether the district court correctly denied Broadnax's claim that he was selectively prosecuted based on race?

4.    Would reasonable jurists debate whether the district court correctly denied Broadnax's Sixth Amendment challenge to the trial court's admission of Broadnax's uncounseled media interviews?

5.    Would reasonable jurists debate whether the district court correctly denied Broadnax's claim that appellate counsel was constitutionally ineffective for failing to assert that the trial court erred in admitting Dr. Price's testimony?

6.    Would reasonable jurists debate whether the district court correctly applied the relevant legal standards to Broadnax's claims?

App. 2.

## STATEMENT OF THE CASE

Broadnax was convicted of capital murder in a judgment entered on August 21, 2009. ROA.2084. Pursuant to the jury's answers to the special issues on future dangerousness and mitigation, the trial court sentenced Broadnax to death. *Id*. The Texas Court of Criminal Appeals (CCA) affirmed Broadnax's conviction on direct appeal. *Broadnax v. State*, No.

AP-76,207, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011), *cert. denied*, *Broadnax v. Texas*, 133 S. Ct. 103 (2012).

Broadnax filed a state application for writ of habeas corpus. ROA.11394–493. After holding an evidentiary hearing, the trial court entered findings of fact and conclusions of law recommending that relief be denied. ROA. 12354–86. The CCA issued an order adopting the trial court's findings and conclusions and denying habeas relief. *Ex parte Broadnax*, No. WR-81,573-01, 2015 WL 2452758, at *1 (Tex. Crim. App. May 20, 2015), *cert. denied*, *Broadnax v. Texas*, 136 S. Ct. 77 (2015). The district court denied federal habeas relief and denied a COA. Broadnax filed an application for a COA, and this proceeding follows.

## STATEMENT OF FACTS

### I.    Facts Relating to Guilt/Innocence

On direct appeal, the CCA provided the following summary of the evidence of Broadnax's capital crime:

> A man riding his bicycle home from work saw the bodies of Stephen Swan and Matthew Butler in the street outside their recording studio in Garland shortly after 1:00 a.m. on June 19, 2008. The man alerted Garland firefighters at a nearby fire station. Upon arriving at the scene, the firefighters quickly determined that both Swan and Butler were recently deceased. At [Broadnax]'s trial, the medical examiner testified that Swan had suffered an intermediate-

3

range gunshot wound to the head, in addition to a gunshot wound to the left chest.

Later that day, [Broadnax] and his cousin, Demarius Cummings, arrived at the Southeast Dallas apartment where [Broadnax] had been staying with family members. While there, [Broadnax] boasted of "hit[ting] a lick"—street slang for committing a robbery—and displayed Swan's driver's license. [Broadnax] and Cummings left the apartment in Swan's Ford Crown Victoria, after telling those present that they planned to sell the vehicle. Fifteen minutes after [Broadnax] and Cummings left, [Broadnax]'s aunt's friend who had been present in the apartment saw news reports of the double homicide. She realized that [Broadnax] and Cummings were likely involved, and she called the Garland Police.

That evening, police officers in Texarkana (which is about 150 miles from Garland) saw Swan's car in a high-crime area. After a check of the license plates returned information for a Cadillac, rather than a Ford, officers pulled the vehicle over. [Broadnax] gave the officers his name, and after they learned that there were warrants for [Broadnax]'s arrest, the officers placed [Broadnax] in custody. The arresting officer testified that [Broadnax] did not appear to be intoxicated when he was pulled over.

After being returned to Dallas, [Broadnax] gave multiple interviews to television broadcasters in the Dallas area. These interviews became the crux of the State's case at trial. In them, [Broadnax] confessed to murdering and robbing Swan and Butler, and he provided explicit details of the crimes. He said that he and Cummings had traveled to Garland that day with the specific intent of committing a robbery. [Broadnax] said that while Cummings had participated in the robberies, [Broadnax], alone, had murdered the victims. [Broadnax] told reporters that he had no remorse for his actions, and that he hoped a jury would sentence him to death.

At trial, the defense conceded that [Broadnax] had shot Swan and Butler, but argued that [Broadnax] was under the influence of marijuana and PCP at the time of the murders. The defense further posited that [Broadnax] was still intoxicated at the time of his multiple television interviews and confessions four days after his arrest. Several of the State's witnesses were skeptical of [Broadnax]'s theory. In addition to the arresting officer's testimony that [Broadnax] was lucid at the time of his arrest, the reporters who interviewed him described [Broadnax] as intelligent and rational. The jail nurse, too, testified that [Broadnax] did not appear to be under the influence of alcohol or drugs.

*Broadnax*, 2011 WL 6225399, at *1.

## II.   Facts Relating to Punishment

### A.   The State's future dangerousness evidence

In response to Broadnax's direct appeal claim that the evidence of

future dangerousness was insufficient, the CCA recounted:

Here, [Broadnax] confessed to murdering two defenseless men in order to steal their car so he could return home. [Broadnax] described to reporters how he shot each man a second time after their initial wounds failed to kill them immediately. Then, when [Broadnax] was sure the victims had expired, he rifled through their pockets. The probability of [Broadnax]'s future dangerousness also can be inferred from evidence showing a lack of remorse. In the same television interviews discussed above, [Broadnax] coldly and calmly walked reporters through the murders. When asked if he had anything to say to the victims' families, [Broadnax] responded, "Fuck 'em." To the specific question by the interviewer, "Do you have any remorse, none whatsoever?" [Broadnax] only shook his head.

5

Finally, in one of the interviews [Broadnax] discussed the probability that he would commit criminal acts of violence that would constitute a continuing threat to society:

Reporter:    What do you think's going to happen to you now?

[Broadnax]:    Whatever they throw at me. Hopefully the death penalty.

Reporter:    Hopefully?

[Broadnax]:    Yea. 'Cuz they give me life I'ma' kill somebody else. Straight up. I'm telling you right now. I can't do no motherfuckin' life. I'ma' go crazy.

Reporter:    So you want the death penalty?

[Broadnax]:    They better. Pick one [Broadnax holds up each arm, presumably referencing the lethal injection method of execution]. Or you gon' have some more bodies.

Reporter:    Oh, in here you're gonna kill someone?

[Broadnax]:    Nah. Whichever penitentiary they send me to. They better put me on death row. Tell you just like I'ma' tell the judge.

*Broadnax*, 2011 WL 6225399, at *17.

## B.    The defense's case in mitigation

Broadnax did not dispute that he killed the victims, but instead his defense focused on his drug use as a mitigating factor. Broadnax

6

presented expert testimony on brain development and the effects of PCP use on the human brain. According to Dr. Cheryl Silver, Broadnax's brain would not have been fully developed at the time of the offenses because he was only nineteen years old. ROA.11315. Dr. Frank Lane, a jail physician who treated Broadnax, testified that Broadnax claimed that he was hallucinating, was paranoid, and did not remember talking to the media. ROA.11323–26. Broadnax also told him that he had used PCP at the time of the offense. Because of this, Dr. Lane concluded that Broadnax was most likely suffering from mood and perceptual disturbances due to prior PCP use. ROA.11326.

## STANDARD OF REVIEW

Broadnax seeks review of the denial of his federal habeas petition. But "[b]efore an appeal may be entertained, [Broadnax] must first seek and obtain a COA" as a jurisdictional prerequisite. *Miller-El v. Cockrell,* 537 U.S. 322, 335–36 (2003) (*Miller-El I*); *see also* 28 U.S.C. § 2253(c)(1)(A). The standard to be applied is whether he "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). This "includes showing that reasonable jurists could debate (or, for that

7

matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citations omitted).

When an inmate seeks a COA on a claim denied on the merits by a state court, it must be reviewed in light of 28 U.S.C. § 2254(d). *Miller-El*, 537 U.S. at 341. This section, as amended by AEDPA, requires federal district courts to give deference to state court decisions. *See Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005). Review under § 2254(d) is "limited to the record that was before the state court" and "focuses on what a state court knew and did." *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Under § 2254(d), a federal court may not grant habeas relief unless the state-court adjudication (1) "was contrary to federal law then clearly established in the holdings of" the Supreme Court; or (2) "involved an unreasonable application of" clearly established Supreme Court precedent; or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation omitted). Findings of fact

made by the state court are presumed correct unless rebutted by clear and convincing evidence. § 2254(e)(1).

