No. 19-70014

In The United States Court of Appeals
for The Fifth Circuit

**JAMES GARFIELD BROADNAX,**
*Petitioner - Appellant,*

**v.**

**LORIE DAVIS, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,**
*Respondent - Appellee.*

On Appeal from The United States District Court
for The Northern District of Texas, Dallas Division
USDC No. 3:15-cv-01758-N

**REPLY TO RESPONDENT'S OPPOSITION TO
APPLICATION FOR CERTIFICATE OF APPEALABILITY**

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
STEVEN C. HERZOG
KIMBERLY A. FRANCIS
JORDANA L. HAVIV
AMEYA S. ANANTH
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

**BURLESON, PATE & GIBSON, L.L.P.**
CAMILLE M. KNIGHT
900 Jackson Street, Suite 330
Dallas, TX 75202
(214) 871-4900

COUNSEL FOR PETITIONER-APPELLANT JAMES GARFIELD BROADNAX

**CAPITAL CASE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

ARGUMENT ..................................................................................................1

I.    The Court Should Certify an Appeal of Broadnax's *Batson* Claim ...............1

    A.    Statistical Evidence Showed the State's Discriminatory Intent............3

    B.    The District Court Failed to Properly Consider Significant
        Documentary Evidence of the State's Discriminatory Intent ..............4

        1.    The Spreadsheet Provides Powerful Evidence of
            Discriminatory Intent...................................................................6

        2.    Reasonable Jurists Could Debate Whether Review of The
            Spreadsheet Is Barred by *Pinholster*..........................................7

    C.    The State's Purportedly Race-Neutral Explanations Are
        Contradicted by The Record .................................................................11

        (a)    Disparate Treatment ......................................................15

        (b)    Disparate Questioning ..................................................15

        (c)    Failure to Question .......................................................16

        (d)    Implausible or Inherently Contradictory Reasons..........16

        (e)    Other Relevant Evidence ..............................................18

II.   The Court Should Certify an Appeal of Broadnax's Claim That The
    Seating of Juror Vessels Violated Due Process.............................................19

    A.    Juror Vessels Should Have Been Excused for Cause Because
        He Was Unable to Consider Mitigating Evidence .............................19

    B.    Broadnax Exhausted The for Cause Challenge to Vessels .................21

    C.    Broadnax Challenged Twelve Other Jurors for Cause.......................22

ii

III.    The Court Should Certify an Appeal of Broadnax's Claim That He Was Selectively Prosecuted Based on Race ................................................... 23

IV.    The Court Should Certify an Appeal of Broadnax's Sixth Amendment Challenge to The Admission of Uncounseled Media Interviews .................. 25

V.    The Court Should Certify an Appeal of Broadnax's Claim That His Appellate Counsel Was Constitutionally Ineffective .................................... 27

CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States* v. *A.R.*,
38 F.3d 699 (3d Cir. 1994) .................................................................27

*Adkins* v. *Warden, Holman CF*,
710 F.3d 1241 (11th Cir. 2013) ...........................................................6

*Anderson* v. *Johnson*,
338 F.3d 382 (5th Cir. 2003) ..............................................................10

*Ayestas* v. *Davis*,
138 S. Ct. 1080 (2018)........................................................................23

*United States* v. *Barnette*,
644 F.3d 192 (4th Cir. 2011) ................................................................7

*United States* v. *Bass*,
310 F.3d 321 (5th Cir. 2002) ..............................................................28

*United States* v. *Bass*,
536 U.S. 862 (2002)............................................................................24

*Batson* v. *Kentucky*,
476 U.S. 79 (1986)....................................................................2, 13, 19

*Brewer* v. *Williams*,
430 U.S. 387 (1977).............................................................................26

*Cahill* v. *Rushen*,
678 F.2d 791 (9th Cir. 1982) ..............................................................27

*Chamberlin* v. *Fisher*,
885 F.3d 832 (5th Cir. 2018) ................................................................4

*United States* v. *Chinchilla*,
874 F.2d 695 (9th Cir. 1989) ..............................................................14

*Clark* v. *Stephens*,
627 F. App'x 305 (5th Cir. 2015)..........................................................9

*Clisby* v. *Jones*,
960 F.2d 925 (11th Cir. 1992) ......................................................................26

*Cullen* v. *Pinholster*,
563 U.S. 170 (2011)...............................................................................8, 10

*Cummings* v. *Standard Register Co.*,
265 F.3d 56 (1st Cir. 2001)............................................................................23

*Currie* v. *McDowell*,
825 F.3d 603 (9th Cir. 2016) .........................................................................14

*Dickens* v. *Ryan*,
740 F.3d 1302 (9th Cir. 2014) (en banc) ............................................................9

*Eddings* v. *Oklahoma*,
455 U.S. 104 (1982)..................................................................................19

*Escamilla* v. *Stephens*,
749 F.3d 380 (5th Cir. 2014) .........................................................................10

*Estelle* v. *Smith*,
451 U.S. 454 (1981)..................................................................................26

*Flowers* v. *Mississippi*,
139 S. Ct. 2228 (2019)..................................................................13, 15, 16, 18

*Foster* v. *Chatman*,
136 S. Ct. 1737 (2016).........................................................................passim

*Harris* v. *Hardy*,
680 F.3d 942 (7th Cir. 2012) .........................................................................13

*Hatten* v. *Quarterman*,
570 F.3d 595 (5th Cir. 2009) .........................................................................21

*Hayes* v. *Thaler*,
361 F. App'x. 563 (5th Cir. 2010) ..................................................................1, 3

*Hebert* v. *Rogers*,
890 F.3d 213 (5th Cir. 2018) .........................................................................14

*Hoffman* v. *Cain*,
   752 F.3d 430 (5th Cir. 2014) ................................................................14

*Howard* v. *Director*,
   2019 WL 4573640 (E.D. Tex. Sept. 20, 2019)......................................23

*Ingram* v. *United States*,
   296 F. Supp. 3d 1076 (N.D. Iowa 2017), *aff'd on other grounds*,
   932 F.3d 1084 (8th Cir. 2019) ..............................................................25

*Jackson* v. *Dretke*,
   181 F. App'x. 400 (5th Cir. 2006) ..........................................................3

*Kesser* v. *Cambra*,
   465 F.3d 351 (9th Cir. 2006) ................................................................14

*United States* v. *Martinez-Salazar*,
   528 U.S. 304 (2000).............................................................................22

*McCleskey* v. *Kemp*,
   481 U.S. 279 (1987).......................................................................23, 24