What is more, formulation of the COA test is dependent on whether the district court dismisses the petitioner's claim on constitutional or procedural grounds. If the district court rejects the constitutional claims on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of [those] claims debatable or wrong." *Slack*, 529 U.S. at 484. But when the district court denies habeas relief on procedural grounds without reaching the underlying constitutional claims, a COA should only issue if the petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of a denial of a constitutional right, *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added).

Thus, a COA determination "requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller–El I*, 537 U.S. at 336. This threshold inquiry "does not require full consideration of the factual or legal bases adduced in support of the

claims," nor does it require a showing that an appeal will be successful.
*Id.*

## SUMMARY OF THE ARGUMENT

A COA should not issue for any of Broadnax's claims.

First, the State provided race-neutral, record-based reasons for its peremptory strikes, which were grounded in the veniremember's answers to questions about their views on the death penalty. Further, the reinstatement of an excluded veniremember is an appropriate remedy for a *Batson* violation under Texas law. And there is no clearly established Supreme Court precedent holding that dismissal of an entire jury panel is required whenever a trial court determines there has been a single *Batson* violation.

Second, the record shows the juror Broadnax challenged for cause had an open mind regarding the mitigation special issue.

Third, the statistics and studies of other prosecutions cited by Broadnax fail to show evidence of selective prosecution as it pertains to his case.

Fourth, since the reporters conducting the interviews were not acting as agents of the State, the interviews were not critical stages

10

under the Sixth Amendment. Further, there is no clearly established Supreme Court precedent holding that a voluntary media interview is a critical stage of a trial.

Fifth, given the relevance of Dr. Price's testimony, and its slight effect—if any—on the jury's findings at the punishment phase, Broadnax is unable to show that he would have prevailed on appeal had counsel pressed this point.

Lastly, reasonable jurists would not debate whether the district court correctly applied the relevant legal standards to Broadnax's claims. Accordingly, no COA should issue.

## ARGUMENT

### I.    Reasonable Jurists Would Not Debate the District Court's Denial of Broadnax's *Batson* Claim.

Broadnax urges that the State's peremptory strikes were exercised in a racially discriminatory manner. App. 21–39. The record reveals otherwise.

Claims of race-based use of peremptory strikes are governed by the three-step test enunciated in *Batson*. *See Rice v. Collins*, 546 U.S. 333, 973 (2006). A defendant must first make out a prima facie case that race motivated the challenged strikes. *Batson*, 476 U.S. at 96–97. If such a

showing is made, the prosecutor must then provide race-neutral explanations for the strikes in question. *Id.* at 97–98. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam). "[S]o long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 974. Finally, the trial court must weigh the evidence and determine whether the race-neutral explanation is credible or whether it is merely pretext for purposeful discrimination. *Batson*, 476 U.S. at 98. The final step "largely will turn on evaluation of credibility." *Id.* at 98 n.21.

In short, the trial court considers the relevant circumstances bearing upon racial animosity. *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (*Miller-El II*). But "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion).

A trial court's denial of a *Batson* claim "is entitled to 'great deference' and 'must be sustained unless clearly erroneous.'" *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). That, however, "is the standard on direct review," but

as Broadnax overlooks, AEDPA imposes an even higher standard of review which "'demands that state-court decisions be given the benefit of the doubt.'" *Felkner*, 562 U.S. at 598 (quoting *Renico v. Lett*, 559 U.S. 766 (2010)). "Therefore, the federal court's role is to 'determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary.'" *Hoffman v. Cain*, 752 F.3d 430, 448–49 (5th Cir. 2014) (quoting *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005)).

The basis of Broadnax's *Batson* challenge is his assertion that "the State treated white and nonwhite veniremembers differently." App. 21. But the State's race-neutral reasons for exercising the peremptory strikes are objectively verifiable and grounded in the record. Indeed, regardless of race, the State consistently struck jurors who were not in favor of the death penalty or who may have been prevented from imposing the death penalty in Broadnax's case. And importantly, where the State asserts multiple race-neutral bases for its strike, even if Broadnax could show that the State accepted a white juror that shared one or some traits with the *Batson*-challenged venireperson, it does not

13

establish that the strike was racially motivated. *See Hoffman*, 752 F.3d at 449 ("It is not clear from the record that the trial judge solely relied on that one race-neutral reason, and we give AEDPA deference to fact-findings made by a state appellate court.").

With that in mind, reasonable jurists would not debate the district court's denial of this claim for the following reasons.

A.   **The State's race-neutral reasons for striking each juror are supported by the record.**

Out of a qualified pool of 47 people, the State exercised peremptory challenges to strike eight minority veniremembers.[2] Broadnax's trial counsel made *Batson*-based objections to each of the strikes. In turn, the State explained its race-neutral reasons for striking the qualified jurors. Among all articulated race-neutral , record-based reasons offered by the State, none are more evident than the reasons rooted in the veniremembers' answers to the juror questionnaire. Notably, the State struck every venireperson—regardless of race—that indicated on their

---

[2] Relevant to Broadnax's claim on this point, seven of these struck veniremembers were not empaneled on the jury. *See infra* Section I (A) (1)–(7)). The State also exercised a strike on Juror Patterson, who is African-American. ROA.10393. However, Juror Patterson was eventually included as part of the jury. Patterson's circumstances are addressed in further detail below. *See infra*, Section II.

14

questionnaire that (1) they were not in favor of the death penalty, or (2) that they believed that the death penalty should never be invoked. ROA. 10351–52. *See Hoffman*, 752 F.3d at 449 (accepting hesitancy to impose a death sentence as race-neutral).

For instance, the first page of the questionnaire presented two questions. The first question asked: "Are you in favor of the death penalty?" *See, e.g.*, 55–57 RR (Juror Questionnaire p. 1). Of the seven veniremembers struck by the State to which trial counsel lodged a *Batson* challenge, five of them checked "No". 55 RR (Vation Questionnaire p. 1), (Rivera Questionnaire p. 1), (Riser Questionnaire p. 1); 57 RR (Jackson Questionnaire p. 1), (Morrison Questionnaire p. 1).

Next, the questionnaire asked venirepersons to circle a response to the following question: "With reference to the death penalty, which of the following statements best represents your feelings?" Answer choice number "3" read: "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances." 55–57 RR (Juror Questionnaire p. 1). Three of the seven *Batson*-challenged veniremembers circled this answer choice. 55 RR (McCraney Juror Questionnaire p. 1), (Riser

15

Questionnaire p.1); 57 RR (Morrison Questionnaire p. 2); s*ee Garcia v. Stephens*, 793 F.3d 513, 529 (5th Cir. 2015) ("We have upheld peremptory strikes as race-neutral  on the basis of a prospective juror's hesitation, even where the juror ultimately indicated he could vote to impose death.").

Again, every *Batson*-challenged venireperson who was excluded from the jury, except Agwana Long, indicated on the first page of the juror questionnaire that they were either not in favor of the death penalty or that they believed that the death penalty ought never be invoked.[3] The State struck all who answered this way. ROA.10351–52; ROA.10425; *see also* ROA.1192, n. 73 ("Unlike the venire members against whom the prosecution exercised peremptory strikes, however, none of these venire members gave any questionnaire or voir dire answers indicating they were opposed to the death penalty . . . .").

As shown in greater detail below, Broadnax is unable to show the State's peremptory strikes were done in a discriminatory fashion.

---

[3] To the extent that juror Patterson's strike is relevant to the State's strikes exercised against the excluded venirepersons, he was struck by the state primarily because (1) during voir dire, he expressly stated that he did not believe in the death penalty, and (2) he was the foreman on two juries, one of which returned a not guilty verdict. ROA.10395.

16

### 1.    Agwana Long

The State gave several reasons for striking Long. ROA.10386–91. Notable among these was the fact that Long answered she would be "automatically prevented" from imposing the death penalty if the defendant were on drugs when the crime was committed. ROA.10389.