*McGahee* v. *Alabama Dep't Of Corr.*,
   560 F.3d 1252 (11th Cir. 2009) ......................................................14, 17

*McLaughlin* v. *Laxalt*,
   665 F. App'x 590 (9th Cir. 2016) ...........................................................9

*Mercadel* v. *Cain*,
   179 F.3d 271 (5th Cir. 1999) ................................................................21

*Miller-El* v. *Cockrell*,
   537 U.S. 322 (2003)...................................................................2, 6, 15

*Miller-El* v. *Dretke*,
   545 U.S. 231 (5th Cir. 2005) .............................................................3, 16

*Morris* v. *Dretke*,
   379 F.3d 199 (5th Cir. 2004) ................................................................21

*Reese* v. *State*,
   33 S.W.3d 238 (Tex. Crim. App. 2000) .................................................28

*Ross* v. *Oklahoma*,
   487 U.S. 81 (1988)..................................................................................22

*Rothgery* v. *Gillespie Cty., Tex.*,
   554 U.S. 191 (2008)................................................................................27

*Rushen* v. *Spain*,
   464 U.S. 114 (1983)................................................................................19

*Smith* v. *Quarterman*,
   515 F.3d 392 (5th Cir. 2008) ..................................................................21

*Soria* v. *Johnson*,
   207 F.3d 232 (5th Cir. 2000) ............................................................19, 20

*Sorto* v. *Davis*,
   859 F.3d 356 (5th Cir. 2017) ..................................................................23

*Van* v. *Jones*,
   475 F.3d 292 (6th Cir. 2007) ..................................................................27

*Wayte* v. *United States*,
   470 U.S. 598 (1985)................................................................................25

*Williams* v. *Davis*,
   192 F. Supp. 3d 732 (S.D. Tex. 2016)......................................................3

*Winston* v. *Pearson*,
   683 F.3d 489 (4th Cir. 2012) ....................................................................9

*Wolfe* v. *Johnson*,
   565 F.3d 140 (4th Cir. 2009) ..................................................................26

*Woodward* v. *Epps*,
   284 F. App'x 173 (5th Cir. 2008) .......................................................2, 13

**STATUTES**

28 U.S.C. § 2254 ...............................................................................1, 8, 9, 26

## ARGUMENT

### I.    The Court Should Certify an Appeal of Broadnax's *Batson* Claim

James Broadnax, a black man, was charged with the murder of two white victims. During jury selection, the State struck, over objection, every eligible, nonwhite veniremember. Many reasons given were equally applicable to empaneled white jurors. Several black veniremembers were also subjected to disparate questioning.

During direct appeal and state habeas, the State refused to turn over its records from the jury-selection process. Those records were only provided after Broadnax filed his federal habeas petition, and revealed a prosecution spreadsheet on which the names of *every* black veniremember—and *only* the names of the black veniremembers—were bolded. In opposition, the State claimed that the spreadsheet was prepared *after* jury selection, to prepare for a hearing on Broadnax's *Batson* challenges. After Broadnax established that this was false, the State abandoned this narrative.

The State does not dispute any of these facts, arguing instead that the Court should focus only on other discrete portions of the record, citing AEDPA deference. (State Br. at 13-14.) But federal courts' review "is not perfunctory," *Hayes* v. *Thaler*, 361 F. App'x. 563, 566 (5th Cir. 2010), even under Section 2254. Deference does not "imply abandonment or abdication of judicial review" or

"preclude relief." *Id.* (citing *Miller-El* v. *Cockrell*, <u>537 U.S. 322, 340</u> (2003) ("Miller-El I")). Courts considering a *Batson* claim must consider "all relevant circumstances" and should "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson* v. *Kentucky*, <u>476 U.S. 79, 93</u> (1986) (internal quotation marks omitted); *see also Woodward* v. *Epps*, <u>284 F. App'x 173, 176</u> (5th Cir. 2008).

Broadnax has more than met the COA standard for three reasons: *First*, the stark statistical evidence shows that the State disproportionately used its peremptory challenges to strike nonwhite veniremembers. *Second*, the State's trial materials demonstrate that race was used to decide who would be on Broadnax's jury. *Finally*, the juror questionnaires and voir dire show that the State treated white and nonwhite veniremembers differently, many of the State's reasons for striking nonwhite veniremembers are not supported by the record, and many of the State's articulated reasons were equally applicable to empaneled white jurors.

The District Court summarily dismissed this evidence, stating that similarities in answers given by white and nonwhite veniremembers were "hardly surprising—or conclusive of anything." (<u>ROA.1191</u>.) The District Court also refused to the consider the spreadsheet, citing the Supreme Court's *Pinholster* decision. In the alternative, the District Court offered an explanation for the spreadsheet that lacked support in the record, was never offered by the State, and

was rejected by the Supreme Court in an analogous case:  that the spreadsheet was prepared during jury selection to help the State **comply** with *Batson*.  (*Id.*)

Reasonable jurists could debate whether the District Court's decision was wrong.

### A.    Statistical Evidence Showed the State's Discriminatory Intent

The statistics in this case are powerful.  Approximately 17% of the 47 qualified veniremembers were black or Hispanic.  (ROA.615.)  Yet the State used 53% of its peremptory strikes to eliminate **all** of the nonwhite veniremembers.  (*Id.*); *see Miller-El* v. *Dretke*, 545 U.S. 231, 240-41 (5th Cir. 2005); *Hayes*, 361 F. App'x. at 570.

Unlike in the cases the State cites, Broadnax has provided the Court with sufficient statistical evidence to support his claim.  *Compare with Jackson* v. *Dretke*, 181 F. App'x. 400, 406, n.5 (5th Cir. 2006) (noting that "although statistical evidence alone may raise some debate as to whether the prosecution acted with a race-based reason for striking prospective jurors . . . Jackson fails to present this court with sufficient statistical information to make that determination"); *Williams* v. *Davis*, 192 F. Supp. 3d 732, 752, 758 (S.D. Tex. 2016) (stating that "the record [was] unclear as to the racial demographics of the entire jury venire" and "the petitioner's arguments were "too conclusory to warrant relief").

*Chamberlin* v. *Fisher*, <u>885 F.3d 832</u> (5th Cir. 2018), is also not analogous. That decision did not involve a motion for a COA. And unlike Broadnax's case, the prosecution did not strike all nonwhite veniremembers, but left two black veniremembers empaneled, both of whom ultimately served. *Id.* at 835. Finally, even with much less compelling statistical evidence, five judges dissented in *Chamberlin*'s en banc proceedings—suggesting that reasonable jurists could certainly debate whether the State violated *Batson* when it struck 100% of nonwhite veniremembers here. *Id*. at 848 (Costa, J., dissenting).