Particularly, page six of the questionnaire asked: "Would a person's use of drugs or alcohol at the time of the offense automatically prevent you from assessing the death penalty if you found him guilty of capital murder?" 55–57 RR (Juror Questionnaires p. 6). Venireperson Long answered "yes," and in the space provided for an answer she stated, "I believe drugs alter a person['s] way of thinking." 57 RR (Long Questionnaire p. 6.).[4] Long confirmed this answer during voir dire, explaining that in the case of voluntary intoxication, "I do think you are responsible for your actions, but I do also think it plays your—it [alters] your thought process. . . I don't think you're at full potential with your thought process." ROA.9498–99.

---

[4] As explained below, *Batson*-challenged venireperson Mattie Vation also answered yes to this question. 55 RR (Vation Questionnaire p. 1).

Since the State was aware that the jury would hear evidence alleging that Broadnax was on drugs when he committed the murders,[5] it was critical that it strike jurors that would be unable to assess a death sentence in those circumstances.

Additionally, the State explained that it exercised a peremptory challenge to Long because she expressed mixed feelings regarding the death penalty, thought that life without parole was the better punishment option, believed that prison was a controlled environment, expressed a limited view of future dangerousness, did not believe that a co-defendant should receive the same punishment as a shooter, and had been on probation for theft. ROA.10387–91. All of which are supported by the record.[6] ROA.1190, n. 72.

---

[5] As the State explained during jury selection, "this hits squarely on the defensive theory of intoxication and what they seem to be heavily voir diring with on each panel member." ROA.10416.

[6] At voir dire, Long confirmed her statement on her questionnaire that she had mixed feelings about the death penalty. ROA.9464. 57 RR (Long Questionnaire p. 1). She explained that she was against the death penalty in some cases, but was in favor of it in cases involving children and the elderly "because they are defenseless more so . . . ." ROA.9465. In addition, in her questionnaire, Long stated that she thought a lifetime in prison was the equivalent to the death penalty and that she was "strongly in favor" of life without parole because she believed it would force the defendant to think about the crime and "deal with it." 57 RR (Long Questionnaire p. 5). Long confirmed these beliefs during voir dire. ROA.9473, 86–88. Long stated that she thought that prison was a controlled environment where violence was less likely to occur. ROA.9482. In addition, at one point during voir dire, Long appeared to be under

18

Further, while Broadnax points to several jurors he claims gave similar answers to Long regarding her mixed feelings about the death penalty, he fails to point to any other juror accepted by the State who would have been automatically prevented from imposing the death penalty if the defendant were under the influence of drugs. App. 24–26. Broadnax argues that a white veniremember, William Stinson, believed like Long that "intoxication was a mitigating circumstance." App. 26. But this misses the mark. Unlike Long, Stinson answered that voluntary intoxication would *not* automatically prevent him from imposing the death penalty. 57 RR (Stinson Questionnaire p. 6) (emphasis added).

To be sure, in the comparative context, Broadnax need not show that white and nonwhite veniremembers were "identical in all respects." App. 22; *Miller-El II*, 545 U.S. at 247 n.6. Still, Long unequivocally stated on her questionnaire that she would be "automatically prevented" from imposing the death penalty if the defendant were on drugs when the crime was committed. Like on direct appeal, Broadnax fails to point to a veniremember that the State did not strike that took "such a definitive

---

the impression that the State was required to prove that a defendant would commit the same offense in order to prove he was a future danger. ROA.9483–84.

19

position." *Broadnax*, 2011 WL 6225399, at *3; *see Hebert v. Rogers*, 890 F.3d 213, 223 (5th Cir. 2018), *cert. denied,* 139 S. Ct. 1290 (2019) ("While a comparator-juror is not required to be identical in all regards, the comparator-juror must be similar in the relevant characteristics.").

On that basis, reasonable jurists would not debate the district court's determination that the state court reasonably rejected Broadnax's claim that this strike was the product of racial discrimination.

### 2.     Shaven McCraney

At the *Batson* hearing, the State explained that it had exercised a peremptory challenge against Shaven McCraney primarily because she listed herself as a "3," was otherwise very weak on the death penalty in her questionnaire and at voir dire, could not look at Broadnax during voir dire, and was a single woman who wanted to mentor young men who did not have a father figure. 55 RR (McCraney Juror Questionnaire p. 1); ROA.10352–53; ROA.1189, n. 71.

After checking the box indicating that she was in favor of the death penalty, venireperson McCraney qualified her choice, "I check yes, but really I'm unsure. It depends on [the] situation I guess." 55 RR (McCraney Juror Questionnaire p. 1). She also stated that she would only

20

be able to assess the death penalty if there were several other people making the decision with her. ROA.3582. Moreover, when the prosecutor asked her to look at Broadnax, she stated that it made her nervous to look at him because, in her words, "It's a little bit uncomfortable for me to be sitting in the same room with someone that I have to make that type of a decision." ROA.3581.

Still, Broadnax contends that the State's proffered reasons for striking McCraney were pretextual. App. 26–29. Notably missing from Broadnax's argument, however, is that fact that McCraney selected answer choice "3" on the first page of the juror questionnaire. Again, all jurors who circled this answer choice were struck. ROA.10351–52; *see Hebert*, 890 F.3d at 223.

Instead, Broadnax focuses on the State's assertions related to McCraney's nervous demeanor, even though that was not the only reason the State gave. Notwithstanding the fact McCraney chose answer choice "3," a nervous demeanor is an acceptable race-neutral basis for striking a juror. *See United States v. Thompson*, 735 F.3d 291, 297 n.14 (5th Cir. 2013). And Supreme Court case law refutes Broadnax's assertion that the lack of an express credibility finding by the trial court in this regard

renders this demeanor-related reason pretextual. As the district court correctly noted: "[t]here is no clearly established federal law requiring that a judge have personally observed a venire member's demeanor during voir dire in order to make credibility findings on that subject." ROA.1187, n.64; *see Thaler v. Haynes*, 559 U.S. 43, 48 (2010).

Thus, reasonable jurists would not debate the district court's determination that the state court reasonably rejected Broadnax's claim that this strike was the product of racial discrimination.

### 3.    Curtis Riser

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Curtis Riser primarily because he was not in favor of the death penalty, listed himself as a "3," ranked himself as a "1" in support of the death penalty, stated he believed that the death penalty was imposed too often, believed that voluntary intoxication should be considered, has a cousin in prison for murder, believed that the lack of a father-figure would be mitigating, and indicated that he saw his son in Broadnax. ROA.10369–71; ROA.1188, n. 67; 55 RR (Riser Questionnaire, p. 1).

Broadnax asserts that several white venirepersons expressed similar views as Riser concerning wrongful convictions, rehabilitation, and had relatives who were incarcerated. App. 29–30. But even if Riser could be considered similarly situated to these members of the venire in terms of views on wrongful convictions and rehabilitation, Broadnax fails to point out that Riser differed from these veniremembers in significant ways. Namely, Riser stated on his juror questionnaire that he was not in favor of the death penalty, listed himself as a "3," and characterized himself as "1" out of "10" on a scale of his support for the death penalty. 55 RR (Riser Questionnaire, pp. 1, 4). Broadnax points to no accepted jurors that gave these answers. Because there were none. ROA.10351–52; ROA.1192, n. 73.

Therefore, reasonable jurists would not debate the district court's determination that the state court reasonably rejected Broadnax's claim that this strike was the product of racial discrimination.

### 4.    Mattie Vation

The State explained that it exercised a peremptory challenge against Mattie Vation mainly due to her views on the death penalty. ROA.1188, n. 65; ROA.10425; ROA.10356–57. The State also explained

23

that it's strike was based on the following: her answer on the juror questionnaire that the use of drugs or alcohol at the time of the offense would automatically prevent her from imposing the death penalty; she had a sister that had struggled with drug addiction; she had a brother and nephew in prison; she had engaged in what the State considered jury nullification during prior jury service; when she heard about the crime on the news, she felt compassion for the men who killed the victims; she had many spelling and grammar errors on her questionnaire; and she appeared anxious to get on the jury. ROA.10357–60.