**B.      The District Court Failed to Properly Consider Significant Documentary Evidence of the State's Discriminatory Intent**

The State's own documents show that the State improperly considered race in deciding whom to strike from Broadnax's jury. The State created a spreadsheet of qualified veniremembers, bolding the names of all the black veniremembers, and only the black veniremembers:

**QUALIFIED JURORS**

| Qualified # | Juror # | Name | Race/Sex | *Death Penalty # | |
|---|---|---|---|---|---|
| 1 | 6 | Jerome Mitchell Williams | W/M | 2 | • 1 |
| 2 | 58 | Jason Micah Ross | W/M | 2 | |
| 3 | 34 | John Edward Wherry | W/M | 2 | |
| 4 | 101 | Jon D. Desmond | W/M | 2 | |
| 5 | 123 | Sue McCormick | W/F | 3 | |
| **6** | **165** | **Sharron Denise McCraney** | **B/F** | **3** | |
| 7 | 134 | Edith Elaine Clements | W/F | 2 | • 2 |
| 8 | 150 | Bradley A. Wiltshire | W/M | 2 | |
| **9** | **131** | **Mattie M. Vation** | **B/F** | **2** | |
| 10 | 227 | Alex James Folz | W/M | 2 | • 3 |
| 11 | 208 | Angelita Marin Rivera | Hisp/F | 2 | |
| **12** | **222** | **Curtis Demetre Riser** | **B/M** | **3** | |
| 13 | 265 | Johnny William Sanford | W/M | 3 | |
| 14 | 277 | Vicki Sue Wood | W/F | 2 | |
| 15 | 272 | Kelly Lynn McDonald | W/F | 2 | • 4 |
| 16 | 337 | Helen Ann Noble | W/F | 2 | |
| 17 | 301 | Billy Eugene Henry | W/M | 2 | |
| 18 | 284 | Heather Sylvia Eger | W/F | 2 | |
| 19 | 289 | John P. Maguire, Jr. | W/M | 2 | |
| 20 | 392 | Lisa Lanelle Davison | W/F | 2 | |
| 21 | 544 | Carl Whitt Jackson | W/M | 3 | |
| 22 | 401 | Leah Michelle Kunard | W/F | 2 | |
| 23 | 451 | Bruce Edward McDonald | W/M | 2 | |
| 24 | 601 | Teresa Elaine Randleas | W/F | 2 | • ~~5~~ |
| 25 | 626 | Kimberly Bronwyn Morris | W/F | 2 | • ~~6~~ |
| 26 | 573 | Guy Gant Ferreira | W/M | 2 | • ~~6~~ |
| 27 | 596 | Rindy Kay Woodward | W/F | 2 | |
| 28 | 474 | John Joseph Cantwell | W/M | 2 | |
| 29 | 660 | Alexander Wayne Konkle | W/M | 2 | |
| 30 | 551 | Wesley Brian Marshall | W/M | 2 | |
| 31 | 468 | Lance Russell Bedford | W/M | 2 | |
| 32 | 412 | Steven James Zaidel | W/M | 2 | • ~~7~~ |
| 33 | 684 | William T. Stinson | W/M | 2 | • ~~8~~ |
| 34 | 797 | Lyle Wynne Livingston | W/M | 2 | |
| 35 | 824 | Jennifer Robin Stockton | W/F | 2 | |
| **36** | **868** | **Aqwana Sweli Long** | **B/F** | **2** | |
| **37** | **930** | **Robert Lee patterson** | **B/M** | **2** | |
| 38 | 874 | William Bruce Kreighbaum | W/M | 2 | • ~~9~~ |
| 39 | 977 | Patricia Diane Hodges | W/F | 2 | |
| **40** | **1397** | **Betty Rue Jackson** | **B/F** | **3** | |
| **41** | **1062** | **Dedric Olin Morrison** | **B/M** | **2** | |
| 42 | 1321 | Clarence Ray Winfield | W/M | 2 | • 10 |
| 43 | 1345 | John Francis Vessels | W/M | 2 | • 11 |
| 44 | 1313 | Emily Alane Blevins | W/F | 2 | • 12 |
| 45 | 1094 | Barry Douglas Fiddick | W/M | 2 | Alternate (1) |
| 46 | 1178 | Elsa Yvonne Olvera | Hisp/F | 2 | |
| 47 | 1389 | George Rene Paradise | W/M | 2 | |
| 48 | 1335 | James McElroy | W/M | 2 | Alternate (2) |

* With reference to the death penalty, which of the following statements best represents your feelings?

1. I believe that the death penalty is appropriate in all murder cases.

2. I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty.

3. Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances.

4. I believe that the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty.

5. I could never, under any circumstances, return a verdict which assessed the death penalty.

Calli:

I need you to type my notes on each of the Jurors I have numbered 1-12 and the 2 alternates. My notes are on the respective questionnaire and in the 2 legal pads.

Also: Please make a copy of the Questionnaire for Juror #412.

Thanks.

(ROA.796.)

### 1. The Spreadsheet Provides Powerful Evidence of Discriminatory Intent

This spreadsheet is characteristic of evidence frequently recognized by courts to be strong evidence of discriminatory intent. *See Miller-El I*, 537 U.S. at 347; *Foster* v. *Chatman*, 136 S. Ct. 1737, 1744, 1755 (2016); *Adkins* v. *Warden, Holman CF*, 710 F.3d 1241, 1253 (11th Cir. 2013) (describing as "strong evidence of discriminatory intent" the prosecution noting on a jury list the race of every black veniremember, and only black veniremembers).

The State's explanations for this spreadsheet have shifted over time. Before the District Court, it argued that the spreadsheet was created after jury selection for a trial court hearing on Broadnax's *Batson* challenges. (See ROA.929.) Broadnax pointed out that this was false. (*See* ROA.1065-1066 (citing 10331-10333); Opening Br. at 18-19.)