On the juror questionnaire, venireperson Vation answered that she was not in favor of the death penalty. And underneath the question she wrote, "I believe in 2nd chances. Too many [have] died innocent I believe I have to think of my love[d] ones." 55 RR (Vation Questionnaire, p. 1). During voir dire, Vation confirmed her answer and explained that she had problems with the death penalty because of all the recent DNA exonerations. ROA.3758–59. She also stated on her juror questionnaire that voluntary intoxication would automatically prevent her from assessing the death penalty, although she attempted to change this answer during voir dire. 55 RR (Vation Questionnaire p. 6); ROA.3771–

24

74; *see Miller-El*, 545 U.S. at 248 (noting that peremptorily striking a venireperson for inconsistent answers can be a race-neutral reason). As explained above, given that there was evidence of Broadnax's drug-use, this inconsistency was highly relevant to the State.

Broadnax asserts the State "mischaracterized Mattie Vation's questionnaire and her feelings toward the death penalty." App.at 31. But the record belies this assertion. Venireperson Vation expressly stated on the juror questionnaire the she was not in favor of the death penalty. 55 RR (Vation Questionnaire, p. 1). The State struck every venireperson who fell into this category. ROA.10351–52; ROA.10425; *see also* ROA.1192, n. 73. In fact, the State specifically said it was striking Vation because she stated she was not in favor of the death penalty; it even read her written answer to the trial court. ROA.10357.

Accordingly, reasonable jurists would not debate the District court's determination that the state court reasonably rejected Broadnax's claim that this strike was the product of racial discrimination.

### 5.   Angelita Rivera

The State explained that it exercised a peremptory challenge against venireperson Rivera primarily because she was not in favor of

25

the death penalty; listed rehabilitation as a primary goal of punishment; stated that in deciding punishment, she would want to know if the defendant had availed himself of available resources, but was unable to articulate what such resources were; would require the State to prove that Broadnax had been violent in the past to show future dangerousness; had a relative that was murdered by another relative; and did not believe that the criminal justice system protected the rights of the accused. ROA.10363–68.

Indeed, Rivera answered that she was not in favor of the death penalty on the juror questionnaire. 55 RR (Rivera Questionnaire p. 1). During voir dire, although Rivera stated that she knew that the law allowed the death penalty and that she could follow the law, she repeatedly admitted that she had religious and moral convictions against the death penalty, which was consistent with her answer on the questionnaire. ROA.3999–4000, 4003; 55 RR (Rivera Questionnaire p. 1). Furthermore, Rivera admitted she was hesitant in her answers about the death penalty. ROA.4010. Further, on her questionnaire, Rivera ranked "rehabilitation" as the primary objective of punishment. 55 RR (Rivera Questionnaire p. 8). During voir dire, Rivera stated that she has

26

witnessed people change and she believes the judicial system provides rehabilitation, but not all inmates accept the help. ROA.4000–03. She also stated that she believed that the death penalty should only be imposed if a person commits "[r]epeated, repeated, repeated, murders." ROA.4010–11.

In addition to relying on the flawed claim that any of the State's reasons that relied on demeanor could not be accepted, App. 33–34, *Haynes*, 559 U.S. at 47, Broadnax's assertions that Rivera provided "many pro-prosecution answers" and "indicated strong support" for the death penalty in certain circumstances are undercut by one simple fact. Rivera chose that she was not in favor of the death penalty and the State struck all jurors who answered this way. ROA.1192, n. 73.

Moreover, Broadnax fails to account for the strong religious conviction Rivera expressed towards the death penalty. App. 32–34. Indeed, "[t]he prosecution called those answers to the trial court's attention, as well as pointed out this venire member was studying for the ministry and expressed strong personal views which could interfere with her ability to render a pro-prosecution verdict at the punishment phase

27

of a capital murder trial, both points amply demonstrated in her voir dire examination." ROA.1188, n. 66.

Reasonable jurists would not debate the District court 's determination that the state court reasonably rejected Broadnax's claim that this strike was the product of racial discrimination.

### 6.    Dedric Morrison

The prosecution explained that it exercised a peremptory challenge against Dedrick Morrison primarily because he was not in favor of the death penalty; he strongly believed that one could change while in prison; he believed that some people that commit crimes while on drugs might not remember what they did; he recently had a cousin that was killed by a police officer; and he indicated that age was an important factor in a person's ability to change. ROA.10414–18. The record supports these explanations.

Morrison answered that he was not in favor of the death penalty on the juror questionnaire, and wrote underneath the question, "You never know what caused the individual to perform whatever act they did. Every individual will change in the essence of time." 57 RR (Morrison

28

Questionnaire p. 1). During voir dire, Morrison reiterated that all people will change over the course of time. ROA.10026–27.

And he indicated on his questionnaire that he believed that some individuals who commit crimes while intoxicated do not realize what they have done until they sober up; consequently, he considered evidence of intoxication to be mitigating. 57 RR (Morrison Questionnaire p. 6). While Broadnax points out that William Stinson, who was not challenged by the State, also indicated that he agreed that intoxication should be considered mitigating, Stinson did not give the detailed answer that individuals may not realize what crimes they committed while on drugs. App. 34; 57 RR (Stinson Questionnaire p.1).

Moreover, during voir dire, Morrison spoke about his cousin who had been killed by an Austin police officer. ROA.10001–02. He explained that the killing was believed to have been intentional and sparked riots in Austin. ROA.10004. Further, he expressed distrust for law enforcement. ROA.10016; ROA.1189, n. 69.

Given his answer that he was not in favor of the death penalty, along with the other race-neutral explanations offered by the State, reasonable jurists would not debate the District court 's determination

29

that the state court reasonably rejected Broadnax's claim that this strike was the product of racial discrimination.

### 7.    Betty Jackson

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Betty Jackson primarily because she was not in favor of the death penalty, selected answer choice "3," and because she would only assess the death penalty in cases that involved the sexual assault or murder of a child. ROA.10412.

Indeed, Venireperson Jackson answered that she was not in favor of the death penalty and wrote, "I believe in life in prison without any chance of parole." 57 RR (Jackson Questionnaire p. 1). Jackson also identified herself as a "3." *Id*. In addition, on her questionnaire, she stated that cases involving rape and murder should carry with it the possibility of the death penalty regardless of the person's past." *Id*. (Jackson Questionnaire p. 4). In his COA application, Broadnax characterizes the State's explanation that she would only consider the death penalty in cases of sexual assault of a child as, "mere speculation." App. 35. The record demonstrates otherwise.

30

During voir dire, when asked if a situation where a person sexually assaults and murders a child was the only exception where she would consider the death penalty as a verdict, she replied, "right." ROA.9933. Then she was asked, "In all other situations life in prison . . . that's going to be the verdict that's rendered in that particular case for you?" ROA.9933–34. She answered, "That's correct." ROA.9934. In any event, Jackson answered she was not in favor of the death penalty, in addition to circling answer choice "3" on the questionnaire.

All in all, the CCA found that the reasons given by the State regarding the strikes were not a "pretext for discrimination." *Broadnax*, 2011 WL 6225399, at *3. In like manner, upon a thorough review of the record, the District court   found that the state provided "racially neutral, objectively verifiable, record-based, reasons for" the peremptory strikes. ROA.1190. And Broadnax's assertions do not present clear and convincing evidence to the contrary regarding the trial court's decision to accept the prosecutor's multiple race-neutral reasons for the peremptory strikes. *See Hoffman*, 752 F.3d at 448–49. Because reasonable jurists would not debate the district court's determination that the state court

31

reasonably rejected this claim, Broandax is not entitled to a COA on this issue.

### B.    **Broadnax's statistical claim is not dispositive of discriminatory intent.**

Broadnax notes that the State used its peremptory challenges to eliminate "100%" of minority veniremembers.[7] App. 15. And that for this reason alone, a COA should be granted. App. 14.

But Broadnax's bare statistical clam is not dispositive. Indeed, "[t]he Supreme Court has instructed that, when analyzing *Batson* challenges, 'bare statistics' are not the be-all and end-all.'" *Chamberlin v. Fisher*, 885 F.3d 832, 840 (5th Cir. 2018), *cert. denied sub nom. Chamberlin v. Hall*, 139 S. Ct. 2773 (2019) (quoting *Miller-El II*, 545 U.S. at 241); *see also Williams v. Davis*, 674 Fed. App'x. 359, 365 (5th Cir. 2017) (unpublished) (denying a COA for a *Batson* claim even though "no black jurors served on [the defendant's] jury").