Before this Court, the State has changed tack. It implicitly concedes that the spreadsheet was actually prepared *during* jury selection. (State Br. at 36-37.)[1] Yet

---

[1] The State claims that it "did advance the argument before the District Court that the spreadsheet was created earlier to comply with *Batson* obligations." (*See* State Br. at 60 (citing ROA.930).) But before the District Court, the State unequivocally stated: "[T]he list was created in preparation for the State's response brief and the subsequent *Batson* hearing." (ROA.930.) Then, in rebuttal to Broadnax's argument that the spreadsheet was prepared earlier, the State said: "[E]ven if the list were prepared prior to the State's peremptory strikes, such evidence does not show that the challenges were racially motivated." *Id.* By no stretch of the imagination did the State "advance the argument before the district court that the spreadsheet was created earlier to comply with *Batson* obligations."

it argues that the spreadsheet proves nothing because, even during jury selection, "the State was likely anticipating any claims Broadnax would make as to these challenges." (*Id.*) This echoes the interpretation advanced by the District Court *sua sponte*. (*See* ROA.1191.)

The State's new argument is nearly identical to one that was considered by the Supreme Court in *Foster*, which the Court rejected as "fall[ing] flat" and "reek[ing] of afterthought." 136 S. Ct. at 1755 (quotations and citation omitted).[2] And the explanation makes no sense. If the State's peremptory strikes would be made for sound, race-neutral reasons, why would the State need to "be prepared to offer sound, race-neutral[] reasons" *before* exercising them?[3] (*See* ROA.1191.)

### 2.    Reasonable Jurists Could Debate Whether Review of The Spreadsheet Is Barred by *Pinholster*

Until Broadnax's federal habeas proceedings, the D.A.'s office refused—despite repeated requests—to turn over its file, citing the attorney-client privilege and/or work product doctrine. (ROA.1090-91.) It was not until after Broadnax filed his federal petition that the office relented. (ROA.1040-1041.) The State does not contend that Broadnax could have discovered the spreadsheet during state

---

[2] *United States* v. *Barnette*, 644 F.3d 192 (4th Cir. 2011), cited by the State, is entirely distinguishable. There, the prosecutor marked all jurors' questionnaires with race and gender information, but unlike here, ***made no special notations about black jurors***. *Id.* at 211–12. The prosecution also accepted 25% of eligible black potential jurors. *Id.* at 200.

[3] To the extent there are any doubts about the provenance of the spreadsheet, this bolsters the need for a COA and further proceedings.

habeas proceedings.  Instead, it argues that, *regardless of Broadnax's diligence*, consideration of the spreadsheet is barred under *Pinholster*.  (*See* State Br. at 33-37.)  But reasonable jurists could debate whether Broadnax's claim falls within the narrow circumstance, expressly contemplated by both the majority and the dissent in *Pinholster*, permitting consideration of such newly discovered evidence.

In *Pinholster*, the en banc Ninth Circuit had affirmed the grant of habeas relief based on new evidence:  the testimony of medical experts who opined on the petitioner's psychiatric disorders.  *Cullen* v. *Pinholster*, 563 U.S. 170, 178-80 (2011).  In holding that this was not permissible under Section 2254(d), the Supreme Court stressed that federal courts sitting in habeas ought not become "an alternative forum for trying facts and issues ***which a prisoner made insufficient effort to pursue*** in state proceedings."  *Id.* at 186 (emphasis added) (quotations and citation omitted).  In dissent, Justice Sotomayor raised the hypothetical of a petitioner who diligently presented a *Brady* claim and later discovered evidence that significantly strengthened it, but which was unavailable through no fault of his own.  *Id.* at 214-15 (Sotomayor, J., dissenting).  Justice Sotomayor noted that such a petitioner would be *worse* off than a petitioner who had not diligently presented the claim originally.  *Id.* at 215.  The majority disputed that this circumstance would bar consideration of the new evidence, stating that such a hypothetical petitioner "may well present a new claim."  *Id.* at 186 n.10.

Broadnax's claim based on the spreadsheet falls squarely within this circumstance. In *Dickens* v. *Ryan*, for example, the Ninth Circuit held that *Pinholster* did not bar the petitioner's "new" IAC claim, even though the state court adjudicated a similar IAC claim, because "the new allegations and evidence 'fundamentally altered' that claim." 740 F.3d 1302, 1320 (9th Cir. 2014) (en banc). The court explained that "new evidence fundamentally alters a claim if it places the claim in a significantly different and stronger evidentiary posture than it had in state court." *Id.* at 1317 (quotations and citation omitted); *see also McLaughlin* v. *Laxalt*, 665 F. App'x 590, 592 (9th Cir. 2016) (holding that new evidence uncovered by petitioner's federal habeas lawyer "fundamentally alter[ed]" petitioner's ineffective-assistance claim and could be considered on federal review notwithstanding *Pinholster*); *Winston* v. *Pearson*, 683 F.3d 489, 501 (4th Cir. 2012) (describing the *Pinholster* majority's "tacit acknowledgment that the hypothetical petitioner would be free to present new, material evidence"); *cf. Clark* v. *Stephens*, 627 F. App'x 305, 309 (5th Cir. 2015) (granting COA and noting that "*Pinholster* might not apply to prevent the admission of new evidence" on ineffective assistance of counsel claim because "this new claim was never adjudicated on the merits in state court, thus rendering § 2254(d) inapplicable").

The State, in urging this Court to ignore the spreadsheet, relies on *Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014) and *Anderson* v. *Johnson*, 338 F.3d 382 (5th Cir. 2003).  Neither compels the result the State seeks.

*First*, in both cases, the evidence was available, just not discovered by counsel.  *See Escamilla*, 749 F.3d at 385; *Anderson*, 338 F.3d at 385, 392-93.  In Broadnax's case, the State *withheld* the evidence, making this claim analogous to the hypothetical petitioner's *Brady* claim in *Pinholster*.  *See* 563 U.S. at 214-15 (Sotomayor, J., dissenting).  *Second*, whether evidence "fundamentally alters" a given claim is necessarily fact specific, and neither case is analogous.   In Broadnax's case, the new evidence—combined with the State's shifting explanations for this evidence—is transformative:   it is contemporaneous, documentary evidence of the State singling out black veniremembers during jury selection.  Courts have treated this kind of evidence as indicative of discriminatory intent.  *See Foster*, 136 S. Ct. at 1744, 1755; *Adkins*, 710 F.3d at 1252.

*Finally*, *Anderson* was decided before *Pinholster*, and the Court thus did not decide in what circumstances new evidence could be presented in line with the majority's opinion and Justice Sotomayor's dissent in *Pinholster*.  *Anderson*, 338 F.3d at 385.