Instead, "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" is "[m]ore

---

[7] Specifically, Broadnax asserts that "[o]ut of the 47 veniremembers who were qualified to serve, black and Hispanic veniremembers constituted 17% of Broadnax's venire panel, but the state used 53% of its peremptory strikes to eliminate 100% of them." App. 15.

powerful" evidence. *Miller-El II*, 545 U.S. at 241. As set out above, *supra* Section I(A), the record "fully support[s] the race-neutral reasons given by the prosecution for peremptorily striking" each of the challenged veniremembers. ROA.1187.

### C.     **Reasonable jurists would not debate the district court's procedural ruling that Broadnax's spreadsheet is *Pinholster*-barred.**

In the proceedings below, Broadnax attempted to introduce—for the first time—a spreadsheet he claims is proof of the State's discriminatory intent in the jury selection process. ROA.612; 720. The spreadsheet, purportedly prepared by the Dallas County DA's Office, lists the juror's gender, race, and the number of an answer choice selected on their juror questionnaire. Further the African-American jurors' names are in bold. The district court found that the spreadsheet was barred by *Pinholster* because it had not been presented to the state court. ROA.1190–91, n. 73. Broadnax fails to show this conclusion is debatable.[8]

---

[8] In part of his challenge to the district court's application of *Pinholster*, Broadnax asserts that the spreadsheet was not available to him "prior to the federal habeas proceedings." App. 36. To be sure, factual or legal unavailability can be cause for failing to exhaust a procedurally defaulted claim. But Broadnax points to no case law holding that a similar "cause" exception exists under *Pinholster*. App. 36.

"The import of *Pinholster* is clear[.] *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012). When a claim has been adjudicated on the merits, review "is limited to the record that was before the state court." *Pinholster*, 563 U.S. at 181. Because the state court did not consider these documents, the district court correctly concluded it could not either. *Id.* at 182–83. ("It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.").

Still, Broadnax urges that the district court's conclusion was wrong. Namely, Broadnax claims that since this spreadsheet "fundamentally alters" his *Batson* claim, it is not "barred" under *Pinholster*. App at 36–37. Essentially, Broadnax argues that this new evidence changes his claim such that it is new and unexhausted. And because his claim is unexhausted—and unadjudicated for that matter—the district court could have considered evidence not presented to the state court. To this end, Broadnax attempts to use AEDPA's exhaustion requirement, which is supposed to be a "significant limitation[] on the power of a federal court," *Pinholster*, 563 U.S at 186 n.9, as means to evade AEDPA's deference to state courts and limits on review of new evidence.

34

This is a non-starter. "[T]he exhaustion requirement of § 2254(b) is a reinforcement of, rather than an escape hatch from, the rule that a federal habeas court's review is limited to the state court record." *Lewis*, 701 F.3d at 789–91. Thus, "[i]n light of the teachings in *Pinholster*," this Court is no longer[9] "tasked with determining whether all the new evidence that [a petitioner presented to the federal district court] was exhausted. [It] consider[s] only the record that was before the state habeas court." *Clark*, 673 F.3d at 417 (footnote omitted). For good reason, *Pinholster* read § 2254(d)(1) as barring new evidence; it makes no sense to allow a petitioner to overcome that bar on new evidence by introducing new evidence.

---

[9] The "factual exhaustion" Broadnax seeks is a remnant of pre-*Pinholster* jurisprudence dealing with federal factual development. Prior to AEDPA, no deference was given to state-court legal determinations and petitioners could rely on new evidence to attack state-court decisions. To protect comity, however, petitioners were limited in the type of the new evidence on which they could rely in federal court. *See, e.g.*, *Vasquez v. Hillery*, 474 U.S. 254, 257–58 (1986). Petitioners could introduce new evidence, but only if it merely supplemented the evidence presented in state court, and not if it "fundamentally alter[ed] the legal claim already considered by the state courts." *Id.* at 260. But AEDPA replaced this exhaustion-based limit with a flat prohibition on the introduction of new evidence to attack a state-court adjudication. *See Pinholster*, 563 U.S. at 187 n.11. Following AEDPA's enactment, this Court continued to apply the exhaustion-based limit because it believed that AEDPA still allowed new evidence to attack a state-court adjudication. Thus, some limit on that evidence remained necessary. *See Clark v. Thaler*, 673 F.3d 410, 416–17 (5th Cir. 2012). *Pinholster* then made clear that all new evidence is barred and rendered the factual-exhaustion inquiry obsolete.

Even assuming *Pinholster* provides for the kind of exception Broandax posits, his *Batson* claim is not fundamentally altered by the spreadsheet. In state court, Broadnax brought the same *Batson* argument he brings now. At most, the spreadsheet adds support to that claim. But merely putting a claim in a stronger evidentiary posture does not make it a new claim. *Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014); *cf. Anderson v. Johnson*, 338 F.3d 382, 388, 398 n.26 (5th Cir. 2003) (to fundamentally alter a claim, the new evidence must "ris[e] to the level of a '180 degree turn,'" "present[ing] a ground of ineffectiveness that is *entirely independent* of the grounds presented in the state courts." (quotation marks omitted) (emphasis added).

Because the district court's refusal to consider the spreadsheet is fully supported by *Pinholster*, its decision is not debatable, and Broadnax's request for a COA on this issue should be denied.

Even if consideration of the spreadsheet were not barred by *Pinholster*, as the district court found, the spreadsheet itself does not provide evidence of racial discrimination. That the State was aware of the race and gender of the veniremembers does not provide per se evidence of discrimination, since the State was likely anticipating any

36

claims Broadnax would make as to these challenges. *Cf. U.S. v. Barnette*, 644 F.3d 192, 211 (4th Cir. 2011) ("Barnette has failed to present any evidence suggesting that this practice was anything more than a way for the prosecutors to identify jurors.").

## II. Reasonable Jurists Would Not Debate the District Court's Decision that the Reseating of Juror Patterson was Sufficient to Remedy a *Batson* Violation.

Broadnax contends that the district court erred in concluding that the trial court's remedy of reseating Juror Patterson after a *Batson* violation was found, without selecting an entire new jury, was adequate. App. 39. But Broadnax points to no clearly established Supreme Court authority that requires such a remedy.

After initially denying Broadnax's *Batson* challenge to Juror Patterson, the trial court had a hearing and granted the challenge.[10] ROA.10574. The trial court then restored Juror Patterson to the jury. Notably, on direct appeal, the CCA found the trial court erred by finding there was a *Batson* violation at all. *Broadnax*, 2011 WL 6225399, at *4.

---

[10] The judge presiding during the initial *Batson* challenge to Juror Patterson was not the same judge who eventually sat at trial. ROA.10410 (indicating Judge Biard denied the *Batson* challenge); ROA.10566 (Judge Snipes presided at trial and at the second *Batson* hearing). And based on his concerns over the fact that all the African-American jurors had been struck, the judge who presided at trial ordered a second *Batson* hearing to reconsider the ruling on Juror Patterson. ROA.10567.

A fact acknowledged by the district court. ROA.1192. This conclusion is supported by the record evidence revealing the race-neutral reasons for the State's striking of Patterson. Namely, the fact that he did not believe in the death penalty. ROA.10395.

That said, Broadnax asserts that after "finding a *Batson* violation, the trial court should have struck the entire jury panel and begun voir dire again." App. 40. But clearly established Supreme Court precedent does not compel this result. *See* ROA.1193. To the contrary, the Court in *Batson* explained, "We express no view on whether it is more appropriate in a particular case, upon a finding of discrimination . . . for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case . . . or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." 476 U.S. at 99 n. 24.

Further, in Texas, reinstating an excluded veniremember is an appropriate remedy for a *Batson* violation. *E.g., State ex rel. Curry v. Bowman*, 885 S.W.2d 421, 425 (Tex. Crim. App. 1993) (holding that a decision to reinstate *Batson*-challenged veniremembers to the jury was appropriate); *see also Jones v. Butler*, 864 F.2d 348, 370 (5th Cir. 1988).

38

And Broadnax's contrary caselaw from other jurisdictions fails to establish that the Texas approach violates clearly established federal law as required by AEDPA. App. 41.