**C.    The State's Purportedly Race-Neutral Explanations Are Contradicted by The Record**

The State argues that Broadnax must be denied a COA as to his *Batson* claim because "regardless of race, the State consistently struck jurors who were not in favor of the death penalty or who may have been prevented from imposing the death penalty in Broadnax's case." (State Br. at 13.)  This explanation fails for veniremembers Long and Patterson, neither of whom selected the questionnaire answers the State has now identified as dispositive, as well as Vation, whose voir dire answers should have allayed any doubts. (*See* Opening Br. at 24.)

As explained in Broadnax's opening brief, Long did not select either of the two "dispositive" questionnaire answers identified by the State, and Long's other answers make clear that she was, in fact, in favor of the death penalty. (*See* Opening Br. at 24.)  The record also shows that the State mischaracterized Long's answers, making her sound more hesitant to impose the death penalty than she actually was. (*See id.* at 25.)  The State now suggests that Long was only in favor of the death penalty in cases "involving children and the elderly." (State Br. at 18 n.6.)  But Long's voir dire makes clear that she would make a case-by-case determination based on the evidence, her mind was not foreclosed to the death penalty in cases involving victims who were not children or elderly, and she would "listen to the facts." (ROA.9464-9467.)

11

The State also claims the strike was valid because Long said she would be "automatically prevented" from imposing the death penalty if the defendant was intoxicated when committing the crime.  (State Br. at 17.)  But during voir dire, Long clarified that she "think[s] you're still responsible for your actions if you voluntarily intoxicate yourself" and she "would be able to render [a death sentence] based on the crime that was committed" if the defendant was intoxicated.  (ROA.9497-9499.)

Patterson similarly did not select either of the two "dispositive" answers. The State argues nonetheless that Patterson "did not believe in the death penalty," (State Br. at 38.), but in fact Patterson explained during voir dire that, while he did not "believe he was in favor of the death penalty," he considered it akin to abortion, meaning "each is the law and I accept each of them."  (ROA.9671.)  This was similar to an answer provided by empaneled white juror Folz, who stated he "would not necessarily be one to push for [the death penalty]" but, if it is the law, he "could support it in certain circumstances."  (ROA.3913.)

Vation checked on her questionnaire that she was not in favor of the death penalty, but she later explained that her reservation stemmed solely from her concern with wrongful convictions (a concern echoed by empaneled white jurors). (See ROA.3758-3759.)  Vation explained:  "That's the only thing.  But there is such a thing as death penalty under certain circumstances."  (ROA.3759.)  And

12

while she checked yes on the questionnaire when asked whether voluntary intoxication would automatically prevent her from assessing the death penalty, she clarified that she would "change that answer" because "it just don't make sense to let people just continue to take lives . . . because whoever's life they're taking is somebody's son or daughter. . . . You can't just let them." (ROA.3773.)

Even with respect to the other veniremembers, the State's—and the District Court's—single-minded focus on two questionnaire responses is erroneous because the Supreme Court and Fifth Circuit have made clear that courts must consider "all relevant circumstances," *Batson*, 476 U.S. at 96; *Woodward*, 284 F. App'x. at 175-76, and thus cannot blind themselves to other facts in the record that strongly indicate pretext. As the Supreme Court recently reiterated: "We must examine the whole picture. . . . We cannot just look away. Nor can we focus on [a strike] in isolation." *Flowers* v. *Mississippi*, 139 S. Ct. 2228, 2250 (2019).

Reasons that might seem race neutral in isolation are insufficient where other justifications "simply do not hold up under scrutiny." *Harris* v. *Hardy*, 680 F.3d 942, 953 (7th Cir. 2012). "[E]ach challenged strike and inference of pretext

must be considered as it bears on the others." *Id.*[4]  The District Court thus should have considered other facts in the record strongly indicative of pretext.  *See, e.g., McGahee* v. *Alabama Dep't Of Corr.*, 560 F.3d 1252, 1264-65 (11th Cir. 2009) (holding that it was an unreasonable application of the law under *Batson* to rely upon only two reasons given for a strike while "fail[ing] to review" a third reason); *Foster*, 136 S. Ct. at 1748 (closely examining each of the "laundry list of reasons" relied upon by the state).[5]

When taken together, the following facts demonstrate that reasonable jurists could debate whether the District Court's decision was correct:

---

[4] *See also, e.g., Currie* v. *McDowell*, 825 F.3d 603, 613–14 (9th Cir. 2016) ("If a prosecutor supplies enough reasons for a strike, it may well be likely that one of those reasons is plausible. . . . Courts applying the *Batson* procedure therefore cannot stop investigating after finding one of a prosecutor's multiple [proffered] reasons plausible."); *Kesser* v. *Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) ("A court need not find all nonracial reasons pretextual in order to find racial discrimination."); *United States* v. *Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) ("Although [the two criteria identified in that case] would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

[5] Neither *Hoffman* v. *Cain*, 752 F.3d 430 (5th Cir. 2014) nor *Hebert* v. *Rogers*, 890 F.3d 213 (5th Cir. 2018), is to the contrary.  *Hebert* actually supports Broadnax's position: the Court did not simply rely on questionnaires, but also thoughtfully examined veniremembers' additional explanations during voir dire to determine whether male and female veniremembers were treated differently.  *Hebert*, 890 F.3d at 223.  And contrary to the State's suggestion, the Court in *Hoffman* did not hold that merely pointing to a veniremember's hesitancy to impose the death penalty ends the *Batson* analysis.  *See* State Br. at 15.  Instead, the Court determined, *in the circumstances of that case*, that that explanation was supported by the record.  *Hoffman*, 752 F.3d at 449.  This record does not support the State's asserted reasons.

### (a)   Disparate Treatment

When a prosecutor's "proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Flowers*, 139 S. Ct. at 2248-49 (citing *Foster*, 136 S. Ct. at 1740).  As set forth in detail in Broadnax's opening brief, the State accepted white veniremembers who provided similar or nearly identical answers to those deemed unacceptable for nonwhite veniremembers.  (Opening Br. at 21-35.)

### (b)   Disparate Questioning

Disparate questioning of black and nonblack panelists can also be probative of discriminatory intent, because it undermines the credibility of race-neutral reasons for a strike.  *See Flowers*, 139 S. Ct. at 2246-48; *Miller-El I*, 537 U.S. at 344.  Here, the State engaged in disparate questioning, telling McCraney, as well as Vation, Long, and Jackson—all of whom are black—to look at Broadnax before asking whether they could give him the death penalty.  (ROA.3581, 3761, 9469, 9929.)  Like McCraney, white veniremembers Clements, Folz, and Morris all expressed nervousness, but none was then asked was asked to look at Broadnax before being provided with graphic descriptions of the death penalty.  (ROA.3600, 3893; RR56: 135 (Morris Questionnaire at 17).)