By extension, the creation of the rule proffered by Broadnax—that a *Batson* violation requires a state trial court to dismiss the entire jury—would violate federal habeas non-retroactivity principles under *Teague v. Lane*.[11] ROA.1193 ("Furthermore, Respondent correctly argues that the new rule advocated by Broadnax in this federal habeas corpus proceeding is foreclosed by the nonretroactivity doctrine of *Teague*."). The district court's conclusion in this regard is not debatable.

All in all, reasonable jurists would not debate the district court's determination that the state court reasonably rejected this claim, Broandax is not entitled to a COA on this issue.

## III. Reasonable Jurists Would Not Debate the Lower Court's Denial of Broadnax's Claim That the Seating of Juror Vessels Violated Due Process.

The crux of Broadnax's claim is that juror John Vessels—the only member of the jury who was challenged for cause by the defense—was

---

[11]  489 U.S. 288 (1989).

unable to consider mitigation evidence. App. 41–45. But the district court found that Vessels was "anything but substantially impaired in his . . . ability to impose the death penalty under the state-law framework." ROA.1157. The district court's resolution of this claim is not debatable.

A.    **Vessels's inability to give examples of mitigating circumstances did not render him unable to follow the law or consider mitigating evidence.**

In a capital case, a trial court must grant a challenge for cause if a prospective juror states that he would automatically impose a death sentence without considering individual aggravating and mitigating circumstances. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). The law does not, however, require a juror to consider any certain circumstance as mitigating. *Soria v. Johnson*, 207 F.3d 232, 244 (5th Cir.2000).

Specifically, Broadnax asserts that Juror Vessels was incapable of considering mitigating evidence because, during an exchange with defense counsel at voir dire, he was unable to give examples of mitigation evidence off the top of his head. App. 43; 35 RR 80. But "[t]here is no requirement that venire members be able to think of sufficiently mitigating circumstances on their own, or that they find any particular

40

circumstance to be sufficiently mitigating." *Broadnax v. State*, 2011 WL 6225399, at *5.

Further, Vessels expressly stated that even if he found Broadnax guilty of capital murder, he could answer the mitigation special issue with an open mind, and that mitigating circumstances would allow him to answer "yes" on the issue. ROA.10185; *see Chavez v. Cockrell*, 310 F.3d 805, 811 (5th Cir. 2002) ("In evaluating claims of juror partiality, we must consider whether the jurors in a given case had 'such fixed opinions that they could not judge impartially the guilt of the defendant.'").

Reasonable jurists would not debate the district court's determination that the state court reasonably rejected Broadnax's claim that the trial court erred in denying his challenge for cause on this point.

B.   **Vessels's answers on his juror questionnaire do not demonstrate an inability to consider mitigating evidence.**

   1.   **This claim is procedurally defaulted.**

Broadnax did not raise these assertions to the state court on direct appeal; instead, he argued only that Juror Vessels's answers on voir dire showed that he would automatically answer yes to the future dangerousness special issue, and that he could not give examples of

41

specific mitigating circumstances off the top of his head. Appellant's Brief at 77. He did not present any argument concerning Juror Vessels's questionnaire answers related to voluntary intoxication or a defendant's upbringing, and the CCA accordingly did not have the opportunity to address this claim. Consequently, the claim is unexhausted and procedurally defaulted. C*oleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

### 2.    This claim is meritless.

Broadnax contends that two answers provided by Juror Vessels on his juror questionnaire indicated that he could not give effect to mitigation evidence. App. 43. Specifically, Broadnax refers to the fact that Juror Vessels explained that he did not agree with Texas law that voluntary intoxication may be considered at punishment and answered "no" when asked if genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment for someone convicted of a crime. 57 RR (Vessels Questionnaire pp. 6, 8); App. 43. Broadnax did not present any argument concerning Juror Vessels's questionnaire answers related to voluntary intoxication or a defendant's upbringing in state court. ROA.1156 ("In his

federal habeas corpus petition, Broadnax complains for the very first time that this venire member gave answers on his juror questionnaire refusing to accept as 'mitigating' potential evidence of voluntary intoxication at the time of the capital offense and evidence regarding the defendant's genetic and psychosocial background.'").

That said, the district court reasoned that these answers did not indicate that Juror Vessels was unable to consider mitigation evidence or that he was precluded as a matter of law from considering any evidence. ROA.1156–57. This conclusion is not debatable.

Indeed, Vessels's answers, at most, indicated that he simply did not afford much weight to a specific kind of evidence at punishment, not that he would refuse to consider the evidence when answering the special issues—as Broadnax posits. App. 44. That did not render Vessels subject to a challenge for cause. In particular, "the law is clear that a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as an aggravating rather than a mitigating factor." *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007). Even assuming his questionnaire answers indicated "bias" against even

43

considering mitigation evidence, Vessels indicated— after the law was explained to him during voir dire—that he would be able to keep an open mind on, and answer yes to, the mitigation special issue. *See Dorsey*, 494 F.3d at 533 (finding that the state court reasonably denied a challenge for cause when the venireperson initially answered that he would automatically assess the death penalty after a guilty verdict, but, after the law was explained to him, agreed he could follow the law and require that the State meet its burden of proof).

Because Broadnax fails to show that Juror Vessels had "such fixed opinions that [he] could not judge impartially" when answering the mitigation special issue, *Chavez*, 310 F.3d at 811, reasonable jurists would not debate the district court's resolution of this claim.

## IV. Reasonable Jurists Would Not Debate the Lower Court's Denial of Broadnax's Selective Prosecution Claim.

Broadnax contends that Dallas County sought the death penalty against him because of his race. App. 46–51. The district court denied relief on this claim notwithstanding Broadnax's failure to exhaust it. ROA.1129, n. 20. And that decision is not debatable.

### A. This claim is procedurally defaulted.

Broadnax conceded in his petition that he has not previously advanced this claim. ROA.694–95. Because this claim would be dismissed pursuant to an adequate state procedural rule if he now raised it in state court, it is subject to federal procedural default.[12]

### B.   **This claim is meritless.**

To demonstrate selective prosecution, Broadnax must show that the prosecution "'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Armstrong*, 517 U.S. 456, 466, (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). This requires a showing (1) that "similarly situated individuals" outside the protected group were not prosecuted, and (2) that the decision to prosecute was "invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights." *United States v. Webster*, 162 F.3d 308, 333–34 (1998) (citing *United States v. Sparks*, 2 F.3d 574, 580

---

[12] Broadnax seemingly re-urges the factual exhaustion argument made previously. App. 47, n.9; *supra* section I(C). He cites *Sorto v. Davis*, 859 F.3d 356 (5th Cir. 2017) for this proposition. *Id.* Notably, a panel of this Court, when presented with this Court's contrary precedent, recently granted rehearing and withdrew this opinion that applied factual exhaustion in the mode requested by Broadnax. *See Sorto v. Davis*, 881 F.3d 933 (5th Cir. 2018), *withdrawing Sorto v. Davis*, 859 F.3d 356 (5th Cir. 2017).

(5th Cir.1993)). Further, "the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner." *Id.* at 334.

Broadnax's claim relies entirely on statistics related to the application of the death penalty in Dallas County, one case in Dallas County where the death penalty was not sought against a white defendant, and a study conducted by Professor Jonathan Sorensen App. 46–51. But none of the bare statistical discrepancies Broadnax points to prove that "the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *Goss v. Johnson*, 199 F.3d 439 (5th Cir. 1999) ("Finally, relying on various newspaper articles and statistics, Goss complains that he was the victim of racially discriminatory prosecution policies at the Dallas County District Attorney's Office. He makes no effort to prove purposeful discrimination against him or a discriminatory effect on him, as are required to make such a claim under *McCleskey*[.]") (citation omitted). Even more, the

statistics provided in Sorensen's study provide no more the "stark" picture than did Baldus's statistics rejected in *McCleskey*.[13]

In the same way, Broadnax's reference to a case where the prosecutor did not seek the death penalty against a white defendant who murdered two men with a handgun during a robbery is similarly unavailing because it fails to show discriminatory intent in his case. *McCleskey*, 481 U.S. at 292. Especially since "sharing a charge alone does not make defendants 'similarly situated' for purposes of a selective prosecution claim.'" *In re U.S.*, 397 F.3d 274, 285 (5th Cir. 2005).