15

Additionally, the prosecutor told Vation—a 70-year-old black woman—that the prosecutor's own mother would find it "very difficult" to "put aside the injustices that were done in her day" if a young black man were to be on trial. (ROA.3760.)  He followed by commanding Vation to look at Broadnax, describing the death penalty graphically, and asking her twice: "Do you really think in your heart of hearts that you can take part in" this process?  Vation responded: "Yes." (ROA.3761.)  The State struck her anyway.

### (c)     Failure to Question

"[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."  *Flowers*, 139 S. Ct. at 2249 (quoting *Miller-El II*, 545 U.S. at 246).

The State failed to question Long about a prior criminal case, yet cited that as a reason for striking her.  (State Br. at 18.)  The State also claims that it struck Patterson because, in part, "he was the foreman on two juries, one that found the defendant not guilty." (ROA.959.)  Yet the State failed to ask a single question about the circumstances of that case during voir dire.

### (d)     Implausible or Inherently Contradictory Reasons

The State struck nonwhite veniremembers for inherently contradictory or implausible reasons.

Respondent cites a laundry list of reasons for its strike of Rivera, but conspicuously omits the fact that the State told the trial court it was striking Rivera in part because she "had four children and no job." (ROA.10364.) At the same time, the State claimed that it struck McCraney because, among other reasons, she "was a single woman with no children." (ROA.10352.) The contradictory nature of these explanations raises more doubt about the State's strikes.

The State also claimed that it struck Rivera because "she so desperately wanted to sound intelligent, but she absolutely could not give a straight answer" and similarly claimed that it struck Vation because her questionnaire "was full of spelling errors and, of course, grammar." (ROA.10364, 10359.) The State never explained why these things were disqualifying for Rivera and Vation, nor did it find multiple spelling errors disqualifying for white veniremembers. (*See* RR56: 139, 141-146, 154 (Ferreira Questionnaire at 2, 4-9, 17); RR57: 27, 31, 34 (Zaidel Questionnaire at 1, 5, 8); RR57: 144, 154-55, 157 (Kreighbaum Questionnaire at 4, 14-15, 17); RR57: 278-79 (Fiddick Questionnaire at 5-6).) The explanation that Rivera and Vation were struck because of perceived proxies for low intelligence is "a particularly suspicious explanation given the role that the claim of 'low intelligence' has played in the history of racial discrimination from juries." *McGahee*, 560 F.3d at 1265.

17

### (e)    Other Relevant Evidence

Also relevant are the State's mischaracterizations of the record, discussed in Broadnax's opening brief at 30-31, as well as its misrepresentations concerning the spreadsheet discussed above. *See Foster*, 136 S. Ct. at 1754 (citing, in addition to comparative juror analysis, "the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file"); *Flowers* 139 S. Ct. at 2250 ("When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent.").

For example, the State claimed that it struck Riser because he stated during voir dire: "I see my son in this room." (ROA.10370-71.) The suggestion was that Riser identified his son with Broadnax, a suggestion Respondent makes again to this Court. (*See* State Br. at 22 (claiming that Riser "indicated that he saw his son in Broadnax").) But the record makes clear that Riser was referring to ***the bailiff and counsel***, not Broadnax. (ROA.4072-74.) The District Court adopted this mischaracterization wholesale, without acknowledging what the record actually said. (ROA.1188.)

*    *    *

18

Finally, the reseating of Patterson did not cure the State's discriminatory strike of him.[6]  And even if it did, it would not cure the improper strikes of ***seven*** other veniremembers.  "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster*, 136 S. Ct. at 1747.

## II.    The Court Should Certify an Appeal of Broadnax's Claim That The Seating of Juror Vessels Violated Due Process

### A.    Juror Vessels Should Have Been Excused for Cause Because He Was Unable to Consider Mitigating Evidence

Juror Vessels repeatedly indicated, both in his questionnaire and during voir dire, that he was incapable of considering mitigating evidence at trial.  He stated that he did not believe certain categories of evidence should be considered in mitigation, and he confirmed those views when he said he could not think of a single type of mitigating evidence.

A juror in a capital case may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings* v. *Oklahoma*, 455 U.S. 104, 114 (1982); *Soria* v. *Johnson*, 207 F.3d 232, 245 (5th Cir. 2000).  For example, if a prospective juror's "voir dire examination . . . indicates that he could not consider a defendant's youth in mitigation of the death penalty, it appears that [his] views

---

[6] Broadnax is not asking this Court to create a new rule requiring courts to strike the entire jury panel every time they find a *Batson* violation. (*See* State Br. at 39 (citing *Teague* v. *Lane* 489 U.S. 288 (1989).)  Broadnax is arguing that the trial court failed, under existing Supreme Court caselaw, to choose the proper remedy *in this case* to cure the *Batson* violation.  *Batson*, 476 U.S. at 99, n.24; *Rushen* v. *Spain*, 464 U.S. 114, 119–20 (1983) ("The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred.").

[are] such that he should [be] excused for cause." *Soria*, 207 F.3d at 245. This is exactly what Vessels did—he stated that there were categories of evidence he would not consider, including evidence of intoxication and genetics, circumstances of birth, upbringing and environment. (RR57:241 (Vessels Questionnaire at 6); RR57:243 (Vessels Questionnaire at 8).) The State argues that Vessels was not required to ultimately conclude that the evidence was mitigating. (State Br. at 40.) But that's not the issue. Vessels was clear that he believed that *this kind* of evidence should not be considered at all. (RR57:241 (Vessels Questionnaire at 6); RR57:243 (Vessels Questionnaire at 8).)

Vessels confirmed these views on voir dire, stating that he could not think of anything that he might consider to be sufficient mitigating evidence to change a death sentence to a life sentence. (ROA.10191.) The State argues that Vessels was under no obligation to think of such examples, but this mischaracterizes Broadnax's argument. (State Br. at 40-41.) Broadnax's claim is not based on Vessels' inability to "think of sufficiently mitigating circumstances on [his] own" but rather on Vessels' repeated demonstration of bias throughout the jury selection process, *including* his inability to identify a single type of evidence he would consider in mitigation. (State Br. at 40.) Viewed in combination with his prior refusals to consider broad categories of evidence, Vessels' inability to identify even one type of mitigating evidence demonstrates—and at least renders

20

debatable—that he could not consider Broadnax's mitigating evidence with an open mind.