Broadnax complains of the district court's "level of granularity" in determining he failed to show others were similarly situated to him. App. 50–51; ROA.1130–31. But the fact of the matter is simple. By murdering Stephen Swan in the course of committing a robbery "[Broadnax] committed an act for which the United States Constitution and [Texas] laws permit imposition of the death penalty." *McCleskey*, 481 U.S. at 297;

---

[13] Broadnax cited Sorensen's study in his petition, claiming that "[w]hile only 23.2% of victims were white, offenders whose victims were white were sentenced to death 41.7% of the time." ROA.354; App. 49. But in *McCleskey*, Baldus reported that Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, 32% of the cases involving white defendants and white victims, 15% of the cases involving black defendants and black victims, and 19% of the cases involving white defendants and black victims. *McCleskey*, 481 U.S. at 287.

*see also Gregg v. Georgia*, 428 U.S. 153, 226 (1976) (White, J., concurring) ("[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder.")). To that end, his statistics— and reference to a case where a white defendant did not receive the death penalty—do not provide the "exceptionally clear proof" of discrimination required by *McCleskey*. *McCleskey*, 481 U.S. at 297.

In the end, the district court's decision that this claim is meritless is not debatable.

**V.    Reasonable Jurists Would Not Debate the District Court's Denial of Broadnax's Sixth Amendment Challenge to the Trial Court's Admission of his Uncounseled Media Interviews.**

Broadnax asserts that media interviews conducted after his arraignment constituted a critical stage of the proceedings, during which he was entitled to counsel under the Sixth Amendment. App. 52–54. But Broadnax points to no Supreme Court authority that supports this claim.

**A.    Relevant facts**

During trial, the State played recordings of Broadnax's interviews with reporters from multiple local media outlets conducted while he was in custody. ROA.10805; ROA.10843–45; ROA.10946–48; SX 18, 403–07.

Broadnax agreed to, and participated in, the interviews after he initially appeared before the magistrate on July 21, 2008, and before he was appointed counsel on July 24th, 2008. ROA.12838–40. In the interviews, Broadnax confessed to shooting the victims, rifling through their pockets, and stealing their car; he also stated that he had no remorse for the killings. SX 18, 403–07.

Before trial, Broadnax moved to suppress the recordings. ROA.10689–96. The trial court held a hearing on the motion to suppress at which all the reporters testified that they were not employed by law enforcement, that their respective stations had initiated the interviews by sending interview request forms that were signed by Broadnax, and that no law enforcement officer had asked them to conduct the interviews.     ROA.10592–97;     ROA.10623–24;     ROA.10627–51; ROA.10671–75. The trial court denied the motion to suppress.

B.    **State court proceedings**

In his state habeas application, Broadnax argued—amongst other things—that the Texas Fair Defense Act and the procedures for appointment employed in this case violated his Sixth Amendment right to counsel because they did not ensure that he was appointed counsel

during his media interviews, which was a "critical stage" of his proceedings.

### C.    The interviews did not constitute a "critical stage" of the proceedings.

Broadnax's Sixth Amendment claim rests entirely on his assertion that his media interviews, and the brief period between his appearance before the magistrate and those interviews, constituted a critical stage of his trial, during which he was deprived of counsel.

An accused is guaranteed his right to counsel during all critical stages of his trial. "The cases have defined critical stages as proceedings between an individual and *agents of the State*, whether 'formal or informal, in court or out,' that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary[.]'" *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 212 n. 16. (2008) (citations omitted) (emphasis added).

Broadnax argues that the Supreme Court cases *Rothgery*, 554 U.S. 191, *Powell v. Alabama,* 287 U.S. 45 (1932), and *Laffler v. Cooper*, 132 S. Ct. 1376 (2012). support his position that media interviews are a critical stage of a trial proceeding. In *Rothgery*, the Supreme Court held that a defendant's right to counsel attaches at the initial appearance before the

court, whether it be formal or informal, and therefore that counsel must be appointed within a reasonable time of the initial appearance. 554 U.S. at 197. The Court explained that "[o]nce attachment occurs . . . counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Id.* at 212. However, the Court reaffirmed the definition of a critical stage as a trial-like confrontation with the State. *Id.* 212 n. 16.

In *Powell*, the Supreme Court determined that the defendants were deprived of their right to counsel and a fair trial when counsel was not appointed until the morning of trial in a capital case. *Powell*, 287 U.S. at 56. Indeed, the Court was specifically concerned with the defendant's preparation for trial, not media interviews days after arraignment. As such, *Powell* does not support Broadnax's claim.

And in *Laffler*, the Supreme Court determined that plea bargaining negotiations with the State at which trial counsel deficiently advised the defendant to reject plea offers constituted a "critical stage" of a trial. *Lafler*, 566 U.S. at 165. Once again, the Court held that the defendant required effective counsel for a confrontation with the State that the Court expressly reasoned was "part of the whole course of a criminal

51

proceeding." *Id.* Here, the media interviews were neither a confrontation with the State nor part of a criminal proceeding.

Broadnax cites case law indicating that improper outside influences can be prejudicial at trial. App. 53–54. (citing *Rideau* v. *Louisiana*, 373 U.S. 723, 725–27 (1963), and *Sheppard* v. *Maxwell*, 384 U.S. 333, 353–58 (1966)). Again, however, Broadnax fails to cite any law supporting a proposition that these factors render a media interview a critical stage of a trial.[14]

Simply put, none of the cases cited by Broadnax stand for the proposition that voluntary media interviews conducted within days of an initial appearance are a critical stage of a trial. App. 52–54. Given the Supreme Court's consistent definition of a critical stage as a "trial-like" confrontation with the State, the state habeas court properly found that Broadnax's critical stage argument fails because the media reporters were not state agents. ROA.12358 (¶23); ROA.1175 (noting the CCA's

---

[14] Moreover, the taped interrogation and confession in *Rideau* had been created "with the active cooperation and participation of the local law enforcement officers" and two local deputy sheriffs later were seated on Rideau's trial jury for what the Supreme Court denounced as "kangaroo court proceedings." *Rideau*, 373 U.S. at 726. Here, no such state involvement existed. To the contrary, in addition to the CCA finding the reporters were not agents of the state, the district court's "independent review of the entirety of Broadnax's pretrial and trial record" disclosed no such evidence that the media and State were acting in concert. ROA.1172.

"unassailable factual finding that the reporters were not acting as state agents when they interviewed Broadnax").

In fact, Broadnax's requested relief would require the district court to extend Supreme Court "critical stage" case law to cover encounters with the media. That is something AEDPA forbids. *See, e.g., Woods v. Donald,* 575 U.S. 312, 317 (2015) (per curiam) ("Because none of our cases confront the specific question presented by this case, the state court's decision could not be 'contrary to' any holding from this Court," nor an "unreasonable application" thereof. (quotation omitted)); *accord Teague,* 489 U.S. at 299–310.

Consequently, reasonable jurists would not debate the district court's determination that the state court reasonably rejected this claim.

## VI. Reasonable Jurists Would Not Debate the District Court's Denial of Broadnax's Ineffective Assistance of Appellate Counsel Claim.

Broadnax contends that his appellate counsel was ineffective for failing to raise the claim that the trial court erred by admitting Dr. Price's testimony because it was irrelevant under Rules 410, 403, and 702 of the Texas Rules of Evidence. He raised this claim for the first time in federal court. ROA.1206.

### A.     This claim is procedurally defaulted.

Broadnax did not raise this claim in state court. Because the CCA would now refuse to rule on the merits of the claim and because Broadnax fails to allege cause and prejudice for the default, it is procedurally barred on federal habeas review. *See Coleman*, 501 U.S. 722, 735 n.1.

### B.     Appellate counsel was not ineffective.

To succeed on an ineffective assistance of appellate counsel claim, a petitioner must satisfy the two-pronged test of *Strickland*.[15] *Smith v. Robbins*, 528 U.S. 259, 286 (2000). To demonstrate deficiency, he must show that "counsel unreasonably failed to discover [and raise] nonfrivolous issues." *Smith*, 528 U.S. at 286. Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Id*. at 765. It is possible that an ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id*. As to the second prong, to prove prejudice, a petitioner must show that but for counsel's deficient

---

[15] *Strickland v. Washington*, 466 U.S. 668, 672 (1984).

performance, "he would have prevailed on appeal." *Smith*, 528 U.S. at 286.