### B. Broadnax Exhausted The for Cause Challenge to Vessels

The State argues that Broadnax's arguments are procedurally barred. But Broadnax exhausted this claim by challenging Vessels at trial and by raising the claim on direct appeal and in the District Court.

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court" either through direct appeal or by state collateral review procedures. *Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) (quoting *Mercadel* v. *Cain*, 179 F.3d 271, 275 (5th Cir. 1999)); *Hatten* v. *Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009). Exhaustion simply demands that a court have a "fair opportunity to pass upon the claim." *Mercadel*, 179 F.3d at 275 (quotations omitted). A petitioner exhausts a claim when "all crucial factual allegations were before the state courts at the time they ruled on the merits." *Smith* v. *Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008).

In his federal habeas petition Broadnax argued, as he did on direct appeal, that the seating of Vessels was improper, and Broadnax demanded a new trial. The government argues that Broadnax did not exhaust this claim because he allegedly complained for the first time on federal review that Vessels gave answers on his juror questionnaire refusing to accept certain mitigating evidence. (State Br. at 41-

42.)  But the questionnaire and the voir dire answers were part of the record at trial, and the factual allegation that Vessels was incapable of considering mitigating evidence was properly preserved at trial and exhausted when presented and ruled on by the Texas Court of Criminal Appeals.  (ROA.12581-12583, 1332-1333, 1339-1340.)

### C.    Broadnax Challenged Twelve Other Jurors for Cause

The State also incorrectly argues that Vessels was the only juror challenged for cause by the defense.  (State Br. at 39.)  But the defense challenged *twelve* prospective jurors before Vessels.  Each of those challenges was rejected by the trial court.

All twelve stated, like Vessels, that they were unable or unwilling to consider established types of mitigation evidence that would be presented in this case.[7]  Despite their obvious bias, the trial court refused to excuse these twelve individuals, and Broadnax was forced to exercise peremptory strikes against each of them.  After Broadnax's strikes were exhausted, Vessels, an undeniably biased juror, was forced upon Broadnax—in violation of Due Process.  *See Ross* v. *Oklahoma*, 487 U.S. 81, 89 (1988); *see also United States* v. *Martinez-Salazar*, 528 U.S. 304, 316 (2000).

---

[7] *See* ROA.640–644 (identifying relevant portions of the challenged jurors' voir dire and juror questionnaires).

### III.    The Court Should Certify an Appeal of Broadnax's Claim That He Was Selectively Prosecuted Based on Race

The State fails to rebut Broadnax's showing that reasonable jurists could debate whether Broadnax was selectively prosecuted on the basis of race.[8]

The State appears to concede that statistical evidence can establish a *prima facie* case for selective prosecution—including to show that the decisionmaker in Broadnax's case acted with discriminatory purpose[9]—but disputes the "stark[ness]" of the statistical evidence presented by Broadnax. (State Br. at 46-47.) The State suggests that, because the statistical disparity in Professor Sorensen's study was not as extreme as the disparity in *McCleskey* v. *Kemp*, 481 U.S. 279 (1987), Broadnax's claim must fail because McCleskey's claim failed. (*See* State Br. at 47 n.13.)

But in *McCleskey*, the district court found, after conducting an evidentiary hearing, that the study at issue contained statistical flaws that rendered its results unreliable. 481 U.S. at 286. No such finding was made here. In fact, the District

---

[8] The District Court reviewed Broadnax's selective prosecution claim *de novo*. (ROA.1129.) To the extent this Court considers the State's argument that the claim was not exhausted, it should reject that argument. The State misleadingly argues that the authority cited by Broadnax, *Sorto* v. *Davis*, 859 F.3d 356, 363 (5th Cir. 2017), was withdrawn. (State Br. at 45 n.12.) But the proposition for which Broadnax cited *Sorto*—that previously unavailable evidence provides an exception to the procedural exhaustion requirement—remains good law. *See, e.g.*, *Howard* v. *Director*, 2019 WL 4573640, at *41 (E.D. Tex. Sept. 20, 2019); *Ayestas* v. *Davis*, 138 S. Ct. 1080, 1095 (2018).

[9] Strong policy justifications support this settled law: "[S]ince discrimination is often subtle and pervasive, plaintiffs must be able to rely on circumstantial evidence to prove discriminatory intent." *Cummings* v. *Standard Register Co.*, 265 F.3d 56, 63 (1st Cir. 2001).

Court declined to conduct an evidentiary hearing on Broadnax's statistical evidence, and instead "assum[ed] the factual accuracy of all the specific facts alleged by Broadnax[.]" (ROA.1212.)

Additionally, the Eleventh Circuit declined to accept the *McCleskey* study because it was too broad in scope, covering over 2,000 murder cases in Georgia during the 1970s. *McCleskey*, 481 U.S. at 289, 292. Here, Sorensen's study was narrowly tailored to Broadnax's case, focusing not on "every actor in the [Texas] capital sentencing process," but on the decisions of a single district attorney in a single Texas county over the course of his tenure, covering 610 arrested homicide offenders in total. (ROA.499.)

Reasonable jurists could debate whether Sorensen's study presents sufficient evidence of racial disparity in the application of the death penalty.[10]   The study supports the presumption that the particular decisionmaker in Broadnax's case acted with discriminatory intent. *See United States* v. *Bass*, 536 U.S. 862, 864 (2002) (showing that similarly situated individuals were not prosecuted may be satisfied by statistical evidence "regarding the record of the decisionmakers in [the claimant's] case").

---

[10] The State argues that "sharing a charge alone does not make defendants similarly situated for purposes of a selective prosecution claim." (State Br. at 47 (citing *In re U.S.*, 397 F.3d 274, 285 (5th Cir. 2005).) But Broadnax's comparator was alleged to have committed an identical crime in similar circumstances:  the murder of two men with a handgun in the course of a robbery.  The only significant difference between the two defendants is their race.  (Opening Br. at 49.)

The government's discretion in deciding whom to prosecute and sentence to death must be bounded by "constitutional constraints." *Wayte* v. *United States*, 470 U.S. 598, 607-08 (1985). The District Court distinguished Broadnax's case at a level of granularity that would render the "similarly situated" standard meaningless—defining the circumstances of his case at a level of detail that would render every case "sui generis" and not entitled to protection or review.