In his petition, Broadnax contended that the testimony was irrelevant because it did not "fit the facts of the case." ROA.664. For this, he relied on Texas law that requires courts to admit only "sufficiently reliable and relevant" evidence. *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992) (adopting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). Thus, despite his sole citations to the Texas Rules of Evidence in his COA briefing, App.55–56, his briefing in the district court on the relevancy of Dr. Price's testimony necessarily looked at the issue through the lens of *Daubert*. But the Fifth Circuit has explicitly held that *Daubert* does not apply to capital sentencing and has likewise consistently summarily denied claims alleging ineffective assistance of counsel for failure raise issues related to the reliability and relevancy of expert testimony on the future dangerousness special issue. *See Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014). To the extent the relevancy claim he brings in the current briefing is rooted in *Daubert* reliability, it is foreclosed for this reason. Thus, "Broadnax's state appellate counsel did not render ineffective assistance by failing to assert a meritless

constitutional challenge to the admission of Dr. Price's testimony." ROA.1206.

Further, as to relevance under Rule 403, Broadnax is unable to show appellate counsel was deficient for not raising this point. Defense counsel elicited testimony from Dr. Lane about Broadnax's drug-induced psychosis at that time of the murder, presumably both to mitigate his responsibility for the crimes and to suggest that he might not be a future danger. ROA.11328. However, Dr. Lane also testified that Broadnax displayed traits of a person with antisocial personality disorder, which he explained is a "more entrenched derangement of personality" and is indicative of a "more enduring pattern of behavior." *Id.* Dr. Lane did not describe specific traits of a person with antisocial personality disorder and testified that he was unable to diagnose Broadnax because he did not have enough information. *Id.*

The State sought to admit Dr. Price's testimony in order to fill in details related Dr. Lane's vague testimony about antisocial personality disorder. This was an attempt to rebut any suggestion that Broadnax's behavior was solely the result of drug-use, but instead, potentially a

56

product of a "more entrenched derangement of personality" that Dr. Lane explicitly testified Broadnax showed signs of having.

Not only is he unable to demonstrate deficiency, Broadnax cannot show that appellate counsel would have been able to show that the admission of this evidence was harmful under either Texas law harmless error standard. Tex. R. App. P. 44.2(a) (for constitutional error, requiring that judgment be reversed unless the error did not contribute to conviction or punishment beyond a reasonable doubt), 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). As noted by the district court:

> Dr. Price emphasized on direct examination that he was not making a mental health evaluation of Broadnax and admitted on cross-examination that (1) psychopathy is not listed in the DSM-IV, (2) the closest thing to  psychopathy in the DSM-IV is a personality disorder, (3) people who have the traits of psychopathy may not be a psychopath, and (4) some of the traits of a psychopath are consistent with those of an immature person

ROA.1207. In other words, Broadnax is unable to show that, if counsel had pressed this point he would have prevailed on appeal. Especially given the nature of the crime committed and Broadnax's lack of remorse, and the evidence presented of Broadnax's violent behavior in prison. ROA.11073–74. Indeed:

By the time of the punishment phase of Broadnax's capital murder trial, the jury had already found Broadnax guilty beyond a reasonable doubt of Swan's brutal murder in the course of a robbery. Broadnax's videotaped confessions to multiple television reporters and his audiotaped telephone conversations had been admitted into evidence and established beyond any doubt his lack of sincere contrition and genuine remorse for his crimes. Under such circumstances, even if erroneous under state law, the admission of Dr. Price's rebuttal testimony at the punishment phase of trial did not, in all reasonable likelihood, constitute reversible error under state law or rise above the level of harmless error under the *Brecht*[16] standard.

ROA.1207.

Thus, reasonable jurists would not debate the district court's determination that this claim was meritless.

## VII. Reasonable Jurists Would Not Debate Whether the District Court Correctly Applied the Relevant Legal Standards to Broadnax's Claims.

Lastly, Broadnax claims the district court failed to apply the correct legal standards when reviewing his claims. App. 57.

Review under § 2254(d)(1) encompasses not just the arguments and legal theories the state court's opinion gave, but also any arguments or legal theories the state court reasonably could have given. *E.g., Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017) (citing *Richter*, 562 U.S. at 102.

---

[16] *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

First, Broadnax claims that the Supreme Court's decision in *Wilson v. Sellers*, 138 S.Ct. 1188 (2018) changed this calculus. But *Wilson* held that a federal habeas court reviewing an unexplained state-court decision should "look through" that decision to the last related state-court decision that provides a relevant rationale and presume the unexplained decision adopted the same reasoning. *Id.* at 1193–97. In Broadnax's case, the CCA issued a reasoned opinion and not a summary denial. Thus, *Wilson's* holding is not relevant here. *See Thomas v. Vannoy*, 898 F.3d 561, 568 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1321 (2019) ("[T]he *Wilson* Court was only directly concerned with a state court order 'that was made without any explanatory opinion whatsoever.'") (quoting *Wilson*, 138 S.Ct. at 1193)). Even assuming Broadnax's assertion is true, Broadnax points to nowhere in the district court's decision where it did not rely on the reasoning provided by the state court in addressing adjudicated claims.

Second, Broadnax asserts the district court did not base its de novo determination of Broadnax's selective prosecution claim on an independent review of the evidence in the record. And instead, the district court ignored the evidence in the record, including the affidavit

of an expert criminologist who conducted a statistical analysis of decisions by the Dallas County District Attorney to seek the death penalty. But a reading of the memorandum opinion shows the district court did not "ignore" the statistical evidence presented by Broadnax for the first time in federal court concerning his selective prosecution claim. *See* ROA.1130 (addressing Broadnax's selective prosecution claim and recognizing "the statistical case and new evidence presented by Broadnax in this Court for the very first time . . .").

Third, Broadnax challenges the district court's findings of fact concerning the spreadsheet the State prepared for jury selection on which only the names of black jurors, were bolded. Broadnax complains that the district court concluded that the State must have created the spreadsheet earlier, in order to comply with its *Batson* obligations, despite the State not advancing such an argument. But Respondent did advance the argument before the district court that the spreadsheet was created earlier to comply with *Batson* obligations. ROA.930. Even so, the district court held the spreadsheet was barred from consideration by *Pinholster*. ROA.1191, n. 73; *supra* Section I(C).

Finally, Broadnax asserts the district court did not consider the testimony of Drs. Lane, Varghese, Mirmesdagh, and Roache regarding Broadnax being on drugs at the time of his media interviews. App. 59. But the district court considered testimony from each one of these individuals concerning Broadnax's drug use. *See* ROA.1256 (Lane); ROA.1166—67, n. 47, 48 (Varghese and Mirmesdagh); ROA.1235–36 (Roache).

## CONCLUSION

For the above reasons, the Director requests that Broadnax's application for a COA be denied.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
   for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

 *s/ Garrett Greene*
Garrett Greene
Assistant Attorney General
State Bar No. 24076286

*Counsel of Record*

Post Office Box 12548,
Capitol Station
Austin, Texas 78711
512.936.1400
Garrett.Greene@oag.texas.gov

*Attorneys for Respondent–Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. It contains 12,496 words and was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 MSO, 14 points, Century Schoolbook.

*s/ Garrett Greene*
Garrett Greene
Assistant Attorney General

## ELECTRONIC CASE FILING CERTIFICATIONS

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

*s/ Garrett Greene*
Garrett Greene
Assistant Attorney General

## CERTIFICATE OF SERVICE

I do hereby certify that on June 21, 2020, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic case-filing (ECF) system of the Court. The ECF system sent a "Notice of Electronic Filing" (NEF) to the following attorney of record, who consented in writing to accept the NEF as service of this document by electronic means:

Steven C. Herzog
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
sherzog@paulweiss.com

Camille M. Knight
BURLESON, PATE & GIBSON, LLP
UNIVERSITY OF HOUSTON LAW CENTER
*900 Jackson Street, Suite, 330*
*Dallas, TX 75202*
cknight@bp-g.com

*s/ Garrett Greene*
Garrett Greene
Assistant Attorney General

63