Reasonable jurists can, and do, disagree with the District Court's narrow interpretation of the "similarly situated" requirement. (*See* Opening Br. at 51.) (collecting cases). Neither the Fifth Circuit nor the Supreme Court has opined on what it means for two defendants to be similarly situated in the selective prosecution context. And at least one district court has found that the lack of binding authority on this issue is sufficient to satisfy the standard for granting a COA. *See Ingram* v. *United States*, 296 F. Supp. 3d 1076, 1090 (N.D. Iowa 2017), *aff'd on other grounds*, 932 F.3d 1084 (8th Cir. 2019). The Court should do the same here.

## IV. The Court Should Certify an Appeal of Broadnax's Sixth Amendment Challenge to The Admission of Uncounseled Media Interviews

The District Court failed to address Broadnax's Sixth Amendment challenge to the uncounseled media interviews, an omission the State does not address. (ROA.598-607.) While the District Court rejected Broadnax's separate Sixth Amendment claim that his interrogation by reporters was involuntary, it did not

address whether the interviews constituted a "critical stage" of the pretrial proceedings at which counsel is guaranteed. (ROA.1172-75.) *Brewer* v. *Williams*, 430 U.S. 387, 404 (1977). A COA is warranted on this basis alone. *See Clisby* v. *Jones*, 960 F.2d 925, 936 (11th Cir. 1992) (holding that "district courts [must] resolve all claims for relief raised in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988), regardless whether habeas relief is granted or denied."); *Wolfe* v. *Johnson*, 565 F.3d 140, 165 (4th Cir. 2009) (granting a COA before ruling that "[t]he district court's failure to adjudicate [a raised] issue constitutes an error of law, and thus an abuse of its discretion").

On the substance of the claim, the State argues that media interviews, in general, do not constitute a "critical stage" of the proceedings. (State Br. at 50-53.) But the interviews' use and impact are relevant to whether the interviews are a critical stage. In *Estelle* v. *Smith*, 451 U.S. 454, 470 (1981), the Supreme Court held that an uncounseled, in-jail examination by a psychiatrist to determine whether the defendant was mentally fit to stand trial qualified as a "critical stage." The Court, in finding that a Sixth Amendment violation occurred when the State "introduc[ed]" the psychiatrist's testimony, explained that the medical examination "*proved* to be a 'critical stage' of the *aggregate* proceedings against respondent." *Id.* at 470, 473 (emphases added). Other Circuits have interpreted the verb "proved" and the use of the qualifier "aggregate" in *Estelle* to hold that "the

26

Supreme Court has sanctioned a retrospective evaluation" of whether something qualifies as a "critical stage." *Cahill* v. *Rushen*, 678 F.2d 791, 794 (9th Cir. 1982); *see also Van* v. *Jones*, 475 F.3d 292, 303-04 (6th Cir. 2007); *United States* v. *A.R.*, 38 F.3d 699, 704 (3d Cir. 1994).

The State pursued a trial strategy that focused on the jailhouse interviews from beginning to end, previewing the interviews in its opening statement, playing them *every day* of the guilt phase, and using them to argue for a death sentence. (ROA.10807, 10950-51; ROA.11357, 5843-44, 5849.) This made the interviews a "critical stage" of Broadnax's case.

Contrary to the State's assertion, Broadnax does not seek a new rule. Broadnax seeks only the application of an existing rule, created in *Rothgery*, that counsel must be appointed in time to "allow for adequate representation at any critical stage before trial, as well as at trial itself," to the facts of his case. *Rothgery* v. *Gillespie Cty.*, 554 U.S. 191, 212 (2008).

## V.    The Court Should Certify an Appeal of Broadnax's Claim That His Appellate Counsel Was Constitutionally Ineffective

The State makes two unavailing arguments why the Court should not grant a COA to review Broadnax's claim that his appellate counsel was ineffective.

*First*, the State argues that this claim is procedurally defaulted. (State Br. at 54.) But the District Court reviewed the claim *de novo*; it is that determination that should be reviewed here. (ROA.1206.) The State also argues that Broadnax did

27

not cite to the Texas Rules of Evidence during federal habeas proceedings. (State Br. at 55.) That is simply wrong: Broadnax's First Amended Petition stated that "[r]easonably competent counsel would have [argued] that the trial court erred in admitting Dr. Price's expert testimony per Rules 401, 403, and 702 of the Texas Rules of Evidence." (ROA.672.)

*Second*, the State argues that at trial, Dr. Price was introduced to "fill in details" following defense witness Frank Lane's testimony, and thus the testimony was admissible as rebuttal evidence. (State Br. at 56-57.) But Dr. Price's testimony should have been excluded under Texas law because it was unduly prejudicial and had no relevance; it was not based on an examination of Broadnax or even a review of his medical and social history. *See Reese* v. *State*, 33 S.W.3d 238 (Tex. Crim. App. 2000) (interpreting Rules 401 and 403 of the Texas Rules of Evidence). The failure to raise this issue on direct appeal was constitutionally ineffective. *See, e.g.*, *United States* v. *Bass*, 310 F.3d 321, 329-30 (5th Cir. 2002). Nor was its admission "harmless," as it led the State to label Broadnax a "psychopath" incapable of change, undermined his powerful mitigation evidence of childhood abuse, and deprived him of a fair punishment proceeding. (ROA.5850-52.)

## CONCLUSION

For the foregoing reasons, and those stated in his opening brief, Broadnax respectfully requests that a COA be issued.

Respectfully submitted,

/s/ Steven C. Herzog
Steven C. Herzog
Kimberly A. Francis
Jordana L. Haviv
Ameya S. Ananth
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
*(212) 373-3000*


Camille M. Knight
BURLESON, PATE & GIBSON, LLP
*900 Jackson Street, Suite 330*
*Dallas, TX 75202*
*(214) 871-4900*


*Attorneys for Petitioner-Appellant*
*James Garfield Broadnax*

## CERTIFICATE OF SERVICE

I, Camille M. Knight, a member of the Bar of this Court and counsel for petitioner James Broadnax, certify that, on February 11, 2020, a copy of the attached Reply to Respondent's Opposition to Certificate of Appealability was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Camille M. Knight
CAMILLE M. KNIGHT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I, Camille M. Knight, a member of the Bar of this Court and counsel for petitioner James Broadnax, certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.3, that the attached Reply to Respondent's Opposition to Certificate of Appealability is proportionately spaced, has a typeface of 14 points or more, and contains 6404 words, not including those sections that are excluded under those rules.

/s/ Camille M. Knight
CAMILLE M. KNIGHT

FEBRUARY 11, 2020